**PROSKAUER ROSE LLP**
Paul Salvatore (PS-1880)
Mark A. Saloman (MS-5764)
1585 Broadway
New York, New York 10036
(212) 969-3000
Attorneys for Defendant
*Allan Pharmaceutical LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
LOUIS DRETCHEN,                          :    07 Civ. 10306 (CLB) (LMS)
:
                    Plaintiff,           :
:
          v.                             :    **NOTICE OF MOTION**
:    **TO TRANSFER VENUE**
:
ALLAN PHARMACEUTICAL LLC,                :
:
                    Defendant.           :    **ECF CASE**
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - x


     **PLEASE TAKE NOTICE**, that, on **January 4, 2007** at **10:00 a.m.,** or as soon thereafter

as counsel may be heard, the undersigned attorneys for defendant Allan Pharmaceutical LLC,

will move before The Honorable Charles L. Brieant, U.S.D.J., at the U.S. District Courthouse for

the Southern District of New York located at 300 Quarrapas Street, White Plains, New York,

10061, upon the accompanying Declaration of Joseph Donovan with annexed exhibits,

Memorandum of Law, and Appendix of Unpublished Cases, for an Order, pursuant to 28 U.S.C.

§ 1404(a), to transfer this action to the Southern District of Mississippi, Eastern Division, and for

such other and further relief as this Court deems just and proper.

Dated: New York, New York
       November 20, 2007

                                        PROSKAUER ROSE LLP

                                        By:   ___s/*Mark M. Saloman*_____
                                              Paul Salvatore (PS-1880)
                                              Mark A. Saloman (MS-5764)
                                              1585 Broadway
                                              New York, New York 10036
                                              (212) 969-3000
                                              Attorneys for Defendant
                                              *Allan Pharmaceutical LLC*


To:    Donald L. Sapir, Esq.
       Daniel T. Driesen, Esq.
       Sapir & Frumkin LLP
       399 Knollwood Road, Suite 310
       White Plains, New York 10603
       (914) 328-0366
       Attorneys for Plaintiff

7209/12636-001  Current/10351594v1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

LOUIS DRETCHEN,               :    07 Civ. 10306 (CLB) (LMS)
                              :
             Plaintiff,       :
                              :    **ECF CASE**
          v.                 :
                              :
ALLAN PHARMACEUTICAL LLC,   :
                              :
            Defendant.      :
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ALLAN PHARMACEUTICAL LLC'S MOTION TO TRANSFER VENUE

---

                                     PROSKAUER ROSE LLP
                                     1585 Broadway
                                     New York, New York 10036
                                     212.969.3000
                                     Attorneys for Defendant
                                     Allan Pharmaceutical LLC

**On The Brief**

Paul Salvatore (PS-1880)
Mark A. Saloman (MS-5764)
Harris Freier (HF-0921)

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................1

PROCEDURAL HISTORY AND STATEMENT OF FACTS ...................................2

I.      Mississippi Is The Proper Venue For This Case ............................................2

II.     Dretchen Entered Into His Employment Contract With Allan Pharma In Mississippi
        And It Is Governed By The Laws Of Mississippi ............................................5

III.    Dretchen Maintained Daily Contact With Allan Pharma In Mississippi ...........................6

IV.     The Operative Facts Of This Litigation Occurred In Mississippi, Not New York ............7

        A.      Dretchen had been arrested for insurance fraud and was a convicted felon ...........8

        B.      Dretchen had no pharmacy license ........................................8

        C.      Dretchen had been debarred from contracting with the U.S. government.............8

        D.      Dretchen's Agreement was terminated for cause in Mississippi...........................9

V.      The Material Witnesses And Evidence Concerning Dretchen's Claims And Allan
        Pharma's Defenses Are Available In Mississippi, Not New York ...............10

ARGUMENT............................................................................................11

FOR THE CONVENIENCE OF THE PARTIES AND WITNESSES AND IN THE
INTERESTS OF JUSTICE, TRANSFER OF THIS MATTER TO THE SOUTHERN
DISTRICT OF MISSISSIPPI IS WARRANTED ...................................................11

        A.      Venue Is Proper In The Southern District of Mississippi ...................11

        B.      The Balancing Of Factors Weigh In Favor Of Transfer .....................12

                1.      Nearly all of the witnesses live, work, or are otherwise
                        available in Mississippi, not New York .........................12

                2.      The operative facts of this case occurred in Mississippi,
                        not New York ..............................................15

                3.      Plaintiff's claims are governed by the laws of Mississippi,
                        not New York ..............................................16

                4.      All relevant documents are in Mississippi, not New York............17

5.  Because Plaintiff's claims arose in Mississippi, are governed by Mississippi law, and have no meaningful connection to New York, his original filing in the Supreme Court of New York merits little consideration ............................................................ 17

6.  Trial efficiency and the interests of justice will be furthered if the case proceeds in Mississippi ............................................................ 18

CONCLUSION ............................................................................................................ 19

# TABLE OF AUTHORITIES

CASES

*Aarons v. Worldtel Servs., Inc.*,
  No. 95 Civ. 8415 (AGS), 1996 WL 185714 (S.D.N.Y. April 17, 1996)................................16

*Chong v. Healthronics, Inc.*,
  No. CV-06-1287 (SJF)(MLO), 2007 WL 1836831 (E.D.N.Y. June 20, 2007).... 11, 14, 16, 18

*Colida v. Panasonic Corp. of N.A.*,
  No. 05 Civ. 5791 (JSR)(JC), 2005 WL 3046298 (S.D.N.Y. Nov. 10, 2005).............12, 17-18

*Credit Suisse Sec. (USA) LLC v. Hilliard*,
  469 F. Supp. 2d 103 (S.D.N.Y. 2007)................................................................................14

*Deshoulieres, S.A. v. Cuthbertson Imports, Inc.*,
  No. 06 Civ. 5163 (HB), 2006 WL 2849818 (S.D.N.Y. Oct. 3, 2006) ............................15, 17

*Elec. Workers Pension Fund, Local 103, v. Nuvelo, Inc.*,
  No. 07 Civ. 975 (HB), 2007 WL 2068107 (S.D.N.Y. July 19, 2007)....................................12

*Essex Crane Rental Corp. v. Vic Kirsch Constr. Co.*,
  486 F. Supp. 529 (S.D.N.Y. 1980)....................................................................................19

*Ferens v. John Deere Co.*,
  494 U.S. 516 (1990) ....................................................................................................16, 19

*Freeman v. Hoffman-La Roche Inc.*,
  No. 06 CIV 13497(RMB)(RLE), 2007 WL 895282 (S.D.N.Y. Mar. 31, 2007) ...................18

*Fuji Photo Film Co. v. Lexar Media, Inc.*,
  415 F. Supp. 2d 370 (S.D.N.Y. 2006) ...........................................................................12, 15

*Gibbs & Hill, Inc. v. Harbert Int'l, Inc.*,
  745 F. Supp. 993 (S.D.N.Y. 1990)..................................................................................16-17

*I Create Int'l, Inc. v. Mattel, Inc.*,
  No. 03 Civ. 3993(JFK), 2004 WL 1774250 (S.D.N.Y. Aug. 9, 2004) .......................11-12, 17

*Int'l Sec. Exch. v. Chi. Bd. Options Exch. Inc.*,
  No. 06 Civ. 13445(RMB)(THK), 2007 WL 1541087 (S.D.N.Y. May 24, 2007) ...... 12, 14, 17

*Reinhard v. Dow Chemical Co.*,
  No. 07 Civ. 3641(RPP), 2007 WL 2324351 (S.D.N.Y. Aug. 13, 2007)....................12, 15, 17

*Rolls-Royce Motors, Inc. v. Charles Schmitt & Co.*,
  657 F. Supp. 1040 (S.D.N.Y. 1987)...................................................................................16

*Unique Indus., Inc., v. Lisa Frank, Inc.,*
No. 93 CIV. 8037 (LAP), 1994 WL 525041 (S.D.N.Y. Sept. 23, 1994) ..............................18


**STATUTES**

28 U.S.C. § 1391(a)(2) ...........................................................................................11

28 U.S.C. § 1391(a)(3) ...........................................................................................12

28 U.S.C. § 1404(a) ...............................................................................................11

## PRELIMINARY STATEMENT

Based upon the totality of the circumstances, defendant Allan Pharmaceutical LLC ("Allan Pharma") respectfully submits that the convenience of the parties and witnesses and the interests of justice dictate that this matter be transferred to the U.S. District Court for the Southern District of Mississippi, Eastern Division.

Allan Pharma is the R & D and sales arm of the companies of Allan Holdings LLC, a Mississippi corporation. Nearly every nonscientific aspect of Allan Pharma's operation—including its business, finance, and corporate functions; sales and administrative support; accounting and payroll; human resources and benefits; product logistics and quality assurance—is based in De Kalb, Mississippi. Indeed, Allan Pharma does not maintain an office or facility in New York, is not incorporated, headquartered, nor licensed to do business in New York, and has never had any employees in New York, other than the brief period of time it employed plaintiff Louis Dretchen ("Plaintiff" or "Dretchen").

Dretchen was a pharmaceutical salesperson for Allan Pharma under an employment agreement prepared and entered into in Mississippi and governed by Mississippi law. During the term of his contract, he worked closely with Allan Pharma's Mississippi-based senior management, maintained daily contact with sales, support, and administrative personnel in Mississippi, traveled to Mississippi on a regular basis to meet with senior management, frequently worked in Mississippi, and traveled extensively for Allan Pharma and throughout the country. Though Dretchen worked from his home in Valley Cottage, New York, he spent the majority of his time traveling outside of New York for Allan Pharma.

On or about March 23, 2007, Plaintiff's contract was terminated for cause in Mississippi after a routine background screening report unexpectedly revealed that Dretchen was a convicted felon, lacked a valid pharmacist's license, and was excluded from contracting with the federal

government.  Plaintiff now claims that he is owed certain sales commissions and other

compensation from Allan Pharma and that it improperly terminated his contract.  Other than

Plaintiff's residence, however, this case has absolutely no connection to New York.

Indeed, this is a textbook case for a change of venue.  Mississippi is an appropriate

alternative forum because it is the site of the operative facts alleged in Plaintiff's Complaint and

Allan Pharma is subject to jurisdiction there.  Moreover, the private and public interest factors

strongly demonstrate that litigation in New York is significantly inconvenient and litigation in

Mississippi is dramatically preferable.  By way of example:

- o The vast majority of witnesses live, work, or are otherwise available in Mississippi;

- o The operative facts central to Plaintiff's claims arose in Mississippi;

- o All relevant documents and hard drives are in Mississippi; and

- o Plaintiff's claims are governed by Mississippi law.

For these and other reasons more fully explained below, transfer of this litigation to the

Southern District of Mississippi is appropriate.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

### I.    Mississippi Is The Proper Venue For This Case

Allan Pharma is a wholly owned subsidiary of Allan Holdings LLC, a Mississippi

corporation comprised of three entities:  ProDerma LLC; Pharma Pac, LLC; and Allan Pharma.

Established in March 2002, ProDerma is a Mississippi-based cosmetic and dietary supplement

manufacturing and packaging company incorporated in Mississippi and headquartered in De

Kalb, Mississippi, a town of roughly 900 people.  ProDerma employs over 30 people and

maintains 22,000 square feet of manufacturing and packaging space in De Kalb.  ProDerma has

no officers, executives, or employees in New York and has never had any in New York. (Donovan Decl., ¶¶3-4).[1]

Pharma Pac is a Mississippi-based pharmaceutical manufacturing company formed in January 2003. It, too, is incorporated in Mississippi and based in De Kalb, where it employs 100 people and operates a 25,000-square-foot manufacturing, packaging, and laboratory facility. Pharma Pac, like ProDerma, has no officers, executives, or employees in New York and has never had any in New York. (Donovan Decl., ¶¶5-6).

Allan Pharma's operations are also centered in Mississippi, as well as Pennsylvania. It was established in June 2005 and is a specialty pharmaceutical company which researches, formulates, and develops a wide range of products for the national market within demanding regulatory requirements. In essence, it is the scientific research, development, and sales arm of ProDerma and Pharma Pac. Allan Pharma employs a team of 18 scientists in Warminster, Pennsylvania near the home of its President, although nearly every facet of its nonscientific operation is handled by personnel in De Kalb, Mississippi. By way of example:

- Allan Pharma's upper management team, including its Chief Executive Officer, Chief Financial Officer, and Vice Presidents of Pharmaceutical Development, Cosmetic Development, and Quality Assurance, are based in Mississippi. No Allan Pharma executive lives or works in New York.

- All of Allan Pharma's key executive, strategic, and financial corporate decisions relevant to Dretchen's Complaint—including those concerning the formation of his employment contract, the creation of his compensation and commission structure, his

---

[1] Allan Pharma relies upon the Declaration of its Chief Financial Officer, Joseph Donovan ("Donovan Decl."), submitted herewith and incorporated herein by reference.

sales commission review, analysis, and payment, and the termination of his employment contract—were made in Mississippi.

- Allan Pharma's contract management services, including all account records, pricing information, and sales contracts, data, and information, are maintained in Mississippi and its account representatives, customer-service personnel, and contract support administrators work in Mississippi. All decisions which affect sales territory, pricing, sales goals and strategy, marketing, advertising, and sales projections—including those central to Dretchen's Complaint—are made in Mississippi.

- All aspects of Allan Pharma's technical services, including material sourcing, initial validation testing, laboratory and stability testing, quality assurance, and outcome analysis, are based in Mississippi and all of the personnel who handle those functions work in Mississippi.

- Allan Pharma's logistics services, including purchasing, manufacturing, packing, shipping, and distribution, are based in Mississippi and all of the personnel who handle those functions work in Mississippi.

- Allan Pharma's finance operations, including payroll, accounting, and accounts payable and receivable, are based in Mississippi, as are its human resources and employee-benefits functions and personnel.

(Donovan Decl., ¶¶7-9). Allan Pharma also shares its corporate offices with Pharma Pac and ProDerma in De Kalb. Indeed, every Allan Pharma business function not entirely handled in

Mississippi is conducted jointly with personnel in Warminster, Pennsylvania. (Donovan Decl., ¶10).

ProDerma, Pharma Pac, and Allan Pharma are not incorporated, headquartered, nor licensed to do business in New York. Like ProDerma and Pharma Pac, Allan Pharma has no officers, executives, or employees in New York and has never had any employees in New York other than the brief period of time it employed Dretchen. (Donovan Decl., ¶¶11-12).

## II.    Dretchen Entered Into His Employment Contract With Allan Pharma In Mississippi And It Is Governed By The Laws Of Mississippi

In the Spring of 2005, Dretchen was interviewed by Chief Financial Officer Joseph Donovan for a pharmaceutical sales and marketing position with Allan Pharma. Dretchen came recommended by Allan Pharma's Chief Executive Officer, Neil Sirkin, who had known Dretchen for many years. During his interview, Dretchen told Mr. Donovan that he was a licensed pharmacist, that he had owned and operated three pharmacies, and that he had sold those businesses because of the time commitment and moved into the pharmaceutical sales field. Mr. Donovan made clear to him that the position required daily communication and contact with numerous executives and employees in Mississippi. (Donovan Decl., ¶¶13-14).

After some negotiation by telephone with Dretchen's lawyer, Mr. Donovan prepared a written employment agreement ("Agreement") for Dretchen concerning the position. (Donovan Decl., ¶15 and Exhibit 1). The Agreement was prepared in Mississippi and none of the contract negotiations occurred in New York. (Donovan Decl., ¶15).

On or about June 1, 2005, Dretchen executed the Agreement and became employed by Allan Pharma as EVP of Sales and Marketing. At that time, Dretchen acknowledged that the Agreement was made and entered into in Mississippi. (Donovan Decl., ¶16; Agreement, §17). He also acknowledged that the Agreement was to be governed by and construed in accordance

with the laws of the State of Mississippi.  (Donovan Decl., ¶16; Agreement, §17).  Dretchen

agreed that he would devote his best efforts to the business and that he could, and would,

perform his duties and responsibilities in accordance with all applicable laws and regulations.

(Donovan Decl., ¶17; Agreement, §2(b)).  Dretchen further agreed that the Agreement would

automatically terminate if he, among other things, "has been convicted of a felony, or any other

crime involving fraud, dishonesty or moral turpitude." (Donovan Decl., ¶17; Agreement, §4(e)).

### III.    Dretchen Maintained Daily Contact With Allan Pharma In Mississippi

During his employment, Dretchen was responsible for implementing the national sales

goals and objectives set for Allan Pharma by its senior executives in Mississippi.  Though Allan

Pharma accommodated his request to work from his home in New York, Dretchen traveled

extensively for his job and spent approximately 15 of every 20 business days per month traveling

outside of New York.  (Donovan Decl., ¶¶18-19).

Dretchen also knew from the outset that, wherever he might be located on a given day,

constant contact and communication with Allan Pharma in Mississippi was required.  Indeed,

Dretchen remained in daily contact with Allan Pharma's comptroller and sales support and

administrative personnel in Mississippi who provided him with product pricing information and

handled all aspects of contract management, customer service, and sales administration on the

Allan Pharma accounts which he sold and serviced.   (Donovan Decl., ¶20).

In addition to this daily contact with Allan Pharma in Mississippi, Dretchen

communicated with Chief Executive Officer Sirkin in Mississippi several times per week.  Mr.

Donovan also communicated with Dretchen from Mississippi on at least a weekly basis to review

his progress and strategies toward meeting the sales goals set for him in Mississippi.  Dretchen,

moreover, regularly traveled to Mississippi to meet with Allan Pharma senior management for

monthly status meetings and often spent days at a time on business in De Kalb.  Though these

meetings occasionally took place in Pennsylvania, they never occurred in New York.  (Donovan Decl., ¶¶21-22).

All aspects of Dretchen's payroll, commission review and reconciliation, expense reimbursement, employment benefits, and other human resources functions were handled out of Mississippi and all business technology used by Dretchen, including a laptop computer, computer software, fax machine, internet service, and cellular telephone service, was either supplied or paid for by Allan Pharma.  The Allan Pharma computers which contain information relevant to this case, including the laptop computer used by Dretchen, are located in Mississippi. (Donovan Decl., ¶¶23-24).

## IV.   The Operative Facts Of This Litigation Occurred In Mississippi, Not New York

Dretchen essentially alleges that Allan Pharma breached the Agreement when it failed to pay him certain sales commissions and that Allan Pharma improperly terminated the Agreement in March 2007.  The events as alleged by Dretchen— though largely untrue—confirm that his claims *and* Allan Pharma's defenses are deeply connected to Mississippi, not New York. Specifically, in the Fall of 2006, Allan Pharma's Mississippi-based Human Resources Manager, Mandi McDade, duly notified Dretchen (and several other Allan Pharma, ProDerma, and Pharma Pac employees) that he needed to execute standard acknowledgement forms and deliver them to her in Mississippi so she could obtain routine background information.  After successfully avoiding Ms. McDade for nearly one month, Dretchen finally delivered his signed acknowledgement forms to her during one of his visits to Mississippi.  Ms. McDade then processed Dretchen's forms and obtained a background report from Employment Screening Services of Birmingham, Alabama.  (Donovan Decl., ¶¶25-28).

**A.**    **Dretchen had been arrested for insurance fraud and was a convicted felon**

To Allan Pharma's complete surprise, it learned from the screening report that Dretchen had been found guilty of Grand Larceny in the third degree, a class D felony, and that he had been sentenced to five years probation and ordered to complete 192 hours of community service and make restitution in the amount of $11,300. (Donovan Decl., ¶29 and Exhibit 2). Dretchen had been arrested and originally charged under New York Penal Law §176.20 with one count of Insurance Fraud in the third degree (a class D felony) and two counts of Grand Larceny in the fourth degree under NY PL § 155.30 (a class E felony). To have been found guilty of Grand Larceny in the third degree, Dretchen must have been convicted of stealing property which exceeded $3,000 in value. (Donovan Decl., ¶30).

Allan Pharma was stunned to discover Dretchen's felony conviction because he had led it to believe that he had not been convicted of a felony or any other crime involving fraud or dishonesty. Indeed, Dretchen knew that the absence of a felony conviction was a prerequisite to his employment with Allan Pharma. (Donovan Decl., ¶31).

**B.**    **Dretchen had no pharmacy license**

The background report also revealed that—despite his claim to be a licensed pharmacist—Dretchen's pharmacy license had been "surrendered" and he was not a pharmacist in good standing. (Donovan Decl., ¶32 and Exh. 2, page 2).

**C.**    **Dretchen had been debarred from contracting with the U.S. government**

The report also reveals that Dretchen had been sanctioned under Sections 1128 and 1156 of the Social Security Act, (Donovan Decl., ¶33 and Exh. 2, pages 4-5), and placed on the federal government's "Excluded Parties Listing System" ("EPLS"). (Donovan Decl., ¶33). The EPLS identifies those parties excluded from contracting and subcontracting with the U.S. Government and elsewhere because they are suspended, proposed for debarment, debarred, declared

ineligible, or excluded or disqualified by agencies, government corporations, or by the

Government Accountability Office.  According to the EPLS, Dretchen had been "indefinitely"

debarred for cause from government contracting and subcontracting in 1993.  (Donovan Decl.,

¶34 and Exhibit 3).  That he was debarred under Cause and Treatment Code "R" meant that

Dretchen was ineligible to contract with the U.S. Government due to:

> one or more of the following causes: (a) conviction or a civil judgment for fraud,
> violation of antitrust laws, embezzlement, theft, forgery, bribery, false statements,
> false claims, or other offense indicating a lack of business integrity or honesty; (b)
> violation of the terms of a public agreement or transaction so serious as to affect
> the integrity of an agency program; or (c) other causes specified in the agency
> implementing regulations, or such other cause of a serious or compelling nature
> affecting responsibility.

(Donovan Decl., ¶34 and Exhibit 4, pages 2-3).  Dretchen was also listed as "indefinitely"

debarred for cause from federal contracting under Cause and Treatment Code "Z," which meant

that he was:

> Excluded by the Department of Health and Human Services from participation in
> Title XVIII (Medicare), Title XIX (Medicaid), Title V (Maternal and Child
> Health Programs) and Title XX (Block Grants to States for Social Services
> Programs) of the Social Security Act under the authority of Title XI of that Act,
> and all other Federal nonprocurement programs.

(Donovan Decl., ¶35 and Exh. 4, pages 4-5).

### D.    Dretchen's Agreement was terminated for cause in Mississippi

On or about March 23, 2007, Allan Pharma's Chief Executive Officer, President, Human

Resources Manager, and Mr. Donovan met with Dretchen at the Hilton Hotel in Jackson,

Mississippi, and revealed the findings of the screening report.  (Donovan Decl., ¶36).  *Accord*

Complaint, ¶¶23-24.  Despite repeated requests and ample opportunity to do so, Dretchen

refused to explain or contradict Allan Pharma's discovery that, contrary to his representations, he

was: (i) a convicted felon; (ii) not a licensed pharmacist; and (iii) an "Excluded Party" named on

the federal EPLS.  Allan Pharma then terminated Dretchen's employment with Allan Pharma with cause, effective immediately.  (Donovan Decl., ¶¶37-38).

## V.    The Material Witnesses And Evidence Concerning Dretchen's Claims And Allan Pharma's Defenses Are Available In Mississippi, Not New York

In addition to the fact that every material aspect of Dretchen's claims and Allan Pharma's defenses are rooted in Mississippi, not New York, every witness with relevant knowledge of the facts of this case is available in Mississippi.  Allan Pharma's Mississippi-based senior management team (its Chief Executive Officer Sirkin; President; VP of Pharmaceutical Development; VP of Cosmetic Development; VP of Quality Assurance; and Chief Financial Officer) has relevant knowledge concerning, among other things, Dretchen's Agreement; his pharmaceutical sales practices; the lack of any due or owing sales commissions; his felony arrest, conviction, inclusion on the EPLS, and debarment for cause from participation in federal contracting; his calculated concealment of those facts from Allan Pharma; and the ultimate decision to terminate the Agreement.  None of these witnesses live or work in New York and all are available in Mississippi.  (Donovan Decl., ¶40).

Other Mississippi-based witnesses (Allan Pharma's Human Resources Manager; Comptroller; and customer service and account representatives) have additional personal knowledge concerning the allegedly owing sales commissions and Allan Pharma's litany of legitimate, good faith defenses to that allegation.  These witnesses live and/or work in Mississippi and are not available in New York.  (Donovan Decl., ¶41).

Even Dretchen regularly traveled to Mississippi when he worked with Allan Pharma and he *continues* to travel extensively in his new business venture.  Indeed, he has recently been spotted by Allan Pharma employees at various industry events and trade shows throughout the country. (Donovan Decl., ¶42).  Likewise, all relevant documents concerning the Agreement and

Dretchen's personnel file, sales data, sales contracts, e-mail traffic and hard drives, and all other supporting material relevant to this case, comprising at least two banker's boxes, are located in Mississippi, not New York. (Donovan Decl., ¶43).

Plaintiff's Complaint was filed in the Supreme Court of New York on October 10, 2007 and timely removed to the Southern District of New York on November 14, 2007.

## ARGUMENT

### FOR THE CONVENIENCE OF THE PARTIES AND WITNESSES AND IN THE INTERESTS OF JUSTICE, TRANSFER OF THIS MATTER TO THE SOUTHERN DISTRICT OF MISSISSIPPI IS WARRANTED

Motions for change of venue are governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "Notions of convenience and fairness must be determined on a case-by-case basis and district courts have broad discretion to transfer actions pursuant to section 1404(a)." *Chong v. Healthronics, Inc.*, No. CV-06-1287 (SJF)(MLO), 2007 WL 1836831, at *11 (E.D.N.Y. June 20, 2007). The proper forum for this case, and the significantly more convenient forum for the litigation to proceed, is the Southern District of Mississippi, not New York.

### A.    Venue Is Proper In The Southern District of Mississippi

Transfer is appropriate here because all of Dretchen's claims "could have brought in the transferee forum." *See I Create Int'l, Inc. v. Mattel, Inc.*, No. 03 Civ. 3993(JFK), 2004 WL 1774250, at *2 (S.D.N.Y. Aug. 9, 2004) (citations omitted). Under 28 U.S.C. § 1391(a)(2), the Southern District of Mississippi is the judicial district where "a substantial part of the events or omissions giving rise to the claim occurred" because Dretchen's claims for breach of contract and retaliatory termination arise directly from decisions and actions made by Allan Pharma's

11

Mississippi-based senior management team in Mississippi.  (Donovan Decl., ¶¶2-12.  Likewise, Allan Pharma's substantial business operations in Mississippi subject it to personal jurisdiction in the state.  *See* 28 U.S.C. § 1391(a)(3); Donovan Decl., ¶¶2-12.  Mississippi, therefore, is a proper venue for this case to proceed.  *See, e.g., I Create,* 2004 WL 1774250, at *2; *Colida v. Panasonic Corp. of N.A.*, No. 05 Civ. 5791 (JSR)(JC), 2005 WL 3046298, at *1 (S.D.N.Y. Nov. 10, 2005).

### B.    The Balancing Of Factors Weigh In Favor Of Transfer

In evaluating the convenience and fairness of transfer, private and public factors to be examined include:

> (1) the convenience of the witnesses; (2) the availability of process to compel the attendance of unwilling witnesses; (3) the convenience of the parties; (4) the locus of operative facts; (5) the location of relevant documents and relative ease of access to source of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) the trial efficiency and the interests of justice, based on the totality of circumstances.

*Elec. Workers Pension Fund, Local 103, v. Nuvelo, Inc.*, No. 07 Civ. 975 (HB), 2007 WL 2068107, at *3 (S.D.N.Y. July 19, 2007).  *See also Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (citing same factors).  Though "[n]o single factor is determinative," *I Create*, 2004 WL 1774250, at *2, a balancing of all of these interests strongly favors the transfer of this matter to the Southern District of Mississippi, Eastern Division.

### 1.    Nearly all of the witnesses live, work, or are otherwise available in Mississippi, not New York

The convenience of the witnesses is "probably the single-most important factor in the analysis of whether transfer should be granted." *Fuji*, 415 F. Supp. 2d at 373 (internal citations omitted).  *Accord Reinhard v. Dow Chemical Co.*, No. 07 Civ. 3641(RPP), 2007 WL 2324351, at *4 (S.D.N.Y. Aug. 13, 2007) (same) (internal citations omitted); *Int'l Sec. Exch. v. Chi. Bd.*

*Options Exch. Inc.*, No. 06 Civ. 13445(RMB)(THK), 2007 WL 1541087, *3 (S.D.N.Y. May 24, 2007) (same). Allan Pharma is aware of no witness, with the sole exception of the Plaintiff, who lives, works, or is subject to compulsory process in New York. Indeed, each of the key defense witnesses with material personal knowledge and information concerning this action live, work, or are otherwise available in Mississippi and have no connection to New York.

Specifically, a number of Allan Pharma executives and employees who have important information and firsthand knowledge concerning the Plaintiff's claims and the litany of defenses to those allegations include:

- o Chief Executive Officer Neil Sirkin

- o Chief Financial Officer Joseph Donovan

- o President Raju V.K. Vegesna

- o VP, Pharmaceutical Development Thomas L. Otto

- o VP, Cosmetic Development Juan I. Picado

- o VP, Quality Assurance John Baugh

- o Human Resources Manager Mandi McDade

- o Comptroller Ashley Withers

- o Customer Service Representative Bertha Rush

- o Senior Account Representative April Williams

(Donovan Decl., ¶¶40-41). These eyewitnesses are expected to be able to present personal information and material evidence directly relevant to the claims in the Complaint including, among other things,

- o Dretchen's interview and hire;

- o The parameters of his Agreement with Allan Pharma;

13

- o   his pharmaceutical sales goals versus his actual practices and productivity;

- o   the internal investigation which revealed his felony arrest, conviction, inclusion on the EPLS, and debarment for cause from participation in federal contracting;

- o   his calculated concealment of those facts from Allan Pharma;

- o   the meeting in Mississippi with senior management in which Dretchen was presented with the findings of the investigation and failed to contradict or explain those findings;

- o   discussions and decisions concerning the termination of the Agreement; and

- o   the absence of any sales commissions or other monies due and owing to Dretchen.

(Donovan Decl., ¶¶40-41).  Clearly, the far greater number of the most material witnesses, *i.e.*, those "whose testimony is likely to be material to the central question at issue," are available in Mississippi, not New York.  *Int'l Sec. Exch.*, 2007 WL 1541087, *4.  This factor strongly favors transfer to Mississippi.  *See Credit Suisse Sec. (USA) LLC v. Hilliard*, 469 F. Supp. 2d 103, 112 (S.D.N.Y. 2007) (that "a significant number of witnesses live in the transferee state weighs in favor of transfer").

The convenience of the parties also favors transfer.  All Allan Pharma witnesses and documents are located or otherwise available in Mississippi and the locus of the operative facts of this case arose in Mississippi.  The notion that transfer might inconvenience Plaintiff is undermined by the fact that Plaintiff traveled regularly to Mississippi and throughout the nation when he worked for Allan Pharma *and* he spent the majority of his time outside of New York during the term of the Agreement.  (Donovan Decl., ¶¶19-22).  That Plaintiff continues to spend significant time traveling outside of New York in the course of his current employment further belies the notion that he will be inconvenienced if he has to litigate this case in Mississippi.  (Donovan Decl., ¶42).  *See Chong*, 2007 WL 1836831, at *12 (transfer from New York

14

warranted where salesman-plaintiff regularly traveled to Georgia, as well as nationally, during the course of his employment with defendant).

### 2. The operative facts of this case occurred in Mississippi, not New York

The locus of the operative facts in this case is another "primary factor" considered in transferring venue. *Fuji*, 415 F. Supp. 2d at 375 (internal citations omitted). "Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district." *Deshoulieres, S.A. v. Cuthbertson Imports, Inc.*, No. 06 Civ. 5163 (HB), 2006 WL 2849818, at *4 (S.D.N.Y. Oct. 3, 2006) (internal citations omitted). Here, the *entirety* of the claims as alleged by Plaintiff—that he was not paid certain sales commissions and other compensation under his Agreement and that the Agreement was improperly terminated—are deeply rooted in Mississippi, not New York. (Donovan Decl., ¶¶24-39).

As a matter of law, the operative facts underlying Plaintiff's breach of contract claim arose in Mississippi, not New York, because the Agreement was created, entered into, and implemented in Mississippi; all of the decisions concerning his sales commissions and compensation which Plaintiff claims to have been improper were made in Mississippi; and Allan Pharma committed no allegedly unlawful act in New York. Likewise, Plaintiff's Agreement was terminated in Mississippi, after Allan Pharma learned, among other things, that he had concealed his criminal background and misrepresented the status of his pharmacy license. (Donovan Decl., ¶¶13-39). That all operative facts concerning Plaintiff's breach of contract and "retaliation"[2] claims occurred in Mississippi strongly favor transfer. *See Reinhard*, 2007 WL 2324351, at *6 (the locus of operative facts favor of transfer where an alleged breach of contract occurs outside

---

[2] Allan Pharma does not waive and specifically reserves the right to challenge whether Plaintiff's "retaliation" claim, brought under the New York State Labor Law, is even cognizable under Mississippi law. *See* Donovan Decl., Exh. 1, §17.

of New York and where "the [] personnel who interpret and administer the compensation plans" are not in New York); *Chong*, 2007 WL 1836831, at *12 (transfer favored because all compensation and bonus payments to plaintiff were made, and meetings concerning his compensation were held, outside of New York).

### 3. Plaintiff's claims are governed by the laws of Mississippi, not New York

"[A] diversity case should be tried in a forum that is at home with the state law that must govern the case." *Gibbs & Hill, Inc. v. Harbert Int'l, Inc.*, 745 F. Supp. 993, 997 (S.D.N.Y. 1990) (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 529-30 (1990)). *See also Rolls-Royce Motors, Inc. v. Charles Schmitt & Co.*, 657 F. Supp. 1040, 1061 (S.D.N.Y. 1987) ("the parties' choice of law governing the contract" at issue "may be considered in deciding venue questions."); *Aarons v. Worldtel Servs., Inc.*, No. 95 Civ. 8415 (AGS), 1996 WL 185714, at *5 (S.D.N.Y. April 17, 1996) (a choice of law provision "weigh[s] heavily in favor of transfer").

Here, Dretchen's Agreement confirms that:

> This Agreement is made and entered into in the State of Mississippi. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Mississippi, without regard to its conflict of law principles.

Agreement, §17. In a similar breach of contract case, in which the contract at issue contained a nearly identical provision designating the application of Alabama law, the Southern District of New York held:

> The district court in Alabama is presumed to be more familiar with the law of that state than this court sitting in New York and accordingly, this factor weighs strongly in favor of Alabama as the most appropriate forum for the present dispute—irrespective of whether the provision ultimately applies.

*Gibbs & Hill*, 745 F. Supp. at 997. Indeed, even if Dretchen attempts to dispute whether Mississippi law applies (which it surely does), that "decision itself will require a familiarity with

[Mississippi] law." *Id.*  The Mississippi choice of law provision in the Agreement, therefore, is another factor strongly in favor of transfer.

### 4.    All relevant documents are in Mississippi, not New York

Documents concerning Plaintiff's Agreement, sales commissions and compensation, and the termination of the Agreement are all located in Mississippi and Allan Pharma is aware of no relevant documents in New York.  (Donovan Decl., ¶43).  This factor also favors transfer to Mississippi. *See Colida*, 2005 WL 3046298, at *3 (where all documents located outside of New York, transfer to the district where the documents were located warranted); *Deshoulieres*, 2006 WL 2849818, at *4 (transfer favored where all of defendant's documents are located outside of New York).  Where, as here, "email discovery is likely and hard drive discovery may be required" of Allan Pharma's computers, transfer is further favored.  *Reinhard*, 2007 WL 2324351, at *5.

### 5.    Because Plaintiff's claims arose in Mississippi, are governed by Mississippi law, and have no meaningful connection to New York, his original filing in the Supreme Court of New York merits little consideration

The weight, if any, accorded Dretchen's choice of forum "is significantly diminished where the operative facts have no connection to the chosen district."  *Colida*, 2005 WL 3046298 at *2.  *Accord Int'l Sec. Exch.,* 2007 WL 1541087, at *6  ("[Plaintiff's] choice of forum is accorded less weight when the operative facts of the litigation have little material connection with the chosen forum."); *I Create*, 2004 WL 1774250, at *6 (relevance of plaintiff's choice of forum "is diminished when the Southern District of New York has only a tenuous connection to the operative facts of the litigation.")  (internal citations and quotations omitted)).  As explained, the fact that (i) most of the material witnesses are available in Mississippi, (ii) all documents are located in Mississippi, (iii) the operative facts arose in Mississippi, *and* (iv) Mississippi law

governs this action overwhelmingly favors transferring this case to Mississippi. Dretchen's only connection to New York—that he lives there—merits little deference. *See Chong*, 2007 WL 1836831, at *11 (transfer to Georgia warranted where plaintiff—a salesman who lived in New York and worked out of his home—reported to management in Georgia, traveled to Georgia and throughout the country on behalf of defendant, and the action had no material connection with New York).

Moreover, Plaintiff's attempt to plead claims for relief under the New York Labor Law—despite the Agreement's clear choice of law provision—signals a deliberate attempt to misuse the New York courts to gain an improper tactical advantage. *See* Complaint, First and Second Causes of Action. Such a stratagem further diminishes the relevance of Dretchen's original choice of forum. *See, e.g.*, *Freeman v. Hoffman-La Roche Inc.*, No. 06 CIV 13497(RMB)(RLE), 2007 WL 895282, at *3 (S.D.N.Y. Mar. 31, 2007)*; Unique Indus., Inc., v. Lisa Frank, Inc.*, No. 93 CIV. 8037 (LAP), 1994 WL 525041, at *2 (S.D.N.Y. Sept. 23, 1994).

### 6.    Trial efficiency and the interests of justice will be furthered if the case proceeds in Mississippi

Although not the dispositive factor, the docket condition of both New York and Mississippi "is a proper factor for the Court to consider." *Colida,* 2005 WL 3046298, at *4 (internal citations and quotations omitted). This also favors transferring the case to Mississippi because "the Southern District of New York is one of the busiest in the nation." *Id.*

18

## CONCLUSION

A New York jury should not be compelled to hear a case which has no tangible

relationship with New York and every material connection to Mississippi.[3]  Based upon this and

the foregoing reasons, Allan Pharmaceutical LLC respectfully requests that its motion to transfer

be GRANTED and that this matter be transferred to the Southern District of Mississippi, Eastern

Division.

Dated: New York, New York
      November 20, 2007

                              PROSKAUER ROSE LLP

                            By: /s/ *Mark A. Saloman*
                                Paul Salvatore (PS-1880)
                                Mark A. Saloman (MS-5764)
                                1585 Broadway
                                New York, New York 10036
                                (212) 969-3000
                                Attorneys for Defendant
                                Allan Pharmaceutical LLC

---

[3] *Ferens*, 494 U.S. at 529-30 ("Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation.") (citations omitted); *Essex Crane Rental Corp. v. Vic Kirsch Constr. Co.*, 486 F. Supp. 529, 536 (S.D.N.Y. 1980) (same).

PROSKAUER ROSE LLP
Paul Salvatore (PS-1880)
Mark A. Saloman (MS-5764)
1585 Broadway
New York, New York 10036
(212) 969-3000
Attorneys for Defendant
*Allan Pharmaceutical LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
LOUIS DRETCHEN,                                    :    07 Civ. 10306 (CLB) (LMS)
:
                            Plaintiff,               :
:
                                                     :    **DECLARATION OF JOSEPH**
                    v.                               :    **DONOVAN**
:
ALLAN PHARMACEUTICAL LLC,                           :
:
                            Defendant.               :    **ECF CASE**
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

    **I, Joseph Donovan**, hereby certify and declare as follows:

    1.    I am Chief Financial Officer of Allan Pharmaceutical LLC ("Allan Pharma").

Based upon my personal knowledge and understanding, I am competent to attest to the matters

within this Declaration in support of Allan Pharma's motion to transfer this case from the United

States District Court for the Southern District of New York to the Southern District of

Mississippi.

    2.    Louis Dretchen's lawsuit centers on his employment agreement with Allan

Pharma that was entered into in Mississippi and governed by Mississippi law. All of Allan

Pharma's witnesses live, work, or are otherwise available in Mississippi and neither they nor this

lawsuit have any meaningful connection to New York. Based upon this, and the undue burden

and expense Allan Pharma will endure in order to participate in its own defense, this case should proceed in Mississippi—if it is to proceed anywhere.

**Allan Pharma's Operations Are Centered In Mississippi and Pennsylvania, Not New York**

3.    Allan Pharma is a wholly owned subsidiary of Allan Holdings LLC, a Mississippi corporation comprised of three entities:  ProDerma LLC; Pharma Pac, LLC; and Allan Pharma.

4.    Established in March 2002, ProDerma is a Mississippi-based cosmetic and dietary supplement manufacturing and packaging company.  It is incorporated in Mississippi and headquartered at 110 Industrial Park Road in De Kalb, Mississippi.  In De Kalb, a town of roughly 900 people, ProDerma employs over 30 people and maintains 22,000 square feet of manufacturing and packaging space.  ProDerma has no officers, executives, or employees in New York and has never had any in New York.

5.    In response to ProDerma's work in cosmetic manufacturing, its existing customers asked ProDerma to consider manufacturing pharmaceutical products.  To meet that need, Pharma Pac was formed in January 2003.  Pharma Pac is a Mississippi-based pharmaceutical manufacturing company.  It, too, is incorporated in Mississippi and employs 100 people and operates a 25,000-square-foot manufacturing, packaging, and laboratory facility in De Kalb.

6.    Pharma Pac, like ProDerma, has no officers, executives, or employees in New York and has never had any in New York.

7.    Allan Pharma was established in June 2005 and is a specialty pharmaceutical company which researches, formulates, and develops a wide range of products for the national market within demanding regulatory requirements.  In essence, it is the scientific research, development, and sales arm for prescription products of Allan Holdings' companies.

8.      Allan Pharma is a Delaware company which employs a team of 18 scientists in Warminster, Pennsylvania, near the home of its President, Dr. Raju V.K. Vegesna.

9.      Nearly every facet of Allan Pharma's non-scientific operation is handled by personnel in De Kalb, Mississippi.  By way of example:

- Allan Pharma's upper management team, including its Chief Executive Officer, Chief Financial Officer, and Vice Presidents of Pharmaceutical Development, Cosmetic Development, and Quality Assurance, are based in Mississippi.  Only Dr. Vegesna works outside of Mississippi.  No Allan Pharma executive lives or works in New York.

- All of Allan Pharma's key executive, strategic, and financial corporate decisions relevant to Dretchen's Complaint—including those concerning the formation of his employment contract, the creation of his compensation and commission structure, his sales commission review, analysis, and payment, and the termination of his employment contract—were made in Mississippi.

- Allan Pharma's contract management services, including all account records, pricing information, and sales contracts, data, and information, are maintained in Mississippi and its account representatives, customer-service personnel, and contract support administrators work in Mississippi.  All decisions which affect sales territory, pricing, sales goals and strategy, marketing, advertising, and sales projections—including those central to Dretchen's Complaint—are made in Mississippi.

- All aspects of Allan Pharma's technical services, including material sourcing, initial validation testing, laboratory and stability testing, quality assurance, and outcome analysis, are based in Mississippi and all of the personnel who handle those functions work in Mississippi.

- Allan Pharma's logistics services, including purchasing, manufacturing, packing, shipping, and distribution, are based in Mississippi and all of the personnel who handle those functions work in Mississippi.

- Allan Pharma's finance operations, including payroll, accounting, and accounts payable and receivable, are based in Mississippi. Its human resources and employee-benefits functions and personnel are also based in Mississippi.

10.    Allan Pharma shares its corporate offices with Pharma Pac and ProDerma in De Kalb. Indeed, every Allan Pharma business function not entirely handled in Mississippi is conducted jointly with personnel in Warminster, Pennsylvania.

11.    ProDerma, Pharma Pac, and Allan Pharma are not incorporated, headquartered, nor licensed to do business in New York.

12.    Like ProDerma and Pharma Pac, Allan Pharma has no officers, executives, or employees in New York and has never had any employees in New York other than the brief period of time it employed Dretchen.

**Dretchen Entered Into His Employment Contract With Allan Pharma In Mississippi And It Is Governed By Mississippi Law**

13.    In the Spring of 2005, I interviewed Dretchen in New Jersey for a pharmaceutical sales and marketing position with Allan Pharma. Dretchen came recommended by Allan Pharma's Chief Executive Officer, Neil Sirkin, who had known Dretchen for many years.

14.    During our meeting, Dretchen told me, among other things, that he was a licensed pharmacist, that he had owned and operated three pharmacies, and that he had sold those businesses because of the time commitment and moved into the pharmaceutical sales field. I made clear to him that the position required daily communication and contact with numerous

4

executives and employees in Mississippi. Based upon our meeting, it was my impression that he could perform the necessary functions of the sales position.

15.    After some negotiation by telephone with Dretchen's lawyer, I prepared a written employment agreement ("Agreement") for Dretchen concerning the position. A true copy of the Agreement is annexed hereto as Exhibit 1. The Agreement was prepared in Mississippi and none of the contract negotiations occurred in New York.

16.    On or about June 1, 2005, Dretchen executed the Agreement and became employed by Allan Pharma as EVP of Sales and Marketing. At that time, Dretchen acknowledged that the Agreement was made and entered into in Mississippi. *See* Exh. 1, §17. He also acknowledged that the Agreement was to be governed by and construed in accordance with the laws of the State of Mississippi. *See* Exh. 1, §17.

17.    Dretchen agreed that he would devote his best efforts to the business and that he would perform his duties and responsibilities in accordance with all applicable laws and regulations. *See* Exh. 1, §2(b). Dretchen further agreed that the Agreement would automatically terminate if he, among other things, "has been convicted of a felony, or any other crime involving fraud, dishonesty or moral turpitude." *See* Exh. 1, §4(e).

**Dretchen's Daily Contact With Allan Pharma In Mississippi**

18.    During his employment, Dretchen was responsible for implementing the national sales goals and objectives set for Allan Pharma by its senior executives in Mississippi.

19.    Though Allan Pharma accommodated his request to work from his home in New York, Dretchen traveled extensively for his job. By my estimate, he spent at least 15 of every 20 business days per month traveling outside of New York.

20.    Dretchen also knew from the outset that, wherever he might be located on a given day, constant contact and communication with Allan Pharma in Mississippi was required. Indeed, Dretchen remained in daily contact with Allan Pharma's comptroller and sales support and administrative personnel in Mississippi who provided him with product pricing information and handled all aspects of contract management, customer service, and sales administration on the Allan Pharma accounts which he sold and serviced.

21.    In addition to this daily contact with Allan Pharma in Mississippi, Dretchen communicated with Chief Executive Officer Sirkin in Mississippi several times per week.  I also communicated with Dretchen from Mississippi on at least a weekly basis to review his progress and strategies toward meeting the sales goals set for him in Mississippi.

22.    Dretchen, moreover, regularly traveled to Mississippi to meet with Allan Pharma senior management for monthly status meetings and often spent days at a time here in De Kalb. Though these meetings occasionally took place in Pennsylvania, they never occurred in New York.  Indeed, I am aware of no Allan Pharma executive who ever traveled into New York for business purposes.

23.    All aspects of Dretchen's payroll, commission review and reconciliation, expense reimbursement, employment benefits, and other human resources functions were handled out of Mississippi and all business technology used by Dretchen, including a laptop computer, computer software, fax machine, internet service, and cellular telephone service, was either supplied or paid for by Allan Pharma.

24.    The Allan Pharma computers which contain information relevant to this case, including the laptop computer used by Dretchen, are located in Mississippi.

**Dretchen's Claims And Allan Pharma's Defenses Are Rooted In Mississippi, Not New York**

25.     In his Complaint, Dretchen essentially alleges that Allan Pharma breached the Agreement when it failed to pay him certain sales commissions and that Allan Pharma improperly terminated the Agreement in March 2007.  The events as alleged by Dretchen, however, confirm that his claims *and* Allan Pharma's defenses are deeply connected to Mississippi, not New York.

26.     Specifically, in the Fall of 2006, Allan Pharma's Mississippi-based Human Resources Manager, Mandi McDade, duly notified Dretchen (and several other Allan Pharma, ProDerma, and Pharma Pac employees) that he needed to execute standard acknowledgement forms and deliver them to her in Mississippi so she could obtain routine background information.

27.     After successfully avoiding Ms. McDade for nearly one month, Dretchen finally delivered his signed acknowledgement forms to her during one of his visits to Mississippi.

28.     Ms. McDade then processed Dretchen's forms and obtained a background report from Employment Screening Services of Birmingham, Alabama.

**Dretchen had an arrest for insurance fraud and a felony conviction**

29.     To Allan Pharma's complete surprise, it learned from the screening report that Dretchen had been found guilty of Grand Larceny in the third degree, a class D felony, and that he had been sentenced to five years probation and ordered to complete 192 hours of community service and make restitution in the amount of $11,300.[1]  A true and exact copy of Dretchen's background screening report is annexed as Exhibit 2.

---

[1] Apparently, Dretchen had been arrested and originally charged under New York Penal Law §176.20 with one count of Insurance Fraud in the third degree (a class D felony) and two counts of Grand Larceny in the fourth degree under NY PL § 155.30 (a class E felony).

30.     To have been found guilty of Grand Larceny in the third degree, we learned, Dretchen must have been convicted of stealing property which exceeded $3,000 in value.

31.     We were stunned to discover Dretchen's felony conviction because he had led us to believe that he had not been convicted of a felony or any other crime involving fraud or dishonesty.

**Dretchen had no pharmacy license**

32.     The background report also shows that—despite his claim to be a licensed pharmacist—Dretchen's pharmacy license had been "surrendered" and he was not a pharmacist in good standing.  *See* Exh. 2 at page 2.

**Dretchen had been debarred from contracting with the U.S. government**

33.     The report also reveals that Dretchen had been sanctioned under Sections 1128 and 1156 of the Social Security Act.  *See* Exh. 2 at pages 4-5.  Ms. McDade followed up on this information and confirmed that Dretchen had been placed on the federal government's "Excluded Parties Listing System" ("EPLS").  The EPLS identifies those parties excluded from contracting and subcontracting with the U.S. Government and elsewhere because they are suspended, proposed for debarment, debarred, declared ineligible, or excluded or disqualified by agencies, government corporations, or by the Government Accountability Office.

34.     According to the EPLS, Dretchen had been "indefinitely" debarred for cause from government contracting and subcontracting in 1993.  A true and exact copy of that report is annexed as Exhibit 3.  That he was debarred under Cause and Treatment Code "R" meant that Dretchen was ineligible to contract with the U.S. Government due to:

> one or more of the following causes: (a) conviction or a civil judgment for fraud, violation of antitrust laws, embezzlement, theft, forgery, bribery, false statements, false claims, or other offense indicating a lack of business integrity or honesty; (b) violation of the terms of a public agreement or transaction so serious as to affect

the integrity of an agency program; or (c) other causes specified in the agency implementing regulations, or such other cause of a serious or compelling nature affecting responsibility.

A true copy of Code R is contained at pages 2-3 of the attached Exhibit 4.

35.    Dretchen was also listed as "indefinitely" debarred for cause from federal contracting under Cause and Treatment Code "Z," which meant that he was:

Excluded by the Department of Health and Human Services from participation in Title XVIII (Medicare), Title XIX (Medicaid), Title V (Maternal and Child Health Programs) and Title XX (Block Grants to States for Social Services Programs) of the Social Security Act under the authority of Title XI of that Act, and all other Federal nonprocurement programs.

A true copy of Code Z is contained at pages 4-5 of Exhibit 4.

**Dretchen's Agreement was terminated for cause in Mississippi**

36.    On or about March 23, 2007, Chief Executive Officer Sirkin, President Vegesna, Human Resources Manager McDade, and I met with Dretchen at the Hilton Hotel in Jackson, Mississippi, and revealed the findings of the screening report.

37.    Despite repeated requests to do so, Dretchen absolutely refused to explain or contradict Allan Pharma's discovery that, contrary to his representations, he was: (i) a convicted felon; (ii) not a licensed pharmacist; and (iii) an "Excluded Party" named on the federal EPLS.

38.    Mr. Sirkin then expressed our disappointment with the results of Dretchen's background report and stated that Dretchen's employment with Allan Pharma was terminated with cause, effective immediately.

39.    Accordingly, every material aspect of Dretchen's claims and Allan Pharma's defenses are rooted in Mississippi, not New York. The contract Dretchen claims to have been breached by Allan Pharma was made and entered into in Mississippi and governed by Mississippi law. Dretchen's sales goals and objectives were formed in Mississippi and all proof

that he failed to meet those goals (and is otherwise not entitled to the sales commissions he

seeks) resides in Mississippi. And the decision to terminate the Agreement—the very heart of

Dretchen's retaliation claim—was made in Mississippi, based on information obtained in

Mississippi, communicated to Dretchen in Mississippi, and implemented in Mississippi.

**The Material Witnesses And Documents Are Located In Mississippi, Not New York**

40.    Every witness with relevant knowledge of the facts of this case is available in

Mississippi. Allan Pharma's Mississippi-based senior management team (Chief Executive

Officer Sirkin; President Vegesna; VP of Pharmaceutical Development Thomas L. Otto; VP of

Cosmetic Development Juan I. Picado; VP of Quality Assurance John Baugh; and myself) has

relevant knowledge concerning, among other things, Dretchen's Agreement; his pharmaceutical

sales practices; the allegedly due or owing sales commissions; his felony arrest, conviction,

inclusion on the EPLS, and debarment for cause from participation in federal contracting; his

calculated concealment of those facts from Allan Pharma; and the ultimate decision to terminate

the Agreement. None of these witnesses live or work in New York.

41.    Other Mississippi-based witnesses (Allan Pharma's Human Resources Manager

McDade; Comptroller Ashley Withers; Customer Service Representative Bertha Rush; Senior

Account Representative April Williams) have additional personal knowledge concerning the

allegedly owing sales commissions and Allan Pharma's litany of legitimate, good faith defenses

to that allegation. These witnesses live and/or work in Mississippi and are not available in New

York.

42.    Dretchen, too, should have little difficulty participating in this matter in

Mississippi because—in addition to his regular travel to Mississippi when he worked with Allan

Pharma—he continues to travel extensively in his new business venture. Indeed, he has recently

been spotted by Allan Pharma employees at various industry events and trade shows throughout the country and we learned from Allan Pharma customers that Dretchen had recently visited them in California, Ohio, and Florida.

43.    Likewise, the relevant documents concerning the Agreement and Dretchen's personnel file, sales data, sales contracts, e-mail traffic and hard drives, and all other supporting material relevant to this case, comprising at least two banker's boxes, are located in Mississippi. I am aware of no relevant documents located in New York.

44.    It would be an unfair, onerous, exceptionally expensive, and extraordinarily time-consuming undertaking for Allan Pharma to be forced to present its numerous witnesses in New York for depositions and for trial in New York in order to defend itself against claims which arose in and are materially connected to Mississippi.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated at De Kalb, Mississippi
this 19th day of November, 2007.

By: _____
JOSEPH DONOVAN
Chief Financial Officer
Allan Pharmaceutical LLC

# Exhibit 1

<u>EXECUTIVE EMPLOYMENT AGREEMENT</u>

This Agreement is made and entered into as of the 1st day of June 2005 by and between Allan Pharmaceutical LLC, a Delaware corporation (Company), and Lou Dretchen (Executive).

In consideration of the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Employment</u>.   The Company hereby employs Executive, and Executive hereby accepts employment, as the Executive Vice President of Sales and Marketing of the Company, upon the terms and conditions set forth in this Agreement for the three (3) year period beginning on the date of this Agreement, subject to extension and/or early termination as stated below.

2. <u>Duties</u>.

(a) Executive shall serve as the Executive Vice President of Sales and Marketing of the Company and shall have the customary duties, responsibilities and authority of such a position. Furthermore Executive will server on the Product Selection and Development Committee.

b) Executive agrees to devote his best efforts to the business and affairs of the Company and its subsidiaries, divisions and operational units. Executive shall perform his duties and responsibilities faithfully, diligently and in a manner consistent with and in furtherance of the best interests of the Company, and in accordance with all laws and regulations related to the performance of his duties hereunder.

3. <u>Base Salary and Benefits</u>.   The Company will provide Executive the following compensation:

(a) <u>Base Salary</u>.   Executive's base salary will be $175,000 for the term of this agreement. The Company will consider in good faith not less often than annually, whether the Executive salary shall be increased because of market conditions, the Executive's performance of his responsibilities, cost-of-living, and other relevant considerations.

Executive's base salary shall be increased each year by at least for a COLA adjustment, based upon and equal to the change in the Bureau of Labor Statistics CPI for the New York-Northern New Jersey-Long Island – all

items.

(b) Commission. Shall be five percent (5%) of Gross sales from Qualified Sales. For the purposes of this section, the following terms shall have the following meanings: Gross Sales means the sales revenue less discounts and rebates in excess of $3,000,000 to $5,000,000. Qualified Sales in excess of $5,000,000 shall be subject to one percent 1% commission. Qualified Sales means business procured by the Executive for the Company, including but not limited to sales of new products to new or existing customers of the Company, and sales of existing products to new customers of the Company.

(d) Stock options.

Executive can earn stock options equal to (1%) one percent of the outstanding stock and / or membership interest, per year up to a total interest of (5%) five percent, based on the following certeria:

1.) Stock options are available after gross sales, as defined in this agreement, exceed $10,000,000.

2.) Sales as defined in this agreement must increase yearly by a minimum of $1,000,000.

3.) The maximum stock options available per year of the outstanding stock and / or membership interest equal 1%.

4.) Stock options are priced at $.01 per share or per .01% of membership interest.

5.) If the company is sold after the 1st year of this agreement the Executive shall have the right to exercise the full 5% of options, regardless of whether he would otherwise have received the entire 5% under the terms of the Agreement.

6.) The Executive's equity interests will be governed by the same terms as that which applies to the current members of the Company which are defined in the Operating Agreement. This ownership interests are vested as earned.

(c) Other Benefits.

(1) During his employment, Executive shall be entitled to participate on the same basis and at the same level as other members of senior management of the Company, in any group insurance plans or programs of the Company and in any other employee benefit programs of the Company for which the other members of senior management of the Company are generally eligible including, but not limited to retirement plans and stock options or grants. Company will provide and pay for family health insurance for the Executive.

(2) During his employment, Executive shall also be entitled to such other fringe benefits and conditions of employment as other members of senior management of

the Company, excluding the LLC members, including without limitation, customary holidays, sick leave, and up to four weeks vacation per calendar year. Executive shall receive a car allowance of $ 1,300.00 per month.

(3) Contract Extension: this contract will automatically extend for an additional period of (3) three years if the sales goal of $15,500,000 is met within the first contract period.

(d) Reimbursement of Expenses. The Company shall reimburse Executive for all reasonable business expenses incurred by him in the course of performing his duties under this Agreement which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

4. Termination. This Agreement, and Executive's employment, shall automatically terminate upon the earliest to occur of the following (the Termination Date):

(a) The close of business on the last day of the term of this Agreement;

(b) The death of Executive;

(c) Upon One-Hundred-eighty (180) days notice from the Company to Executive in the event of Executive's Disability (as used herein, Disability means physical or mental disability which prevents Executive from performing his obligations under this Agreement for (i) a period of One-Hundred-eighty (180) consecutive days or (ii) shorter periods aggregating One-Hundred-eighty (180) days during any period of one hundred eighty (180) consecutive days);

(d) Upon thirty (30) days written notice of resignation by Executive to the Company; or

(e) Upon written notice from the Company to Executive that his employment is being terminated for cause (as used herein, for cause means (i) Executive has demonstrated habitual drunkenness or substance abuse; (ii) Executive has been convicted of a felony, any other crime involving fraud, dishonesty or moral turpitude or (iii) Executive has committed any act of fraud, misappropriation of funds or property, bribery, corrupt practice or embezzlement in connection with his employment hereunder); or failure to reach sales goals of $4,000,000 within the first 12 calendar months from the first day for employment. This sales goal is dependant

3

on the Company providing the Executive with the product to sell and good customer service.

(f) Upon written notice by the Company at any time specifying that such termination be without cause.

5. Severance.

(a) Upon termination of this Agreement, Executive shall be entitled to receive his Base Salary and all benefits accrued through the Termination Date.  Subject to Section 5(b) below, following the Termination Date, Executive shall not be entitled to any Salary or benefits.

(b) Notwithstanding Section 5(a), if this Agreement is terminated by the Company without cause, Executive shall be entitled to receive the full base salary that would have been payable to Executive for the balance of the contract along with continued health insurance at the companies expense for the balance of the contract. This amount may be payable, at Company's discretion, at the same time base salary would otherwise have been payable or in one (1) lump sum payment within thirty (30) days following the termination date.

**6. Confidentiality.**

(a) For purposes of Sections 7 through 11 of this Agreement, the term Company shall include the Company and each of its subsidiaries, divisions and operating units identified by the Company to the Executive. Executive recognizes that the Company derives economic value from information created and used in its business which is not generally known by the public, including but not limited to customer and supplier information and lists; confidential business practices of the Company or any of its customers, suppliers, licensees or other business partners or relations; profit margins and the prices or discounts the Company obtains or has obtained or at which it provides or has provided or plans provide its services; labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; employee staffing or recruiting plans and employee personal information; and other confidential concepts or ideas related to the Company's business (collectively, Protected Information). Executive expressly acknowledges and agrees that, by virtue of Executive's employment and position with the Company, Executive has access to certain Protected Information and that Protected information constitutes trade secrets and confidential and proprietary business information of the Company, all of which is the exclusive property of the Company. For purposes of this Agreement, Protected Information includes the foregoing but does not include information that (i) is known to Executive as of the date of this Agreement from sources outside the Company, or (ii) becomes known outside the Company through means other than a breach of this Agreement by Executive or other person(s) acting in concert with him.

(b) Executive agrees that Executive will not directly or indirectly, without the prior written consent of the Company: (i) use Protected Information for the benefit of any person or entity other than the Company; (ii) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Protected Information, except as required to perform Executive's duties for the Company; and (iii) while employed and for a period of no less than two (2) years thereafter, publish, release, disclose or deliver or otherwise make available to any third party any Protected Information by any communication, including oral, documentary, electronic or magnetic information transmittal device or media; provided, that Executive shall have the right to disclose Protected information pursuant to Subpoena or other process of law. Upon termination of employment, the Executive shall return all Protected Information and all other Company property. This obligation of non-disclosure and non-use of information shall continue to exist

5

for so long as such information remains Protected Information, except as otherwise limited above.

7. **Non-Competition During Employment.** While Executive is employed by the Company, Executive will not, either directly or indirectly, either as a principal, agent, employee, independent contractor, employer, partner, member or shareholder (other than as an owner of 25% or less of the stock of a Company) or in any other capacity, other than for the Company, engage in any manner in a business providing Pharmaceutical products or services without the prior written approval of the company. Executive shall be permitted to invest in any business opportunities which he introduces to the Company or its members if they invest in them.

8. **Non-Competition Following Employment.** Executive agrees that the Executive be bound by this non-compete for as long as his severance payments continue. If the Executive is terminated for cause the term of the non-compete will be 6 months. Executive will not, either directly or indirectly, either as a principal, agent, employee, contractor, partner, member or shareholder (other than as an owner of 25% or less of stock) or in any other capacity, perform work or services for, or become affiliated with, any drug manufacturer that is a direct competitor of the Company through making similar products.

10. **Acknowledgment of Consideration; Business Interest; Remedies.**

(a) Executive acknowledges and agrees that the level of compensation he is receiving pursuant to this Agreement and the opportunity to receive severance pursuant to Section 5, is in consideration of the continuing covenants and obligations of Executive under Sections 7 through 11 hereof and constitutes adequate consideration in support thereof.

(b) If, at the time of enforcement of Sections 7 through 11 above, a court shall hold that the duration, scope, area or activity restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope, area or activity restrictions reasonable and enforceable under such circumstances shall be substituted for the stated duration, scope, area or activity restrictions.

11. **Survival.** Sections 5, 6, 7, 8, 10, and 11 shall survive and continue in full force in accordance with their terms notwithstanding any termination of the Period. This contract is binding on any successor company.

12. Notices. Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, or mailed by first class mail, return receipt requested, or sent by Federal Express or similar next day mail service or by facsimile to the recipient at the address indicated below:

Notices to Executive:
Lou Dretchen, R. PH
8 Sasson Terrace
Valley Cottage, NY 10939

Notices to Company:
Joseph Donovan

110 Industrial Drive

Dekalb, MS 39328

or at such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party. Any notice under this Agreement will be deemed to have been given when so delivered or mailed.

13. Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

14. Complete Agreement. This Agreement and the other agreements referenced herein embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

15. Counterparts. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same Agreement.

16. **Successors and Assigns.** This Agreement is intended to bind and inure to the benefit of and be enforceable by the parties hereto and their respective heirs, successors and assigns, except that Executive may not assign his rights or delegate his obligations hereunder without the prior written consent of the Company.

17. **Governing Law.** This Agreement is made and entered into in the State of Mississippi. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Mississippi, without regard to its conflict of law principles.

18. **Amendment and Waiver.** The provisions of this Agreement may be amended or waived only with the prior written consent of the Company and Executive, and no course of conduct or failure to delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Executive Employment Agreement as of the date first written above.

Allan Pharmaceutical LLC.

By: _____
Name: Joseph Donovan
Title: Chief Financial Officer

EXECUTIVE

_____
Lou Dretchen

8

**Exhibit 2**

**Mandi McDade**

| | |
|---|---|
| **From:** | results@es2.com |
| **Sent:** | Friday, December 01, 2006 5:08 PM |
| **To:** | mandi@pharmapacllc.com |
| **Subject:** | Completed Report - LOUIS DRETCHEN |



## Employment Screening Services

http://www.es2.com
1401 Providence Park Birmingham, AL 35242
Phone: 205-879-0143
Fax: 205-380-7548
Email: results@es2.com

**Pharma Pac, LLC**
110 Industrial Park Road
DeKalb, MS 39328
Phone: 601-743-9771 Ext. 222
Email: mandi@pharmapacllc.com
Fax: 1-601-743-9772

### Profile Information

**Name:** LOUIS DRETCHEN
**DOB:** 02/25/****

The following are included in this report:

| Search Type | Detail | Status |
|---|---|---|
| Statewide Criminal | New York | Complete - Record |
| Professional License Verification | New York (BOARD OF PHARMACY - PHARMACIST - PHARMACIST) | Complete |
| Professional License Verification | Florida (BOARD OF PHARMACY - PHARMACIST - PHARMACIST) | Complete |
| Professional License Verification | Pennsylvania (BOARD OF PHARMACY - PHARMACIST - PHARMACIST) | Complete |
| Professional License Verification | New Jersey (BOARD OF PHARMACY - PHARMACIST - PHARMACIST) | Complete |
| FACIS Report | | Complete |

## Statewide Criminal

**Jurisdiction Searched**    New York
**Name Searched**    LOUIS DRETCHEN

| | |
|---|---|
| **DOB Searched** | 02/25/**** |
| **SSN Searched** | 081-44-**** |
| **Search ID** | 408693 |
| **Date Ordered** | 11/17/2006 |
| **Date Completed** | 12/01/2006 |
| **Status** | Record Found |

| | |
|---|---|
| **Case Number** | 5008509R |
| **Verified By** | Name and DOB |
| **Full Name on File** | LOUIS DRETCHEN |
| **DOB on File** | 02/25/**** |
| **File Date** | 3/20/1990 |
| **Disposition Date** | 1/17/1991 |
| **Years Searched** | 7 |
| *Charge* | GRAND LARCENY (3RD DEGREE) |
| **Disposition** | Found Guilty |
| **Type of Crime** | NOT LISTED |
| **Probation** | 5 YEARS |
| **Comments** | |

192 HOURS COMMUNITY SERVICE & $1i,3000 RESTITUTION

## Professional License Verification

| | |
|---|---|
| **Name Searched** | LOUIS DRETCHEN |
| **DOB** | 02/25/**** |
| **SSN** | 081-44-**** |
| **Search ID** | 408694 |
| **Date Ordered** | 11/17/2006 |
| **Date Completed** | 11/17/2006 |
| **Information Provided** | |
| State | New York (BOARD OF PHARMACY - PHARMACIST - PHARMACIST) |
| **Information Searched** | |
| Type of License | PHARMACIST |
| Organization | BOARD OF PHARMACY - PHARMACIST |
| **Information Verified** | |
| State | New York |
| In Good Standing | no |
| Comments | |

Name : DRETCHEN LOUIS
Address : BROOKLYN NY
Profession : PHARMACY
License No: 032178
Date of Licensure : 04/13/79
Additional Qualification : Not applicable in this profession
Status : LICENSE SURRENDERED
Registered through last day of :

## Professional License Verification

| | |
|---|---|
| **Name Searched** | LOUIS DRETCHEN |
| **DOB** | 02/25/**** |
| **SSN** | 081-44-**** |
| **Search ID** | 408696 |

**Date Ordered**      11/17/2006
**Date Completed**    11/17/2006
**Information Provided**
  State          Florida (BOARD OF PHARMACY - PHARMACIST - PHARMACIST)
**Information Searched**
  Type of License    PHARMACIST
  Organization       BOARD OF PHARMACY - PHARMACIST
**Unable To Verify**
No licensee found matching the search criteria

## Professional License Verification

**Name Searched**     LOUIS DRETCHEN
**DOB**               02/25/****
**SSN**               081-44-****
**Search ID**         408697
**Date Ordered**      11/17/2006
**Date Completed**    11/17/2006
**Information Provided**
  State          Pennsylvania (BOARD OF PHARMACY - PHARMACIST - PHARMACIST)
**Information Searched**
  Type of License    PHARMACIST
  Organization       BOARD OF PHARMACY - PHARMACIST
**Information Verified**
  State          Pennsylvania
  In Good Standing    no
  Comments
Type: Pharmacist Secondary Type: N/A Nurnber: RP031632L
Profession: Pharmacy Status: Inactive Obtained By: Application
Issue Date: 10/29/1981 Expires: 9/30/1988 Last Renewed: 8/13/1986
Standing: This license is not in good standing based on the license status 'Inactive'.
Disciplinary action history: No disciplinary actions were found for this license.

## Professional License Verification

**Name Searched**     LOUIS DRETCHEN
**DOB**               02/25/****
**SSN**               081-44-****
**Search ID**         408698
**Date Ordered**      11/17/2006
**Date Completed**    11/17/2006
**Information Provided**
  State          New Jersey (BOARD OF PHARMACY - PHARMACIST - PHARMACIST)
**Information Searched**
  Type of License    PHARMACIST
  Organization       BOARD OF PHARMACY - PHARMACIST
**Unable To Verify**
Your search for Pharmacist with the name LOUIS DRETCHEN generated 0 matches.

## FACIS Report

**Name Searched**     LOUIS DRETCHEN
**DOB**               02/25/****

| | |
|---|---|
| **SSN** | 081-44-**** |
| **Search ID** | 408695 |
| **Date Ordered** | 11/17/2006 |
| **Date Completed** | 11/17/2006 |

**Information Provided**

**Results**

Source: OIG CUMULATIVE SANCTION REPORT
Issue: February, 1996
Name: DRETCHEN, LOUIS
Birth Date: 02/25/1953
Provider Type: PHARMACIST
Provider Cat.: PHARMACY
Address: 8 SASSOON TERRACE
City: VALLEY COTTAGE
State: NY
Zip: 10989
Action Code: 1128b4
Action: Exclusion: 1128b4 - License revocation or suspension
Notify Date: 04/10/1992
Reporting State: US
Authority: OFFICE OF INSPECTOR GENERAL OF HEALTH AND HUMAN SERVICES
Run Date: 01/01/1996
Note 2: "Action & Action Code = Sections of Social Security Act under which exclusions were imposed."

Source: OIG CUMULATIVE SANCTION REPORT
Issue: June 1994
Name: DRETCHEN, LOUIS
Birth Date: 02/25/1953
Provider Type: PHARMACIST
Provider Cat.: PHARMACY
Address: 8 SASSOON TERRACE
City: VALLEY COTTAGE
State: NY
Zip: 10989
Action Code: 1128b4
Action: Exclusion: 1128b4 -License revocation or suspension
Term: INDEFINITE
Notify Date: 04/10/1992
Reporting State: US
Authority: Office of Inspector General of Health and Human Services
Run Date: 06/30/1994

Source: CUMULATIVE SANCTION REPORT, DHHS Office of Inspector General
Issue: January 1999 Cumulative List: Downloaded from: http://exclusions.oig.hhs.gov/home.html
Name: DRETCHEN, LOUIS
Birth Date: 02/25/1953
Provider Type: GENERAL: PHARMACY; SPECIALTY: PHARMACIST
Provider Cat.: PHARMACY
Address: 8 SASSOON TERRACE
City: VALLEY COTTAGE
State: NY
Zip: 10989
Action Code: 1128b4
Action: EXCLUSION: 1128(b)(4) License revocation or suspension.
Effective Start: 04/10/1992
Reporting State: US
Authority: DHHS Office of Inspector General
Run Date: 03/01/1999
Note 1: The HHS Office of Inspector General imposes exclusions on individuals and entities based on the authority contained in Sections 1128 and 1156 of the Social Security Act. This List of Excluded Individuals/Entities is a listing of all parties excluded as of the date of publication. The effect of an exclusion is that no program payment will be made for any items or services, including administrative and management

services, (other than an emergency item or service not provided in a hospital emergency room) furnished, ordered, or prescribed by an excluded individual or entity under the Medicare (title XVIII), Medicaid (title XIX), Maternal and Child Health Services Block Grant (title V), Block Grants to States for Social Services (title XX) and State Children's Health Insurance (title XXI) programs during the period of exclusion, except as provided in regulations found at 42 CFR 1001.1901(c). Program payment will not be made to any entity in which an excluded individual is serving as an employee, administrator, operator, or in any other capacity, for any services including administrative and management services furnished, ordered, or prescribed on or after the effective date of this exclusion. In addition, no payment may be made to any entity or facility, e.g., a hospital, that submits bills for payment of items or services provided by an excluded party. Section 1128 exclusion actions with a sanction effective date after August 5, 1997 are also from all Federal health care programs.

Note 2: For further information, contact Natalie Jones at (202) 501-4873 or Priscilla Owens at (202) 501-4740.

Note 3: The Provider_Type field contains two items. The first description, GENERAL, is the basic subject type. The second description, called SPECIALTY, is more specific. For example, if HOSPITAL is listed as GENERAL and NURSE/NURSE AIDE is listed as the SPECIALTY, the excluded individual was a nurse or nurse aide in a hospital. The Provider_Num field contains the UPIN Number.

Source: OIG CUMULATIVE SANCTION REPORT
Issue: October 1996, New 1096.dbf
Name: DRETCHEN, LOUIS
Birth Date: 02/25/1953
Provider Type: PHARMACIST
Provider Cat.: PHARMACY
Address: 8 SASSOON TERRACE
City: VALLEY COTTAGE
State: NY
Zip: 10989
Action Code: 1128b4
Action: License revocation or suspension
Notify Date: 04/10/1992
Reporting State: US
Authority: Office of Inspector General of Health and Human Services
Run Date: 10/31/1996

**Exhibit 3**

**Search Results Excluded By**
**Partial Name : dretchen**
**as of 13-Nov-2007**

| | |
|---|---|
| **Name** | Dretchen, Louis |
| **Classification** | Individual |
| **Exclusion Type** | NonProcurement |
| **Description** | none |

**Address(es) --**

| | |
|---|---|
| **Address** | Valley Cottage, NY, 10989 |
| **DUNS** | none |

**CT Action(s) --**

| | |
|---|---|
| **Action Date** | 21-Jun-1993 |
| **Termination Date** | Indef. |
| **CT Code** | R |
| **Agency** | OPM |
| **Action Status** | Created (03-Feb-1997) |

| | |
|---|---|
| **Action Date** | 21-Jun-1993 |
| **Termination Date** | Indef. |
| **CT Code** | Z |
| **Agency** | HHS |
| **Action Status** | Created (03-Feb-1997) |

**Exhibit 4**



# EPLS

Excluded Parties List System

Search - Current Exclusions



> Advanced Search
> Multiple Names
> Exact Name and SSN/TIN
> MyEPLS

View Cause and Treatment Code
Descriptions

> Reciprocal Codes
> Procurement Codes
> Nonprocurement Codes

Agency & Acronym Information

> Agency Contacts
> Agency Descriptions
> State/Country Code Descriptions

OFFICIAL GOVERNMENT USE ONLY

> Debar Maintenance
> Administration
> Upload Login

## Nonprocurement Cause and Treatment Codes

Defines the cause and treatment code (letter/number) indicating the cause of the action and the treatment to be accorded the excluded party.

## Codes

| C | C1 | E | G | H |
| H1 | H2 | I | P | PP |
| Q | QQ | R | RR | S |
| SS | T | TT | U | UU |
| V | VV | W | WW | X |
| Y | Z | Z1 | | |

## Descriptions

**C**

**Cause**
Debarred by the Comptroller General for violation of the Davis-Bacon Act, 40 U.S.C. 276a-2(a).

**Treatment**
The person, or any firm, corporation, partnership, or association in which the person has an interest is ineligible to receive any contract or subcontract of the United States or District of Columbia and any contract or subcontract subject to the labor standards provisions of the statutes listed in 29 CFR 5.1 (see Code G). Debarment is for a three-year period to terminate on the date shown.

TOP

**C1**

**Cause**
Debarment under a settlement generally with DOL (consent) agreement in which the contractor agrees to be debarred to settle government charges that contractor violated the Davis-Bacon Act.

**Treatment**
The contractor and any firm, corporation, partnership, or association, in which the contractor has an interest is ineligible to receive any contract or subcontract of the United States or District of Columbia or any contractor subcontract subject to the labor standards provisions of the statutes listed in 29 CFR 5.1 (see Code G). Debarment is for a three-year period. Debarment will terminate on the date shown.

TOP

Resources

> Search Help
> Public User's Manual
> FAQ
> Acronyms
> Privacy Act Provisions
> News

Reports



> Advanced Reports

Archive Search - Past Exclusions



> Advanced Archive Search
> Multiple Names

Contact Information

> Email:  support@epls.gov
         eplscomments@epls.gov
> Phone: 1-866-GSA-EPLS
         1-866-472-3757

disability, veterans benefit, public housing, or other similar benefit, or any other benefit for which payments or services are required for eligibility. Veterans benefits include all benefits provided to veterans, their families, or survivors by virtue of the service of a veteran in the Armed Services of the United States. The denial shall terminate on the date shown. Persons convicted for a third offense relating to distribution of controlled substances after the effective date of the Act shall be denied benefits permanently. Therefore, the termination date for such denials shall be listed as Permanent (Perm.)

TOP

## Q

**Cause**
Suspension by any Federal agency pursuant to Executive Order 12549 for violations of the Drug-Free Workplace Act of 1988, Pub. L. 100-690.

**Treatment**
Same as Code P, except that suspensions are temporary actions. Therefore the termination date will be listed as "Indefinite (Indef.).

TOP

## QQ

**Cause**
Partial denial of Federal benefits by a sentencing judge pursuant to Section 5301 of the Anti-Drug, Abuse Act of 1988 on the basis of a conviction(s) for a Federal or State offense relating to the distribution or possession of controlled substances.

**Treatment**
Listed persons shall not be issued grants, contracts, loans, and/or professional or commercial licenses as specified by the sentencing judge which are provided by an agency of the United States or by appropriated funds of the United States. Contact the U.S. Department of Justice's Denial of Federal Benefits Project point of contact listed. The denial does not include any retirement, welfare, Social Security, health, disability, veterans benefit, public housing, or other similar benefit, or any other benefit for which payments or services are required for eligibility. Veterans benefits include all benefits provided to veterans, their families, or survivors by virtue of the service of a veteran in the Armed Services of the United States. The denial shall terminate on the date shown. Persons convicted for a third offense relating to distribution of controlled substances after the effective date of the Act shall be denied benefits permanently. Therefore the termination date for such denials shall be listed as "Permanent_ (Perm ). NOTE A denial of benefits under Section 5301 of the Anti-Drug Abuse Act of 1988 does not include benefits relating to long-term drug treatment programs for addiction for any person who declares himself an addict, provides a reasonable body of evidence to substantiate this declaration, and submits to a long-term treatment program for addiction, or is deemed to be rehabilitated pursuant to rules established by the Secretary of Health and Human Services. The denial of benefits may also be suspended on the basis of the person's participation or good faith effort to participate in a supervised rehabilitation program. Contact the U.S. Department of Justice's Denial of Federal Benefits Project point of contact listed to verify any assertions that the denial of benefits does not apply, or has been waived or suspended on this basis.

TOP

## R

**Cause**
Debarment by any Federal agency pursuant to Executive Order 12549 and the agency implementing regulations for one or more 153 of the following causes: (a) conviction or a civil judgment for fraud, violation of antitrust laws, embezzlement, theft, forgery, bribery, false statements, false claims, or other offense indicating a lack of business integrity or honesty; (b) violation of the terms of a public agreement or transaction so serious as to affect the integrity of an agency program; or (c) other causes specified in the agency implementing regulations, or such other cause of a serious or compelling nature affecting responsibility.

**Treatment**
Listed persons are excluded as participants or principals in all primary and lower tier covered transactions of all agencies. Further, agencies and participants shall not renew or otherwise extend the duration of covered transactions or consent to lower tier covered transactions with such persons. Exceptions to this treatment require a written determination by the head of the Federal agency or designee stating the reasons for entering the transaction. Debarments are for a specified term as determined by the debarring agency and as indicated in the listing.

TOP

**RR**

**Cause**
Declared ineligible by the Secretary of Education in accordance with the Higher Education Act of 1965 20 U.S.C. 1145g, and the Drug-Free Schools and Communities Act of 1986, 20 U.S.C. 3224a, based upon a failure to submit a certification of adoption and implementation of a drug prevention program.

**Treatment**
Listed institutions of higher education, local educational agencies and State educational agencies are ineligible to receive funds or any other form of financial assistance under any Federal program. An institution or agency remains ineligible until it submits the drug prevention program certification. Therefore, the termination date will be listed as Indefinite" (Indef.). For additional information, please call the ED point of contact listed under "View Agency Contacts".

TOP

**S**

**Cause**
Suspension by any Federal agency pursuant to Executive Order 12549 and the agency implementing regulations based on an indictment or other adequate evidence (a) to suspect the commission of an offense that is a cause for debarment or (b) that other causes for debarment under the agency regulations may exist.

**Treatment**
Same as Code R, except that suspensions are temporary actions and the period of suspension is indefinite. Therefore, the termination date will be listed as "Indefinite (Indef.). NOTE Debarments and suspensions taken in accordance with agency regulations issued pursuant to Executive Order 12549, which become effective on October 1, 1988, are effective throughout the Executive Branch.

TOP

**SS**

## WW

**Cause**
Conviction of fraud or any other felony, on or after September 29, 1988, arising out of a contract with the Department of Defense as required by the 1993 National Defense Authorization Act 10 U.S.C. 2408.

**Treatment**
Listed individuals are prohibited from serving in a management or supervisory capacity on any DoD contract or first-tier subcontract; serving on the board of directors, or as a consultant, agent or representative for any DoD contractor or first tier subcontractor; or serving in any other capacity with the authority to influence, advise, or control the decisions of any DoD contractor or subcontractor with regard to any DoD contract or first-tier subcontract.

TOP

## X

**Cause**
Debarment, suspension, or equivalent exclusion by an agency prior to the October 1, 1988, effective date for the agency's rule implementing Executive Order 12549. These actions will generally be effective only in the Nonprocurement programs of the agency taking the action.

**Treatment**
Applicable to all Nonprocurement programs of the agency taking the action. When used by other agencies, such listings are for informational purposes only, but should be considered by program officials as reflecting acts, or circumstances, which may have a bearing on the person's responsibility, and which may serve as a basis for debarment or suspension of the person by the agency. For further information, contact the liaison of the agency taking the action.

TOP

## Y

**Cause**
Debarment, suspension, or equivalent exclusion by an agency prior to the October 1,1988, effective date for the agency's rule implementing Executive Order 12549. Authority for the actions generally limit the effects of the action to a specific Nonprocurement program within the agency. These actions will generally be effective in only specific Nonprocurement programs of the agency taking the action.

**Treatment**
Applicable only to specified Nonprocurement programs of the agency taking the action. When used by other agencies, such listings are for informational purposes only, but should be considered by program officials as reflecting acts, or circumstances, which may have a bearing on the person's responsibility, and which may serve as a basis for debarment or suspension of the person by the agency. For specific information on the nature of the action and scope of the exclusion, contact the liaison of the agency taking the action.

TOP

## Z

**Cause**
Excluded by the Department of Health and Human Services from participation in Title XVIII (Medicare), Title XIX (Medicaid), Title V (Maternal and Child Health Programs) and Title XX (Block Grants to States for

Social Services Programs) of the Social Security Act under the authority of Title XI of that Act, and all other Federal nonprocurement programs.

### Treatment

Exclusions are limited to the four specific health care programs referred to above. The effect of an exclusion is that payment may not be made by the programs for any items or services furnished (except an emergency item or service) by an excluded party. If the party is a physician, no payment may be made for any items or services furnished, ordered, or prescribed. This code is applicable only to those parties who were excluded prior to the enactment of the Federal Acquisition Streamlining Act in 1994, after which the scope of all exclusions encompasses both Federal procurement and nonprocurement programs.

TOP

### Z1

### Cause

Excluded by the Department of Health and Human Services and all other Federal procurement and nonprocurement programs. In addition, for exclusions imposed on or after August 5, 1997, the scope of the exclusions encompasses all Federal health care programs.

### Treatment

For exclusions imposed prior to August 5, 1997, the scope is limited to the four health care programs specifically referenced above. For exclusions imposed on or after August 5, 1997, the scope includes all Federal health care programs. The effect of an exclusion is that payment may not be made by the programs for any items or services furnished (except an emergency item or service) by an excluded party. If the party is a physician, payment may not be made for any items or services furnished, ordered, or prescribed. Contact the Health and Human Services liaison shown under the heading "For Additional Information" in the front of this issue is you need specific information concerning listed parties.

TOP

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
LOUIS DRETCHEN,                                     :    07 Civ. 10306 (CLB) (LMS)
                                                    :
                              Plaintiff,            :
                                                    :
                                                    :    **ECF CASE**
              v.                                    :
                                                    :
ALLAN PHARMACEUTICAL LLC,                            :
                                                    :
                              Defendant.            :
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - x


---

**DEFENDANT ALLAN PHARMACEUTICAL LLC'S**
**APPENDIX OF UNPUBLISHED CASES CITED IN**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION TO TRANSFER VENUE**

---


PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
212.969.3000
Attorneys for Defendant
Allan Pharmaceutical LLC

## Table of Contents

**Tab**

*Aarons v. Worldtel Servs., Inc.*, No. 95 Civ. 8415 (AGS), 1996 WL 185714 (S.D.N.Y. Apr. 17, 1996)..................................................................................................................    1

*Chong v. Healthronics, Inc.*, No. CV-06-1287 (SJF)(MLO), 2007 WL 1836831 (E.D.N.Y. June 20, 2007)..............................................................................................................    2

*Colida v. Panasonic Corp. of N. Am.*, No. 05 Civ. 5791(JSR)(JC), 2005 WL 3046298 (S.D.N.Y. Nov. 10, 2005) ..................................................................................................    3

*Deshoulieres, S.A. v. Cuthbertson Imports, Inc.*, No. 06 Civ. 5163(HB), 2006 WL 2849818 (S.D.N.Y. Oct. 3, 2006)..........................................................................................    4

*Elec. Workers Pension Fund, Local 103, v. Nuvelo, Inc.*, Nos. 07 Civ. 975(HB), 07 Civ. 1229(HB), 07 Civ. 1777(HB), 07 Civ. 1953(HB), 2007 WL 2068107 (S.D.N.Y. July 19, 2007)..............................................................................................................................    5

*Freeman v. Hoffman-La Roche Inc.*, No. 06 CIV 13497(RMB)(RLE), 2007 WL 895282 (S.D.N.Y. Mar. 31, 2007).............................................................................................    6

*I Create Int'l, Inc. v. Mattel, Inc.*, No. 03 Civ. 3993(JFK), 2004 WL 1774250 (S.D.N.Y. Aug. 9, 2004) ...............................................................................................................    7

*Int'l Sec. Exch., v. Chi. Bd. Options Exch. Inc.*, No. 06 Civ. 13445(RMB)(THK), 2007 WL 1541087 (S.D.N.Y. May 24, 2007)................................................................................    8

*Reinhard v. Dow Chemical Co.*, No. 07 Civ. 3641(RPP), 2007 WL 2324351 (S.D.N.Y. Aug. 13, 2007)................................................................................................................    9

*Unique Indus., Inc. v. Lisa Frank, Inc.*, No. 93 CIV 8037 (LAP), 1994 WL 525041 (S.D.N.Y. Sept. 23, 1994)........................................................................................    10

**TAB 1**

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 185714 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 1

C

Aarons v. Worldtel Services, Inc.
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Karen AARONS, Plaintiff,
v.
WORLDTEL SERVICES, INC., Defendant.
No. 95 Civ. 8415 (AGS).

April 17, 1996.

*OPINION AND ORDER*
SCHWARTZ, District Judge:
*1 This is a diversity action that was removed by defendant Worldtel Services, Inc. ("Worldtel") from New York State Supreme Court. Plaintiff Karen Aarons ("Aarons") seeks to recover damages for alleged misrepresentations and breach of contract by Worldtel. Worldtel moves to dismiss, or, in the alternative, to transfer this action to the Central District of California, Orange County Division. For the reasons set forth below, Worldtel's motion to transfer is granted.

*FACTS*

Aarons filed her Complaint on or about September 8, 1995 in the Supreme Court of the State of New York, County of Westchester. Worldtel removed to this Court on or about September 29, 1995. Aarons brings this action in three capacities: (1) individually; (2) as assignee of Telequest Communications Corp. ("Telequest"), a Delaware corporation which Aarons alleges has ceased doing business; and (3) on behalf of Telequest's shareholders. Aarons is a resident of New York and Worldtel is a California corporation with a place of business in Irvine, California. Complaint at ¶¶ 1, 3. Worldtel has engaged in the business of selling, leasing, and/or installing telephone equipment, and the selling of long distance telephone services.

Complaint at ¶ 4.

Operating as BPR-NET, Inc., Worldtel entered into a "Dealer Commission Agreement" with Telequest in June 1990. Affidavit in Opposition of Karen Aarons dated November 10, 1995 ("Aarons Aff.") at ¶¶ 13-14; Affidavit of Kenneth A. Lipinski dated October 25, 1995 ("Lipinski Aff.") at ¶ 3. Under the terms of this agreement, Telequest agreed to market long distance services on behalf of Worldtel, and Worldtel agreed to pay Telequest commissions on long distance revenues generated by Telequest customers. In November 1990, the Dealer Commission Agreement was superceded by a "Long Distance Advance Commission Agreement, " which Aarons signed on behalf of Telequest. Lipinski Aff. at ¶ 4. Both of these "commission agreements" contain a forum selection clause which states as follows:
Parties mutually and knowingly agree that any suit arising out of or relating to this Agreement shall be filed and adjudicated exclusively by a court in Orange County, State of California.

Lipinski Aff. ¶ 5.

Plaintiff's Complaint asserts two counts of fraud based on misrepresentations allegedly made by Worldtel's representative for the purpose of inducing execution of the commission agreements. Plaintiff also asserts claims for (1) rescission of the June 1990 commission agreement and quantum meruit based on the alleged misrepresentations; (2) breach of contract based on Worldtel's alleged failure to pay commissions; (3) and unjust enrichment based on Worldtel's receipt of payments for long distance services from Telequest's customers.

*DISCUSSION*

There are two divergent strands in the case law regarding the appropriate analysis for deciding a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 185714 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

motion to transfer venue in a diversity case where the parties have entered into a forum selection clause. Some cases indicate that the analysis applicable in diversity cases is the same as in admiralty cases, and that a forum selection clause should be enforced "unless it is clearly shown that enforcement would be unreasonable and unjust or that the clause was obtained through fraud or overreaching."*Jones v. Weibrecht*, 901 F.2d 17, 18 (2d Cir. 1990) (applying standard enunciated in *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907 (1972), to forum selection clause requiring litigation in state court); *see also Carnival Cruise Lines v. Shute*, 499 U.S. 585, 111 S.Ct. 1522 (1991). However, there is substantial authority supporting the view that the multi-factored approach under the change of venue statute, 28 U.S.C. § 1404(a) ("Section 1404(a)"), is appropriate in a diversity case where there is a forum selection clause. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239 (1988); *see also Haskel v. FPR Registry, Inc.*, 862 F.Supp. 909 (E.D.N.Y. 1994) (Section 1404(a) analysis was appropriate -- rather than dismissal -- where forum selection clause allowed parties to bring suit in federal court); *Water Energizers Ltd. v. Water Energizers, Inc.*, 788 F.Supp. 208, 212-13 (S.D.N.Y. 1992) (applying Section 1404(a)); *Huntingdon Eng'g & Envtl. Inc. v. Platinum Software Corp.*, 882 F.Supp. 54 (W.D.N.Y. 1995) (same). Under these latter cases, a forum selection clause is a "significant factor that figures centrally in the district court's calculus,"*Stewart*, 487 U.S. at 29, 108 S.Ct. at 2244, but other factors -- such as the convenience of parties and witnesses -- are also relevant.

*2 In their memoranda of law, the parties appeared to agree that the appropriate standard in this case was the one enunciated in *The Bremen* and in *Jones*; they differed only in their analyses of the correct result under this standard. After reviewing the parties' memoranda and the applicable case law, the Court ordered the parties to file supplemental affidavits addressing the Section 1404(a) factors. Given that the parties' forum selection clause permits litigation in federal as well as state court, the Court considers the multi-factored analysis under Section 1404(a) -- rather than the more rigid

analysis of *The Bremen* and *Jones* -- to be the correct analytical framework. *See Haskel*, 862 F.Supp. at 915-16. Under either approach, however, the Court concludes that transfer is appropriate, and both are discussed below.

One preliminary matter applicable to both analyses is whether Aarons' claims fall within the scope of the forum selection clause in the commission agreements. It is clear to the Court -- and Aarons' opposition papers do not dispute -- that the asserted claims fall within the intended scope of the provision. The clause states that "any suit arising out of or relating to this Agreement shall be filed and adjudicated exclusively by a court in Orange County, State of California."Claims fall within the scope of this clause if they arise out of or relate to the commission agreements. This clause is a broad one which applies to Aarons' claims because all arise out of and relate to the execution, terms, and alleged breach of the commission agreements.

A. *Standard under The Bremen and Jones*

Under *The Bremen* and *Jones*, a forum selection clause should be enforced "unless it is clearly shown that enforcement would be unreasonable and unjust or that the clause was obtained through fraud or overreaching."*Jones*, 901 F.2d at 19 (citing *The Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916).

Aarons urges the Court to decline to enforce the clause. First, Aarons contends that the forum selection clause should be considered null and void because the June 1990 commission agreement was procured by the fraud and overreaching of Worldtel's representative. Aarons argues that enforcing the clause would be tantamount to a conclusion that the commission agreement was not in fact procured by fraud or overreaching. Aarons suggests that the Court be guided by the standard applicable to summary judgment motions and inquire whether there is a genuine issue as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Further, plaintiff argues that the clause is unreasonable in that it requires litigation in an inconvenient and unreasonable forum. Finally, Aarons argues that the policy considerations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 185714 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

justifying enforcement of forum selection clauses in other cases are not present here.

None of these arguments justify refusing to enforce the forum selection clause in the parties' agreements. First, the Court declines the suggestion that this motion be determined under the standard applicable to summary judgment. Under *Jones,* the appropriate inquiry is to determine whether the clause is applicable, and, if it is, to afford the clause a presumption of validity unless it is "clearly shown that enforcement would be unreasonable or unjust or that the clause was obtained through fraud or overreaching."*Jones,* 901 F.2d at 19. Enforcement of the forum selection clause will not deny Aarons an opportunity to prevail on her underlying fraud claims. The Court makes no finding as to the merit of these claims, which remain open for determination in the California court according to the appropriate law.[FN1]

*3 Second, Aarons' Complaint and her affidavits submitted in opposition do not allege that the forum selection clause, specifically, was obtained through fraud or overreaching. The forum selection clause *itself* must be found to be the product of fraud or coercion; allegations that the agreement as a whole may have been obtained through fraud or overreaching are insufficient. *See Haskel,* 862 F.Supp. at 916 (citations omitted).

Aarons' remaining arguments for denying enforcement of the forum selection clause also lack merit. It is neither inconvenient nor unreasonable to enforce the clause requiring litigation in California. As discussed below in the context of the Section 1404(a) factors, California is the home state of one of the parties, and approximately half of the witnesses are located there. This is not a case, notwithstanding Aarons' contention, in which the clause would require two Americans to resolve their dispute in a "remote alien forum," *see The Bremen,* 407 U.S. at 17, 92 S.Ct. at 1917. Finally, the policy considerations justifying enforcement of forum selection clauses are well served by enforcing the clause in this case. Enforcement of the clause in Worldtel's commission agreement will help promote the uniform application of law to businesses such as Worldtel which have locations, franchises, or dealers in many states.

**B.** *Section 1404(a) Analysis*

Section 1404(a) provides that:
For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). As a threshold matter, the Court must determine whether the proposed transferee jurisdiction is a proper forum for resolution of this dispute. This action initially could have been brought in the Central District of California, Orange County Division. Venue is appropriate in that district and division under 28 U.S.C. § 1391(a)(1) because Worldtel resides in Irvine, California, where it maintains a place of business and is subject to personal jurisdiction.

Factors which determine whether a case should be transferred under Section 1404(a) are: (1) the place where the operative facts occurred; (2) the convenience to parties; (3) the convenience of witnesses; (4) the relative ease of access to sources of proof; (5) the availability of process to compel attendance of unwilling witnesses; (6) the plaintiff's choice of forum; (7) the forum's familiarity with the governing law; and (8) trial efficiency and the interests of justice. *See, e.g., Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.,* 774 F.Supp. 858, 868 (S.D.N.Y. 1991). In addition, under the Supreme Court's analysis in *Stewart,* forum selection clauses are to be a "significant" though not dispositive factor in the transfer analysis.*Stewart,* 487 U.S. at 29-31, 108 S.Ct. at 2244-45;*Haskel,* 862 F.Supp. at 916.

The moving party on a motion to transfer generally bears the burden of showing that the forum should be changed. *See Factors, Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir. 1978), *cert. denied,*440 U.S. 908 (1979). Although a plaintiff's choice of forum would normally be given deference, once a forum selection clause is determined to be valid the plaintiff bears the burden of showing why the contractual provision should not be enforced.*Haskel,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1996 WL 185714 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

862 F.Supp. at 916 (citing *Weiss v. Columbia Pictures Television, Inc.*, 801 F.Supp. 1276, 1278 (S.D.N.Y. 1992)). As discussed above, the Court finds that Aarons has not made an adequate showing of why the forum selection clause should not be enforced.

*4 In light of the Section 1404(a) factors – and with significant weight given to the mandatory forum selection provision – transfer of this case to the Central District of California, Orange County Division, is appropriate.

### 1. *Operative Facts*

Although Worldtel's performance under the commission agreements mainly took place in California, Aarons alleges that the misrepresentations on which she sues took place entirely in New York. Supplemental Affidavit of Kenneth Lipinski dated February 23, 1996 (Supp. Lipinski Aff.) at ¶ 5; Supplemental Affidavit of Karen Aarons dated March 2, 1996 ("Supp. Aarons Aff.") at ¶ 5. As a result, this factor does not weigh in favor or against transfer.

### 2. *Convenience to Parties*

Aarons is a resident of Westchester County who is employed in Manhattan. Supp. Aarons Aff. at ¶ 6. Worldtel is a California corporation, and all of its current employees are located at its Irvine headquarters. Supp. Lipinski Aff. at ¶ 1. Worldtel is not a thriving corporation. It has recently laid off over 90 percent of its staff and is experiencing financial difficulty. *Id.* at ¶ 7. Just as litigation in New York would certainly be more convenient for Aarons, litigation in California would certainly be more convenient for Worldtel and its remaining employees. As a result, convenience to parties does not tip the scales appreciably in either direction.

### 3. *Convenience of Witnesses*

The potential witnesses appear to be located in approximately equal numbers in California and New York. Aarons intends to call four witnesses other than herself, all of whom reside in the New York area. Supp. Aarons Aff. at ¶ 7. Worldtel intends to call four witnesses, all of whom reside in Orange County, California. Supp. Lipinski Aff. at ¶ 3. Consequently, this factor does not weigh in favor or against transfer.

### 4. *Access to Sources of Proof*

Although Telequest's records are located in Manhattan and some telephone records of Telequest customers may be located in New York and New Jersey, Supp. Aarons Aff. at ¶ 8, Worldtel's business records are primarily located in California. Supp. Lipinski Aff. at ¶ 2. As a result, this factor also does not weigh in favor or against transfer.

### 5. *Availability of Process*

Aarons contends that a number of Telequest's sub-dealers and sales representatives are in the New York area and not subject to Aarons' direct control. Supp. Aarons Aff. at ¶ 9. The substance and relevance of these witnesses' testimony to this action is somewhat unclear. Even assuming this testimony is highly relevant, Aarons has offered no reason why these witnesses could not provide deposition testimony. *See Haskel*, 862 F.Supp. at 917. As a result, this factor does not tip significantly either way.

### 6. *Plaintiff's Choice of Forum*

As discussed above, plaintiff's choice of forum is not entitled to deference because the parties entered into a binding forum selection clause requiring litigation in Orange County, California.

### 7. *Familiarity with Governing Law*

*5 This factor weighs heavily in favor of transfer because the California court is likely to be substantially more familiar with the governing law. The parties' commission agreements contain a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 185714 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

choice-of-law provision explicitly providing that California law governs. Supp. Lipinski Aff. at ¶ 4. Although this Court is familiar with breach of contract and fraud issues, the California court is likely to be far more familiar with the particulars of California substantive law.

### 8. *Trial Efficiency and Interests of Justice*

Trial efficiency does not factor into the transfer analysis in this case because there is no evidence that the proposed transferee jurisdiction would not be as available to hear this case as this Court would be.

Overall, the Section 1404(a) factors lead the Court to conclude that Worldtel has met its burden of showing that the forum should be changed. Although some of the factors do not tip appreciably either way, the presence of the forum selection clause and the California choice-of-law provision weigh heavily in favor of transfer. These clauses were integral parts of the agreements at issue. Aarons' reliance on witnesses and documents in the New York area and her other arguments, addressed above, do not satisfy her burden of demonstrating that the forum selection clause should not be enforced. The interests of justice will be served by enforcing the forum selection clause and transferring this action to the Central District of California, Orange County Division.

### CONCLUSION

For the reasons set forth above and in the interests of justice, Worldtel's motion to transfer is granted. The Clerk of the Court is directed to transfer this action to the Central District of California, Orange County Division.

SO ORDERED.

> FN1. Aarons also notes that the three-year California statute of limitations for fraud has expired. This fact has no relevance to the instant motion. No determination has

been made on the issue of whether the California or New York statute of limitations applies to plaintiff's claims. While it is certainly possible that the California court will determine that the California statute of limitations applies, the California court may determine that the New York statute of limitations applies to certain of plaintiff's claims. Furthermore, even a New York court adjudicating this matter might be obliged to apply the California limitations period.

S.D.N.Y.,1996.
Aarons v. Worldtel Services, Inc.
Not Reported in F.Supp., 1996 WL 185714 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB
2**

Westlaw.

Slip Copy

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

C
Chong v. Healthtronics, Inc.
E.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Raymond CHONG, Plaintiff,
v.
HEALTHTRONICS, INC. d/b/a Healthtronics
Service Center, Inc., Defendant.
No. CV-06-1287 (SJF)(MLO).

June 20, 2007.

Christopher K. Collotta, Christopher K. Collotta,
Saul D. Zabell, Zabell & Associates, P.C.,
Bohemia, NY, for Plaintiff.
Philip M. Halpern, Collier, Halpern, Newberg,
Nolletti & Bock LLP, White Plains, NY, for
Defendant.

**OPINION & ORDER**

FEUERSTEIN, J.
*1 On March 21, 2006, plaintiff Raymond Chong
(plaintiff) filed this diversity action against
Healthtronics, Inc. d/b/a Healthtronics Service
Center, Inc. (defendant) alleging claims for, *inter
alia*, breach of contract, fraud, and violations of
sections 190 and 198, *et seq.*, of the New York
State Labor Law. Defendant now moves (1)
pursuant to Rules 12(b)(2) and 12(b)(3) of the
Federal Rules of Civil Procedure to dismiss the
complaint for lack of personal jurisdiction and/or
improper venue; or (2), in the alternative, pursuant
to 28 U.S.C. § 1404(a), to transfer this case to the
United States District Court for the Northern
District of Georgia; or (3), in the alternative,
pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure to dismiss the complaint for failure
to state a claim. For the reasons stated herein,
defendant's motion is granted in part and denied in
part.

I. Background

A. Factual Background

1. The Parties

Plaintiff is a citizen of the State of New York,
residing in Centereach, New York. (Complaint
[Compl.], ¶ 5).

Defendant is a foreign corporation, incorporated
under the laws of the State of Georgia. (Affidavit of
Kari Smith dated June 2, 2006 [Smith Aff.], ¶ 3;
Affidavit of Dr. Argil Wheelock dated June 31[sic],
2006 [Wheelock Aff.] ). During the period of
plaintiff's employment with defendant, defendant
had its headquarters in Marietta, Georgia. (Smith
Aff. ¶ 3; Wheelock Aff. ¶ 2).FN1 According to
Kari Smith (Smith), associate counsel for defendant
(Smith Aff., ¶ 2), defendant does not maintain a
license to do business or any assets, offices, books,
bank accounts, a listed telephone number, or a
mailing address in the State of New York and does
not have any employees who work in New York.
(Smith Aff., ¶ 4). In addition, Smith avers that
defendant did not have any taxable income from
New York for the years from 1999 through 2003,
and had only two hundred ninety-three thousand
three hundred sixty-four dollars ($293,364) of
taxable income from New York in 2004, which
represented less than one percent (.505%) of its
total income for that year. (Reply Affidavit of Kari
Smith dated August 3, 2006 [Smith Reply Aff.], ¶
3).FN2

FN1. Defendant currently has its
headquarters in Austin, Texas but
continues to maintain offices in Georgia.
(Smith Aff. ¶ 3; Wheelock Aff., ¶ 2).

FN2. Although personal jurisdiction is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

determined as of the time the lawsuit is filed, *see Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione*, 937 F.2d 44, 52 (2d Cir.1991), Ms. Smith notably does not indicate what, if any, taxable income defendant derived from New York in 2005 and 2006.

Plaintiff maintains, "upon information and belief" that defendant is the majority partner in Metropolitan Lithotriptor Associations (MLA), which conducts business in at least four (4) locations in New York. (Supplemental Affidavit of Raymond A. Chong dated June 26, 2006 [Plf. Supp. Aff.], ¶ 5). However, according to Smith, MLA is a professional corporation wholly owned by physicians which maintains the New York offices to which plaintiff refers. (Smith Reply Aff., ¶ 13). Moreover, according to Smith, defendant does not have any ownership interest in MLA and the two companies do not share any of the same officers. (Smith Reply Aff., ¶¶ 15. 17).

Plaintiff further contends that defendant has advertised in New York regarding its products and services and has sold approximately five (5) lithotripsy and/or orthotripsy machines in New York during the past five (5) years. (Plf.Supp.Aff., ¶¶ 1-2). However, according to Smith, defendant has not directed any advertising to New York, but has simply included information on its equipment in national trade journals. (Smith Reply Aff., ¶¶ 4-5).

### 2. Plaintiff's Employment

\*2 According to plaintiff, he and Bradley Devine (Devine) had created a health service company which they agreed to merge with defendant to form a new company called HealthTronics Technical Service Division (HTSD). (Compl., ¶ 12). According to Dr. Argil Wheelock (Wheelock), defendant's former Chief Executive Officer, he discussed the creation of a service department within defendant linked with Devine. (Wheelock Aff., ¶ 4). Wheelock avers that those discussions took place entirely in Georgia. (*Id.*). Wheelock does not recall having any personal discussions with plaintiff

about the creation of a service department. (*Id.*. ). Plaintiff alleges that all negotiations with him regarding the "business venture" with defendant were done "via telephone, e-mail and fax between [plaintiff], here in New York, and [defendant] in Georgia."(Affidavit of Raymond A. Chong dated June 26, 2006 [Plf. Aff.], p. 1).

Plaintiff alleges that he and Devine entered into a written profit-sharing agreement with defendant, which was based upon their respective percentage of ownership in the new company. (Compl., ¶ 13; *see also* Affidavit of Bradley G. Devine dated June 21, 2006 [Devine Aff.], p. 3). According to plaintiff, he and Devine owned sixty-one and a half percent (61.5%) of the net profit of HTSD. (*Id.; see also* Plf. Aff., p. 1). Plaintiff contends that the payments he received from defendant, purportedly pursuant to the profit-sharing agreement, were significantly less than he was supposed to receive under the agreement. (Compl., ¶¶ 16-20). According to Wheelock, the payments plaintiff believes are due him as compensation under any profit-sharing agreement actually constituted bonuses, which were approved and paid out of defendant's Georgia headquarters. (Wheelock Aff., ¶¶ 8, 10).

On or about September 1, 1999, defendant hired plaintiff as a senior field service manager. (Compl., ¶¶ 10-11). According to Wheelock, the decision to hire plaintiff was made in defendant's Georgia headquarters. (Wheelock Aff., ¶ 6). On or about that same date, plaintiff entered into a Non-Statutory Employee Stock Option Agreement (the stock option agreement), which was "intended to provide additional financial incentive to [plaintiff] and to intensify [plaintiff's] interest in the success of [defendant], as well as reward [plaintiff's] contribution to [defendant's] performance."(Wheelock Aff., ¶ 7, Exhibit [Ex.] B, p. 1). The stock option agreement was expressly governed by the laws of the State of Georgia. (Wheelock Aff., Ex. B, ¶ 12).

Plaintiff alleges that he began employment with defendant on September 6, 1999, at which time he went to Georgia to train. (Plf.Aff., p. 1). According to Wheelock, during the course of his employment,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 3

plaintiff worked both out of his home in New York and in defendant's Georgia headquarters, and traveled to other states and Canada, but he always reported to Devine in Georgia. (Wheelock Aff., ¶ 12). Plaintiff avers that during the course of his employment, he managed the Field Service Engineers and taught classes for defendant, attended meetings and occasionally substituted for Devine in Georgia. (Plf.Aff., pp. 1-3). However, plaintiff also claims that he serviced equipment "in the New York Metro area," as well as in New England and Toronto; that he conducted business nationally and internationally from New York via telephone, e-mail and postal service; that he performed other services for clients in other states from New York or by traveling to the client's respective states; and that during his employment with defendant, he "established and cultivated five (5) new business accounts located in New York on behalf of [defendant]."(*Id.* at pp. 1-2; Plf. Supp. Aff., ¶ 4).

*3 According to plaintiff, in January 2004, he and Devine FN3 met with Martin McGahan (McGahan), defendant's former Chief Financial Officer, who informed them that defendant wanted to eliminate the profit-sharing agreement. (Compl., ¶ 14). Plaintiff contends that in January 2004, he complained to defendant's management about not being paid his earned wages. (Compl.¶ 22).

> FN3. According to Smith, Devine was employed by defendant as vice president of service. (Smith Aff., ¶ 6).

Plaintiff alleges that in February 2004, he met with Wheelock and Roy Brown (Brown), defendant's former Chief Operating Officer, regarding a reduction of plaintiff's profit-sharing compensation for 2003. (Compl., ¶ 15). According to plaintiff, he agreed to the reduction in the payments under the profit-sharing agreement in exchange for a block of stock options. (*Id.*). Plaintiff does not indicate where this discussion took place. However, Wheelock avers that any discussions plaintiff had with defendant's executives concerning his "bonuses " occurred in Georgia. (Wheelock Aff., ¶ 9).

Defendant terminated plaintiff's employment on or about May 14, 2004, effective May 31, 2004, during a training class that plaintiff was conducting in Georgia. (Compl., ¶ 22; Wheelock Aff., ¶ 11; Plf. Aff., p. 3). According to Dr. Wheelock, the decision to terminate plaintiff was made in Georgia. (Wheelock Aff., ¶ 11). According to plaintiff, all subsequent discussions with defendant regarding his termination were conducted via telephone and e-mail between him in New York and defendant in Georgia. (Plf.Aff., p. 3).

3. Location of Witnesses and Documents

According to Smith, Brown, Devine, and McGahan no longer work for defendant. (Smith Aff., ¶¶ 5-7). Smith advises that Brown currently resides in Lawrenceville, Georgia; Devine currently resides in Kennesaw, Georgia, and McGahan currently resides in Smyrna, Georgia. (*Id.*). Devine indicates that he " can make [himself] availably [sic] to testify at a trial in NY, providing sufficient notice is given."(Devine Aff., ¶ 8).

According to Wheelock, he was CEO of defendant until November 2004, at which time defendant went through a merger. (Wheelock Aff., ¶ 2). Wheelock avers that he continues to serve on defendant's Board of Directors; that he resides on Lookout Mountain, Tennessee, which is approximately two miles from the Georgia state line; and that he has an apartment and office in Georgia. (Wheelock Aff., ¶ 3).

Smith further avers that all of plaintiff's personnel records, as well as any compensation or financial data upon which he may base his claims, were maintained in Georgia during the course of plaintiff's employment, and are currently maintained in both Georgia and Texas. (Smith Aff., ¶ 9).

B. Procedural History

On October 24, 2005, plaintiff filed this action against defendant alleging claims for breach of contract, fraud, retaliation, quantum meruit and violations of sections 190 and 198, *et seq.*, of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

New York State Labor Law. In essence, plaintiff contends that he "has not received earned compensation in the form of non-discretionary profit-sharing in connection with [h]is former employment with Defendant * * *." (Compl., ¶ 23). Plaintiff seeks, *inter alia*, compensatory and liquidated damages, costs and attorney's fees.

*4 Defendant now moves (1) pursuant to Rules 12(b)(2) and (3) of the Federal Rules of Civil Procedure to dismiss the complaint for lack of personal jurisdiction and/or improper venue; or (2), in the alternative, pursuant to 28 U.S.C. § 1404(a) to transfer this case to the United States District Court, Northern District of Georgia; or, (3) in the alternative, pursuant to Rule 12(b)(6) to dismiss the complaint for failure to state a claim.

## II. Discussion

### A. Jurisdiction

#### 1. Standard of Review

In resolving issues of personal jurisdiction in diversity cases, the court must determine (1) whether, under the laws of the forum state, in this case New York, there is jurisdiction over the defendant; and (2) whether an exercise of jurisdiction under the laws of the forum state is consistent with federal due process requirements. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir.1999); *see also D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir.2006) (holding that in diversity cases, the issue of personal jurisdiction is governed by the laws of the forum state, so long as the exercise of jurisdiction comports with the requirements of due process). Although the plaintiff must ultimately establish personal jurisdiction over the defendant by a preponderance of the evidence, *see Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984), in opposing a Rule 12(b)(2) motion prior to discovery, "the plaintiff

bears the burden of establishing that the court has jurisdiction over the defendant. * * * Where a court [has chosen] not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials."*Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir.2005), *cert. denied sub nom King v. Grand River Enterprises Six Nations, Ltd.*, — U.S. —, 127 S.Ct. 379, 166 L.Ed.2d 267 (2006) (quoting *Bank Brussels*, 171 F.3d at 784 (internal quotations and citations omitted)). In order to make a prima facie showing of jurisdiction, the plaintiff need only plead "legally sufficient allegations of jurisdiction." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir.1998); *see also Dorfman v. Marriott International Hotels, Inc.*, No. 99 Civ. 10496, 2002 WL 14363, at * 1 (S.D.N.Y. Jan.3, 2002) (holding that when a motion to dismiss pursuant to Rule 12(b)(2) is brought on the pleadings, before any discovery has taken place, the plaintiff need only make a prima facie showing that personal jurisdiction exists, based on allegations of fact which will be taken as true).

"Unlike a motion to dismiss pursuant to Rule 12(b)(6), deciding a Rule 12(b)(2) motion necessarily requires resolution of factual matters outside the pleadings."*ADP Investor Communication Services, Inc. v. In House Attorney Services, Inc.*, 390 F.Supp.2d 212, 217 (E.D.N.Y.2005)."Where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor."*Wickers Sportswear, Inc. v. Gentry Mills, Inc.*, 411 F.Supp.2d 202, 205-206 (E.D.N.Y.2006) (quoting *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 [2d Cir.2001] ); *see also Magnetic Audiotape*, 334 F.3d at 206 (holding that a plaintiff's averments of jurisdictional facts must be credited as true); *ADP Investor*, 390 F.Supp.2d at 217 (holding that where no jurisdictional discovery has been conducted, the plaintiff need only establish a prima facie case, and allegations of jurisdictional fact must be construed in a light most favorable to the plaintiff).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 5

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

2. General Jurisdiction [FN4] -N.Y. C.P.L.R. § 301

> FN4. "General" jurisdiction exists where the plaintiff's claim is not related to the defendant's contacts in New York. *See, e.g. Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 98 (2d Cir.2000) (stating that where the plaintiffs' claims is not related to the defendants' contacts with New York, jurisdiction is properly characterized as " general.")

*5 Under New York law, an out-of-state defendant is subject to general personal jurisdiction if it is " doing business" in the state. N.Y. C.P.L.R. § 301; *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir.2000).Section 301"permits a court to exercise jurisdiction over a foreign corporation on any cause of action if the defendant is 'engaged in such a continuous and systematic course of "doing business" here as to warrant a finding of its "presence" in this jurisdiction.' " *Landoil Resources Corp. v. Alexander & Alexander Services, Inc.* ., 918 F.2d 1039, 1043 (2d Cir.1990) (citing *McGowan v. Smith*, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)). "A corporation is 'doing business' and is therefore ' present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contacts, if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity.' " *Wiwa*, 226 F.3d at 95 (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985)).

In order to establish general personal jurisdiction under section 301, a plaintiff must demonstrate that the defendant engaged in "continuous, permanent, and substantial activity in New York."*Landoil Resources*, 918 F.2d at 1043. "The test is a 'simple pragmatic one' * * *, which is necessarily fact sensitive because each case is dependent upon its own particular circumstances."*Id.* (citations omitted). Factors to be considered in determining whether general jurisdiction lies under section 301 include: (1) whether the defendant maintains an office in New York; (2) whether the defendant has

any bank accounts or other property within the state; (3) whether the defendant has a telephone listing in the state; (4) whether the defendant does public relations work or solicits business within the state; and (5) whether the defendant has employees or agents located within the state. *See Wiwa*, 226 F.3d at 98;*Landoil Resources*, 918 F.2d at 1043.

Plaintiff has not made a prima facie showing that defendant had a "substantial 'physical corporate presence' in [New York], permanently dedicated to promoting [its] interests,"*Wiwa*, 226 F.3d at 98, sufficient to confer general personal jurisdiction over defendant. The evidence submitted on the motion establishes that defendant did not maintain an office in New York, did not have any bank accounts or other property in New York, did not have a New York telephone listing, did not perform public relations work in New York, and did not, as of the date the action was filed, have any employees permanently located in New York. Plaintiffs conclusory allegations to the contrary, particularly those stated only upon "information and belief," are insufficient to establish general personal jurisdiction over defendant pursuant to N.Y. C.P.L.R. § 301. *See, e.g. Jazini*, 148 F.3d at 185 (holding that courts are not bound to accept as true a legal conclusion couched as a factual allegation).

a. "Agency" or "Mere Department" Theory of Jurisdiction

*6 Plaintiff maintains that general personal jurisdiction may be maintained over defendant because it has an agent in New York, HealthTronics Service Center Inc. (HTSCI), which is either a wholly-owned subsidiary or independent department of defendant and which consented to jurisdiction in New York when it registered with the Secretary of State of New York.

According to Smith, during plaintiff's employment, HTSCI operated under the name Prime Service Center, Inc. (PSCI) and was owned by Prime Medical Services, Inc. (PMSI) until PMSI merged with defendant effective November 9, 2004. (Smith Reply Aff., ¶ 6). After the merger, PSCI became HTSCI. (*Id.*). Defendant wholly owns Prime

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 6

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

Medical Operating, Inc., which wholly owns HTSCI. (*Id.*). Smith maintains: (1) that HTSCI is not financially dependent on defendant and instead relies on its own revenues; (2) that HTSCI directs its own marketing, operational policies and daily practices; and (3) that defendant and HTSCI " follow appropriate corporate procedures with respect to actions taken by their officers and boards. "(Smith Reply Aff., ¶¶ 10-12). In addition, Smith maintains that only one of defendant's directors sits on HTSCI's board, as Chairman of the Board, and that "four individuals are officers of one of the companies but not the other."(Smith Reply Aff., ¶ 11). However, eight (8) of the ten (10) officers of HTSCI are also officers of defendant and vice versa. (Smith Reply Aff., Exhibit A).

Initially, since HTSCI is authorized by the New York Secretary of State to do business in New York, and, pursuant to New York Business Corporation Law § 304, has consented to jurisdiction in New York, general personal jurisdiction exists over HTSCI under N.Y. C.P.L.R. § 301. *See, e.g. Obabueki v. International Business Machines Corp.* ., No. 99 Civ. 11262, 2001 WL 921172, at * 5 (S.D.N.Y. Aug.14, 2001) (finding that the defendant who was authorized by the New York Secretary of State to do business in New York met the "doing business" criteria of section 301 for the purposes of personal jurisdiction); *Amalgamet, Inc. v. Ledoux & Co.,* 645 F.Supp. 248, 249 (S.D.N.Y.1986) (holding that the general rule is that a foreign corporation which files a certificate of authority to do business in New York has consented to personal jurisdiction in the state and that by filing its application for authority to do business in New York, defendant has also designated the Secretary of State as agent for service of process); *Augsbury Corp. v. Petrokey Corp.,* 97 A.D.2d 173, 175, 470 N.Y.S.2d 787 (3d Dept.1983) (holding that the defendant's authorization to do business in New York and concomitant designation of the Secretary of State as its agent for service of process pursuant to section 304(b) of the New York Business Corporation Law is consent to in personam jurisdiction).[FN5]

FN5. Although two district courts have

held that a filing for authorization to do business alone is insufficient to confer personal jurisdiction, *see Wright v. Maersk Line, Ltd.,* No. 99 Civ. 11282, 2000 WL 744370, at * 1 (S.D.N.Y. Jun.9, 2000) and *Bellepointe, Inc. v. Kohl's Department Stores, Inc.,* 975 F.Supp. 562, 564 (S.D.N.Y.1997), those cases rely on mere *dictum* from a Second Circuit case, *Beja v. Jahangiri,* 453 F.2d 959, 961-962 (2d Cir.1972), which vaguely stated that "the mere authorization to do business * * * *may* not be conclusive on the issue of [personal] jurisdiction * * * [but was] certainly very strong evidence that the corporation is subject to in personam jurisdiction ."(emphasis added).*Wright* and *Bellepointe* are not persuasive in light of the majority of federal district courts and New York courts which hold that a filing for authorization to do business in New York is sufficient to subject a foreign corporation to general personal jurisdiction in New York. *See, e.g. Erne Shipping Inc. v. HBC Hamburg Bulk Carriers GmbH & Co. KG,* 409 F.Supp.2d 427, 436 (S.D.N.Y.2006) (citing New York and federal cases), *rejected on other grounds by Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 460 F.3d 434 (2d Cir.2006).

The mere presence of a subsidiary in New York, without more, is insufficient to establish the parent company's presence in the state for jurisdiction purposes. *See Jazini,* 148 F.3d at 184;*see also Beech Aircraft,* 751 F.2d at 120 (holding that the presence of a local corporation does not create jurisdiction over a related, but independently managed, foreign corporation). Rather, the subsidiary must be either an "agent" or a "mere department" of the parent company in order for personal jurisdiction to attach. *Jazini,* 148 F.3d at 184.

### i. Agent

*7 In order to establish that a domestic corporation is an agent of a foreign corporation, "the plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 7

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.' " *Jazini,* 148 F.3d at 184 (quoting *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967) (alteration in original)). "Courts have interpreted this to mean that the agent's activities in New York must be sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Stutts v. De Dietrich Group,* 465 F.Supp.2d 156, 162 (E.D.N.Y.2006) (internal quotations and citations omitted). "To be considered an agent for jurisdictional purposes, the putative agent must have acted in the state 'for the benefit of, and with the knowledge and consent of' the non-resident principal." *Ross v. UKI Ltd.,* No. 02 Civ. 9297, 2004 WL 384885, at * 4 (S.D.N.Y. Mar.1, 2004) (quoting *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981)). In addition, the plaintiff must demonstrate that the principal exercised some control over the activities of the purported agent. *Ross,* 2004 WL 384885, at * 4 (citing *CutCo Industries. Inc. v. Naughton,* 806 F.2d 361, 366 (2d Cir.1986)). "The required control need not rise to the level of absolute control over the acts or decisions of the putative agent; rather, it may involve the ability of the principal to influence such acts or decisions by virtue of the parties' respective roles." *Scholastic, Inc. v. Stouffer,* No. 99 Civ. 11480, 2000 WL 1154252, at * 5 (S.D.N.Y. Aug.14, 2000).

Plaintiff offers no factual allegations in support of its contention that HTSCI is an "agent" of defendant for purposes of personal jurisdiction, instead arguing that further discovery on this issue is warranted. Therefore, plaintiff fails to make any showing, never mind a prima facie showing, that jurisdiction should be based on an agency theory.

ii. "Mere Department"

In determining whether a subsidiary is a "mere department" of the parent, the court should consider the following four factors: (1) whether there is common ownership; (2) whether the subsidiary is financially dependent on the parent corporation; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities;" and (4) the degree of control the parent corporation exerts over the subsidiary's marketing and operational policies.*Jazini,* 148 F.3d at 185;*Beech Aircraft,* 751 F.2d at 121-122. Only the first factor-common ownership-is essential to a finding that a subsidiary is a "mere department" of the parent corporation; whereas the other three factor necessitate a balancing process. *See Beech Aircraft,* 751 F.2d at 120;*Dorfman,* 2002 WL 14363, at * 7 (citing cases); *see also Allojet PLC v. Vantage Associates,* No. 04 Civ. 5223, 2005 WL 612848, at * 5 (S.D.N.Y. Mar.15, 2005).

*8 Here, there is common ownership of defendant and HTSCI, but plaintiff does not offer any factual allegations to dispute Smith's assertions that HTSCI is not financially dependent on defendant and does not control HTSCI's marketing or operational policies. However, defendant's involvement in the selection and assignment of HTSCI's executive personnel cannot be determined at this stage, prior to discovery. Although some amount of overlap between the officers and directors of corporations under common ownership is to be expected and does not necessarily warrant a finding that the subsidiary is a "mere department" of the parent, *see, e.g. Jazini,* 148 F.3d at 185 (finding that the fact that one of the defendant's four managing executive directors is the chairman of the subsidiary does not establish that the subsidiary is a "mere department" of the parent); *Porter v. LSB Industries, Inc.,* 192 A.D.2d 205, 600 N.Y.S.2d 867 (4th Dept.1993) (holding that the fact that the directors and officers of the subsidiary and parent corporations overlap to an extent is intrinsic to the parent-subsidiary relationship and is not, itself, determinative), since all but two (2) of HTSCI's ten (10) officers are officers of defendant, and the President and CEO and director of defendant is the chairman of the board of HTSCI, there is at least an inference that defendant has control over the selection and assignment of HTSCI's executive personnel. *See, e.g. Obabueki,* 2001 WL 921172, at * 5 (finding that the structural overlap that existed where all but

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 8

one of the officers of the putative agent was an officer of the parent corporation, and each of the agent's board members was an officer or director of the parent suggested that the parent had control over the selection and assignment of its subsidiary's executive personnel); *Derthick v. Bassett-Walker Inc.*, No. 90 Civ. 5427, 1992 WL 249951, at * 3 (S.D.N.Y. Sept.23, 1992) (holding that evidence of excessive parental interference in the selection and assignment of the subsidiary's executive personnel may be found in the presence of interlocking officers and directors and finding that the fact that the parent company's two highest ranking officers were members of the subsidiary's board of directors, and that the subsidiary's chairman of the board was a member of the parent's board of directors, coupled with evidence that the companies disregarded corporate formalities, weighed in favor of exercising jurisdiction).

Since at this juncture all inferences must be drawn in favor of plaintiff, and two of the four factors arguably support a finding that HTSCI is a "mere department" of defendant for the purposes of personal jurisdiction under section 301, the branch of defendant's motion which seeks dismissal for lack of personal jurisdiction is denied. Plaintiff's application for leave to conduct jurisdictional discovery is granted to the extent that plaintiff is permitted to conduct such discovery limited to the facts necessary to establish general jurisdiction under a "mere department" theory. *See, e.g. Allojet*, 2005 WL 612848, at * 7 (permitting jurisdictional discovery, limited to the facts relating to establishing general jurisdiction, notwithstanding the plaintiff's failure to make a prima facie showing under section 301).

### 3. Specific Jurisdiction

*9 Personal jurisdiction may still be found to exist over a defendant who is not "doing business" in New York within the meaning of section 301 based on the defendant's transaction of business within the state pursuant to N.Y. C.P.L.R. § 302. Section 302(a)(1) permits the exercise of personal jurisdiction over an out-of-state defendant if (1) that defendant "transacts any business within the state"

and (2) the claim arises from such business contacts. *See D.H. Blair*, 462 F.3d at 104;*Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996).

To meet the "transacting business" element, the plaintiff must demonstrate that the defendant " purposely availed [itself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws * * *."*Bank Brussels*, 171 F.3d at 787 (quoting *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506, 509 (1970)). In *Agency Rent A Car*, the Second Circuit enumerated a variety of factors to be considered in determining whether an out-of-state defendant transacts business in New York, including: "(i) whether the defendant has an on-going contractual relationship with a New York corporation * * *; (ii) whether the contract was negotiated or executed in New York * * *, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship * * *; (iii) what the choice-of-law clause is in any such contract * * *; and (iv) whether the contract requires [defendants] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state * * *."98 F.3d at 29 (citations omitted). No one factor is dispositive and the court must look at the totality of circumstances concerning the defendant's interactions with, and activities within, the state. *Id.*

Plaintiff's claims against defendant relate to payments allegedly due plaintiff by defendant under the profit-sharing and stock option agreements and the termination of his employment by defendant. In this case, none of the factors cited by the Second Circuit support the exercise of personal jurisdiction under the "transacting business" section of New York's long-arm statute with respect to those claims. Specifically, any contracts between the parties with respect to the profit-sharing and stock option payments and plaintiff's employment were not negotiated or executed in New York, the only choice-of-law provision is contained in the stock option agreement and calls for the application of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 9

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

Georgia law, plaintiff does not allege that he participated in any meetings with defendant in New York regarding the formation, performance or breach of contract or that defendant otherwise purposefully availed itself of the privilege of conducting activities within the State of New York, and plaintiff was terminated in Georgia. *See, e.g. Barrett v. Tema Development (1988), Inc.,* 463 F.Supp.2d 423, 430-431 (S.D.N.Y.2006); *Singer v. Carrington Laboratories,* No. CV-01-2084, 2001 WL 995353, at * 7 (E.D.N.Y. Aug.28, 2001). In addition, defendant's use of telephone, facsimiles or e-mails to communicate with plaintiff in New York are insufficient to establish that defendant transacted business in New York, absent any indication that defendant intended "to project itself into ongoing New York commerce."*Kulas v. Adachi,* No. 96 Civ. 6674, 1997 WL 256957, at *7 (S.D.N.Y. May 16, 1997); *see also Copeland v. Life Science Technologies, Ltd.,* No. 97 Civ. 0456, 1997 WL 716915, at * 2 (S.D.N.Y. Nov.17, 1997).[FN6]

> FN6. Since plaintiff has not made a prima facie showing that defendant transacted business in New York, it is unnecessary to consider the "arising out of" element of specific jurisdiction.

### 4. Due Process

*10 In order to satisfy constitutional due process requirements, the exercise of long-arm jurisdiction " must be based on defendants' 'minimum contacts' with the state and must comport with 'traditional notions of fair play and substantial justice.' " *Agency Rent A Car,* 98 F.3d at 32 (citing *International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed.2d 95 (1945)); *see also Wiwa,* 226 F.3d at 99 (accord). Where specific jurisdiction is found, minimum contacts exist "where the defendant purposefully availed itself of the privilege of doing business in the forum and could forsee being haled into court there," but where general jurisdiction is found, minimum contacts exist only where the contacts "are continuous and systematic." *Bank Brussels,* 305 F.3d at 127 (internal quotations and

citations omitted). Generally, "once a plaintiff has made a 'threshold showing' of minimum contacts, the defendant must come forward with a ' compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Wiwa,* 226 F.3d at 99 (citing *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 568 (2d Cir.1996).

The Second Circuit has enumerated the following factors in determining whether the exercise of jurisdiction "comports with traditional notions of fair play and substantial justice:"
(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."

*Chaiken v. VV Publishing Corp.,* 119 F.3d 1018, 1028 (2d Cir.1997) (citation omitted); *see also Bank Brussels,* 305 F.3d at 129 (accord).

"A voluntary use of certain state procedures, as in [the case where the defendant is authorized to do business in the State and designates the Secretary of State as its agent for service of process pursuant to section 304 of the New York Business Corporation Law], is in fact a form of constructive consent to personal jurisdiction which has been found to satisfy due process."*Augsbury,* 97 A.D.2d at 176, 470 N.Y.S.2d 787 (citing *Insurance Corporation of Ireland, Ltd. v. Compagnie Des Bauxites De Guinee,* 456 U.S. 694, 703-704, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)). Since personal jurisdiction over defendant only exists if HTSCI is found to be a "mere department" of defendant, HTSCI's authorization to do business and concomitant designation of the Secretary of State as its agent for service of process would also satisfy due process requirements.

### B. Transfer

Defendant contends that even if this Court has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 10

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

personal jurisdiction over it, plaintiff's claims should be transferred to the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a).

*11 Motions for change of venue are governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[FN7]Notions of convenience and fairness must be determined on a case-by-case basis and district courts have broad discretion to transfer actions pursuant to section 1404(a).See In re Cuyahoga Equipment Corp., 980 F.2d 110, 117 (2d Cir.1992). Factors to be considered in determining whether an action should be transferred pursuant to section 1404(a) include: " (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties, "D.H. Blair, 462 F.3d at 106 (citing Albert Fadem Trust v. Duke Energy Corp., 214 F.Supp.2d 341, 343 (S.D.N.Y.2002)), as well as (8) the forum's familiarity with the governing law, and (9) judicial economy and the interests of justice, based on the totality of circumstances. See Navigators Management Co., Inc. v. St. Paul Fire and Marine Ins. Co., No. 06 Civ. 599, 2006 WL 3317030, at * 2 (S.D.N.Y. Nov.9, 2006); see also International Securities Exchange, LLC v. Chicago Board Options Exchange Inc., No. 06 Civ. 13445, 2007 WL 1541087, at * 2 (S.D.N.Y. May 24, 2007) (holding that a could should also consider the transferee court's familiarity with the governing law, as well as trial efficiency and the interests of justice). The moving party bears the burden of making a "clear and convincing showing" that there should be a transfer of venue. International Securities, 2007 WL 1541087, at * 2 (quoting Montgomery v. Tap Enterprises, Inc., No. 06 Civ. 5799, 2007 WL 576128, at * 2 (S.D.N.Y. Feb. 26, 2007)); see also Tralongo v. Shultz Foods, Inc., No. 06 Civ. 13282, 2007 WL 844687, at * 2 (S.D.N.Y. Mar.14, 2007) (holding that the burden of demonstrating that a transfer is warranted lies with

the moving party, and a court should not disturb the plaintiff's choice of forum unless the defendant makes a "clear and convincing showing" that the balance of convenience favors a transfer).

> FN7. The parties do not dispute that this action could have been brought in the Northern District of Georgia.

1. Plaintiff's Choice of Forum

The plaintiff's choice of forum is to be given great weight, see D.H. Blair, 462 F.3d at 106;Albert Fadem Trust, 214 F.Supp.2d at 343, and this factor clearly favors plaintiff herein. Unless the balance of the remaining factors weighs "strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."International Securities, 2007 WL 1541087, at * 2. However, the plaintiff's choice of forum "is not entitled to the weight it is generally accorded when the forum chosen has no material connection with the action."Tralongo, 2007 WL 844687, at * 4. Here, the only connection that plaintiff's claims have with New York are his residence in this state. Thus, this factor is not entitled to the deference normally due it in balancing the factors relative to a transfer motion.

2. Convenience of Witnesses

*12 The convenience of witnesses, particularly nonparty witnesses, is an important factor in considering a transfer pursuant to section 1404(a). Navigators Management, 2006 WL 3317030, at * 4; see also International Securities, 2007 WL 1541087, at * 3 (holding that the convenience of witnesses is probably the single-most important factor in the analysis of whether transfer should be granted); Tralongo, 2007 WL 844687, at * 2 (accord). All of the potential witnesses identified,[FN8] other than plaintiff, are nonparties to this action and reside in or near, or work in, Georgia, and only one of those witnesses, Devine, has indicated a willingness to travel to New York to testify in this matter. As "the convenience of a party witness is entitled to less weight than the convenience of a nonparty,"Navigators

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 11

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

*Management*, 2006 WL 3317030, at * 4, this factor strongly weighs in favor of a transfer. *See, e.g. International Securities*, 2007 WL 1541087, at * 4 (finding that since every witness who could testify at trial resided or worked in the transferee district, the "convenience of witnesses" factor strongly favored a transfer); *Tralongo*, 2007 WL 844687, at * 3 (finding that the "convenience of witnesses" factor weighed in favor of a transfer where the plaintiff's immediate supervisors, and all persons responsible for the relevant personnel decisions, worked in the transferee court's district).

> FN8. The potential witnesses identified by the parties are Argil Wheelock, Roy Brown, Bradley Devine, Martin McGahan and Victoria Beck.

### 3. Location of Documents

Plaintiff does not dispute that all relevant documents and other evidence in the possession of defendant are located either in Texas or Georgia and not in New York. Accordingly, this factor weighs in favor of a transfer. However, "[t]he location of relevant documents is not a very compelling factor because records are easily portable."*Navigators Management*, 2006 WL 3317030, at *5.

### 4. Convenience of Parties

The "convenience of the parties" factor is relatively neutral. Although defendant currently has its headquarters in Texas, it maintains offices and certain documents in Georgia and, thus, Georgia, to which defendant seeks this action to be transferred, would be slightly more convenient to it than New York. Plaintiff resides in New York and, thus, New York would be a more convenient forum for him. However, during the course of his employment with defendant, plaintiff regularly traveled to Georgia, as well as nationally and to Canada. Thus, it cannot be said that plaintiff would be greatly inconvenienced if he had to litigate the present action in Georgia.

### 5. Locus of Operative Facts

The "locus of operative facts" factor "is traditionally an important factor to be considered in deciding where a case should be tried." *International Securities*, 2007 WL 1541087, at * 5 (internal quotations and citations omitted); *see also Tralongo*, 2007 WL 844687, at * 3 (holding that the location of operative facts is a primary factor in a transfer motion)."Courts routinely transfer cases to the district where the principal events occurred, and where the principal witnesses are located * * *." *Tralongo*, 2007 WL 844687, at * 3. The terms of plaintiff's employment and profit-sharing and stock option agreements were negotiated by defendant in Georgia via telephone, facsimile and e-mail to plaintiff in New York, but, according to defendant, the decision to hire plaintiff was made in Georgia. The stock option agreement contains a choice-of-law provision providing that the laws of the State of Georgia were to apply thereto. Plaintiff performed his employment duties both in New York and Georgia, as well as in the New England area and Canada, but, according to defendant, he reported to Devine in Georgia. According to defendant, any compensation and bonus payments to plaintiff were approved and paid out by defendant in Georgia and any discussions and meetings plaintiff had with defendant's executives concerning such payments occurred in Georgia. Moreover, plaintiff was terminated in Georgia and the decision to terminate plaintiff was made in Georgia, although, according to plaintiff, all subsequent discussions with defendant regarding his termination were conducted via telephone and e-mail between him in New York and defendant in Georgia. Since a substantial portion of the facts relevant to plaintiff's claims occurred in Georgia, this factor weighs in favor of transfer.

### 6. Availability of Process

*13 "Availability of compulsory process is an important consideration in transfer motions." *International Securities*, 2007 WL 1541087, at * 4 (internal quotations and citation omitted). In the event service of process is necessary to compel the appearance of any unwilling nonparty witnesses, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 12

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

Northern District of Georgia could subpoena the potential witnesses identified, who are located within that district, or within one hundred (100) miles thereof, see Fed.R.Civ.P. 45(b)(2), whereas this Court cannot. Thus, this factor strongly weighs in favor of transfer. *See, e.g. International Securities,* 2007 WL 1541087, at * 4 (finding that the "service of process" factor strongly weighed in favor of a transfer because none of the nonparty witnesses were subject to subpoena power in New York, but were subject to such authority in the transferee court's district).

### 7. Means of Parties

Since plaintiff is an individual and defendant is a corporation, the "relative means of the parties" factor weighs in favor of plaintiff.

### 8. Familiarity with Law

To the extent plaintiff's claims pertain to the stock option agreement, that document contains a choice-of-law provision providing that Georgia law is to be applied and plaintiff does not allege that that provision is unenforceable due to fraud or bad faith or for public policy considerations. Moreover, applying a choice-of-law analysis to plaintiff's remaining claims establishes that Georgia law applies to plaintiff's contract and quasi-contract claims, but New York applies to plaintiff's tort claims, to the extent those claims pertain to the profit-sharing agreement.

In diversity cases, federal courts apply the choice-of-law analysis of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed.2d 1477 (1941). Accordingly, New York choice-of-law rules apply here.

With respect to plaintiff's contract and quantum meruit or quasi-contract claims, New York courts apply a "center of gravity" or "grouping of contacts" analysis to choice-of-law situations in order to determine which state has the most significant relationship to the transaction and the parties. *Matter of Allstate Ins. Co. (Stolarz),* 81 N.Y.2d

219, 226, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993) ; *see also Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.,* 448 F.3d 573, 583 (2d Cir.2006) (applying New York law to contract claims); *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 394 (2d Cir.2001) (applying New York law to quantum meruit claims). In applying a "center of gravity" or " grouping of contacts" analysis, the court should consider the following factors: "[1] the place of contracting, negotiation and performance; [2] the location of the subject matter of the contract; and [3] the domicile [or place of business] of the contracting parties."*Stolarz,* 81 N.Y.2d at 227, 597 N.Y.S.2d 904, 613 N.E.2d 936;*see also Fieger,* 251 F.3d at 394 (citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 612, 642 N.E.2d 1065 (1994)).

*14 Applying the "center of gravity" or "grouping of contacts" analysis, Georgia law applies to plaintiff's contract and quasi-contract claims. Plaintiff alleges that he negotiated the terms of the profit-sharing agreement while he was in New York with defendant's personnel located in Georgia, and he does not indicate where he was located when he actually entered into the contract. Accordingly, this factor is neutral. In addition, the "domicile of the parties" factor is neutral, since the parties are domiciled in different states. However, plaintiff does not dispute that all decisions regarding payments due him under the alleged agreement were made in Georgia or that all payments were issued to him from Georgia. Accordingly, the place of performance of the profit-sharing agreement was Georgia. Since this is the only determinative factor, Georgia law applies to plaintiff's contract and quasi-contract claims pertaining to the profit-sharing agreement.

However, contrary to defendant's claim, New York law applies to plaintiff's remaining claims for fraud and violations of the New York State Labor Law as those claims pertain to the profit-sharing agreement [FN9], as well as to plaintiff's retaliation claim. New York courts apply an "interest analysis," which requires the application of "the law of the jurisdiction having the greatest interest in the litigation * * *."*Krock v. Lipsay,* 97 F.3d 640, 645

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                            Page 13

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

(2d Cir.1996) (internal quotations and citations omitted) (applying New York law). In determining which state has the greater interest, the court must make two separate inquiries: "(1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss."*Id.* at 645-646 (citing *Padula v. Lilarn Properties Corp.,* 84 N.Y.2d 519, 620 N.Y.S.2d 310, 311, 644 N.E.2d 1001, 1002 (1994)); *see also Grosshandels-und Lagerei-Berufsgenossenschaft v. World Trade Center Properties, LLC,* 435 F.3d 136, 139 (2d Cir.2006), *cert. denied,*— U.S. —, 127 S.Ct. 43, 166 L.Ed.2d 19 (2006)."In all interest analyses, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort."*Krock,* 97 F.3d at 646 (internal quotations and citations omitted); *see also Merrill Iron & Steel, Inc. v. Yonkers Contracting Co.,* No. 05 Civ. 5042, 2006 WL 2679940, at * 4 (S.D.N.Y. Sept. 19, 2006). Where, as here, the parties are domiciled in different states, "the locus of the tort will almost always be determinative in cases involving conduct-regulating laws."*Krock,* 97 F.3d at 646.

> FN9. As noted above, since the stock option agreement contains a choice-of-law provision providing that Georgia law applies, this analysis is not applicable to plaintiff's fraud and Labor Law claims to the extent they pertain to the stock option agreement.

Since plaintiff's fraud, retaliation and Labor Law claims are conduct-regulating claims, the proper body of law to be applied thereto turns on the locus of the tort. "When 'the defendant's * * * conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred.' " *Merrill Iron,* 2006 WL 2679940, at * 4 (citing *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 195, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) ). Although defendant was located in Georgia when it entered into the profit-sharing agreement, which is when plaintiff alleges the fraudulent conduct occurred, and all decisions regarding the payments

allegedly due plaintiff under the profit-sharing agreement were made in Georgia, the last event necessary to make defendant liable for fraud and/or violation of the New York Labor Law was its alleged failure to make payments purportedly due plaintiff in New York under the agreement. Thus, plaintiff's injuries were suffered in New York. *See, e.g. Id.*(finding that New York law applied to plaintiff's tort claims where the last event necessary to make the defendant liable was its alleged failure to issue a joint check to New York). In addition, plaintiff's injuries following his termination were suffered in New York. Therefore, New York law applies to plaintiff's fraud and Labor Law claims as those claims relate to the profit-sharing agreement, as well as to plaintiff's retaliation claim.

*15 In sum, this factor weighs slightly in favor of transfer, since Georgia law applies to more of plaintiff's claims than does New York law and, thus, the Northern District of Georgia is more familiar with the law applicable to the majority of claims.

### 9. Interests of Justice

Finally, interests of judicial economy weigh in favor of a transfer. The "interest of justice" factor "relates primarily to issues of judicial economy."*Colida v. Panasonic Corp. of North America,* No. 05 Civ. 5791, 2005 WL 3046298, at * 4 (S.D.N.Y. Nov. 10, 2005) (internal quotations and citation omitted). Although docket conditions and calendar congestion, alone, are insufficient to support a transfer motion, they are properly considered and entitled to "some weight." *In re Hanger Orthopedic Group, Inc. Securities Litigation,* 418 F.Supp.2d 164, 171 (E.D.N.Y.2006); *see also Colida,* 2005 WL 3046298, at * 4.

It is undisputed that the docket of the Eastern District of New York is significantly more congested than the docket of the Northern District of Georgia: As of September 30, 2006, the total number of pending cases (civil and criminal) per active judge in the Eastern District of New York was more than double that of the Northern District of Georgia-six hundred ninety-seven (697) as compared to three hundred twenty-five (325),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                  Page 14

Slip Copy, 2007 WL 1836831 (E.D.N.Y.)
(Cite as: Slip Copy)

respectively. *See* Administrative Office of the United States Courts, *Federal Court Management Statistics* (FCMS), *available at* http://www.uscourts .gov/cgi-bin/cmsd2006.pl. In addition, the median disposition time is less in the Northern District of Georgia than in this Court (9.5 months as compared to 10.5 months).*Id.*

Since plaintiff has not offered any competing concerns with respect to this factor, interests of judicial economy weigh in favor of transfer.

### III. CONCLUSION

Based on the totality of the circumstances, I find that defendant has made a "clear and convincing showing" that the balance of factors weighs strongly in favor of transferring this action to the Northern District of Georgia.[FN10] Accordingly, the branch of defendant's motion which seeks to transfer venue of this action pursuant to 28 U.S.C. § 1404(a) is granted and the clerk of the Court is directed to transfer this case to the Northern District of Georgia. Defendant's motion is otherwise denied.

> FN10. In light of this determination, I decline to address the branch of defendant's motion seeking dismissal of plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.

SO ORDERED

E.D.N.Y.,2007.
Chong v. Healthtronics, Inc.
Slip Copy, 2007 WL 1836831 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB
3

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3046298 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

C

Colida v. Panasonic Corp. of North America
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Tony COLIDA, Plaintiff,
v.
PANASONIC CORPORATION OF NORTH
AMERICA, and Matsushita Electric Corporation of
America, Defendants.
No. 05 Civ. 5791(JSR)(JC.

Nov. 10, 2005.

Tony Colida, Montreal, Canada, pro se.

*MEMORANDUM AND ORDER*
FRANCIS, Magistrate J.
**1** This case involves the alleged infringement by
Panasonic Corporation of North America [FN1] ("
Panasonic") of the rights of Tony Colida, the holder
of a design patent for a cellular phone. Panasonic is
a Delaware corporation having a principal place of
business in New Jersey. Panasonic moves pursuant
to 28 U.S.C. § 1404(a) to transfer this case to the
District of New Jersey for the convenience of the
parties and witnesses and in the interest of justice.
For the reasons that follow, the motion is granted.

FN1. Matsushita Electric Corporation of
America changed its name to the
Panasonic Corporation of North America
on January 1, 2005. Panasonic is a wholly
owned subsidiary of Matsushita Electric
Industrial Co., a Japanese corporation.
(Declaration of Frank Lasorsa dated Sept.
21, 2005 ("Lasorsa Decl."), ¶ 3, attached
as Exh. A to Memorandum in Support of
Panasonic Corp. of North America's
Motion to Transfer ("Def.Memo.")).

*Background*

Tony Colida, a resident of Montreal, Canada, is the
owner of a United States design patent for a cellular
telephone. (Complaint ("Compl."), ¶¶ 1, 5; U.S.
Patent No. 321,184 issued Oct. 29, 1991, attached
to Compl. as Exh. P-1). Mr. Colida contends that
Panasonic infringed on his rights in marketing and
selling the Panasonic Model KX-TG 6502B
cordless telephone, which Mr. Colida claims "
reproduces the overall distinctive ... appearance" of
his patented design. (Compl., ¶¶ 9, 14).

Upon learning of the offending phone, Mr. Colida
sent Panasonic a cease-and-desist letter, in which he
offered to sell Panasonic a non-exclusive license to
the design for $1 million. (Letter of Tony Colida
dated April 6, 2005, attached to Compl. as Exh.
P-3). Panasonic responded on April 15, 2005, in a
letter to Mr. Colida's attorney declining the license
offer and denying any infringement. (Letter of
Tadashi Horie dated April 15, 2005, attached to
Compl. as Exh. P-4). Panasonic noted Mr. Colida's
previous patent infringement suits against other
corporations, and threatened to seek sanctions
against Mr. Colida and his counsel should Mr.
Colida pursue litigation.

Proceeding *prose*, Mr. Colida filed the present
complaint on June 22, 2005, seeking $10 million in
damages. Panasonic counterclaimed for malicious
use of process and malicious prosecution, and cited
a previous patent infringement suit initiated by Mr.
Colida against Panasonic in 2003, decided on
summary judgment in Panasonic's favor. *Colida v.
Matsushita Electric Corp. of America,* No. 03 Civ.
2904, 2004 U.S. Dist. LEXIS 23116 (D.N.J. March
26, 2004), *aff'd,* 114 Fed. Appx. 383 (Fed.Cir.2004);
(Defendant's Answer to Complaint, Affirmative
Defense and Counterclaims ("Ans.") at 7-12).

On September 30, 2005, Panasonic filed a motion
requesting a transfer of venue to the District of New
Jersey. Panasonic argues that New Jersey, as the
company's principal place of business and the
location of all witnesses and relevant documents, is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3046298 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

the more appropriate forum. (Lasorsa Decl., ¶ 4; Ans. at 7).

*Discussion*

The statute governing transfer of cases provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a). Here, there is no dispute that this action could have been brought in the District of New Jersey, as Panasonic is headquartered in New Jersey and subject to personal jurisdiction there. Indeed, Mr. Colida's previous litigation against Panasonic was filed in New Jersey.*SeeColida v. Matsushita Electric Corp. of America,* 2004 U.S. Dist. LEXIS 23116. The determination whether to transfer on grounds of convenience lies "within the broad discretion of the district court."*Palace Exploration Co. v. Petroleum Development Co.,* 41 F.Supp.2d 427, 437 (S.D.N.Y.1998) (quoting *In re Cuyahoga Equipment Corp.,* 980 F.2d 110, 117 (2d Cir.1992) ). The burden of demonstrating the desirability of transfer rests with the moving party.*Palace Exploration Co.,* 41 F.Supp.2d at 437;*seealso Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.,* 865 F.2d 513, 520 (2d Cir.1989).

*2 In evaluating a motion to transfer venue, courts take into account a variety of factors including: (1) the plaintiff's choice of forum, (2) the locus of operative facts, (3) the convenience and relative means of the parties, (4) the convenience of the witnesses, (5) the location of and relative ease of access to evidence including documents, and (6) the interests of justice. *SeeAmersham Pharmacia Biotech, Inc. v. Perkin-Elmer Corp.,* 11 F.Supp.2d 729, 730 (S.D.N.Y.1998).FN2

> FN2. This list is not exhaustive. Other factors relevant to a motion to transfer are either inapplicable to this case or have not been addressed by the parties.

A. *Plaintiff's Choice of Forum*

A plaintiff's choice of venue is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer. *SeeIn re Warrick,* 70 F.3d 736, 741 (2d Cir.1995). Mr. Colida filed this action in United States District Court for the Southern District of New York, thus indicating New York, not New Jersey, to be his forum of choice.

However, the weight accorded to a plaintiff's choice of venue is significantly diminished where the operative facts have no connection to the chosen district. *See800-Flowers, Inc. v. Intercontinental Florist, Inc.,* 860 F.Supp. 128, 135 (S.D.N.Y.1994); *Dostana Enterprises LLC v. Federal Express Corp.,* No. 00 Civ. 0747, 2000 WL 1170134, at *7 (S.D.N.Y. Aug. 16, 2000) ("A plaintiff's choice of forum is not entitled to the weight which it is generally accorded where there is no material connection between the forum and the events underlying the cause of action."). Furthermore, where a plaintiff's chosen forum is not his home state, his choice of forum is given less weight. *See Herbert Limited Partnership v. Electric Arts, Inc.,* 325 F. Supp 2d 282, 291 (S.D.N .Y.2004). Because the present dispute bears little connection to New York, the plaintiff's choice of forum is not a factor that militates against transfer.

B. *Locus of Operative Facts*

"Courts routinely transfer cases when the principle events occurred and the principal witnesses are located in another district ."*In re Nematron Securities Litigation,* 30 F.Supp.2d 397, 404 (S.D.N.Y 1998) (citing *Viacom International, Inc. v. Melvin Simon Productions,* 774 F.Supp. 858, 867 (S.D.N.Y.1991)). The facts underlying this dispute occurred predominantly in New Jersey, as well as in Japan, where the Panasonic model KX-TG6502B cordless phone was designed, and in Indonesia and Malaysia, where the KX-TG6502B was manufactured. (Lasorsa Decl., ¶¶ 4-5). All business records and documents relating to, and persons having knowledge of the design, manufacture, or sale of the KX-TG6502B are located in New Jersey. (Lasorsa Decl., ¶¶ 9-11). The only connection suggested by Mr. Colida

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3046298 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

between New York and this litigation is that "the infringing product was noticed" here. (Plaintiff's Opposition to Defendants' Motion to Transfer Venue, ¶ 1). However, that some of the accused phones may have been marketed or sold in New York does not establish a material connection to the present litigation. See *Invivo Research, Inc. v. Magnetic Resonance Equipment Corp.,* 119 F.Supp.2d 433, 439-40 (S.D.N.Y.2000) ("Where a party's products are sold in many states, sales alone are insufficient to establish a material connection to the forum and to override other factors favoring transfer.").

### C. Convenience and Relative Means of the Parties

*3 When considering the convenience of the parties, "[t]he logical starting point is a consideration of the residence of the parties." *Frasca v. Yaw,* 787 F.Supp. 327, 331 (E.D.N.Y.1992) (citing *Heyco, Inc. v. Heyman,* 636 F.Supp. 1545, 1550 (S.D.N.Y.1986)). Mr. Colida is a resident of Montreal, Canada. New Jersey is thus no less convenient for him than New York, and he can travel to either forum at comparable expense. Mr. Colida has also previously chosen New Jersey as the forum to litigate similar claims against Panasonic, see *Colida v. Matsushita Electric Corp. of America,* 2004 U.S. Dist LEXIS 23116, as well as other corporations. *See, e.g., Colida v. LG Electronics, Inc.,* No. 02 Civ. 4947 (D.N.J. April 28, 2003); *Colida v. Sharp Electronics Corp.,* No. 03 Civ. 2889, 2004 U.S. Dist. LEXIS 27428 (D.N.J. Oct. 6, 2004). As Mr. Colida has himself instituted suit in New Jersey, "[i]t is difficult for plaintiff to argue ... that [the transferee district] is an inconvenient forum." *Nieves v. American Airlines,* 700 F.Supp. 769, 773 (S.D.N.Y.1988).

Mr. Colida argues that he will be prejudiced by transfer to another district because he has been granted *informapauperis* status in this district. However, Mr. Colida may apply for *informa pauperis* status in the District of New Jersey, and therefore transfer should not result in prejudice to him.

### D. Convenience of the Witnesses

The convenience of witnesses has been characterized as "the most powerful factor governing the decision to transfer a case." *In re Eastern District Repetitive Stress Injury Litigation,* 850 F.Supp. 188, 194 (E.D.N.Y.1994)(citing *Saminsky v. Occidental Petroleum Corp.,* 373 F.Supp. 257, 260 (S.D.N.Y.1974)). Although the convenience of party witnesses weighs less heavily than that of nonparty witnesses, and here the majority of witnesses are employees of Panasonic, this factor nonetheless cuts in favor of transfer because *no* witnesses are located in New York. (Lasorsa Decl., ¶¶ 10-11). See *Computer Horizons Corp. v. Knauer,* 483 F.Supp. 1272, 1273 (S.D.N.Y.1980) (transfer ordered where almost all witnesses having knowledge of relevant facts located in California).

### E. Location of Documents and Other Evidence

The location of physical evidence also favors transfer in this case, because all of the documents related to this matter are located in New Jersey. *See Royal & Sunalliance v. British Airways,* 167 F.Supp.2d 573, 578 (S.D.N.Y.2001) (citing *McEvily v. Sunbeam-Oster Co.,* 878 F.Supp. 337, 348 (D.R.I.1994)) (ease of access to large quantity of documents favors transfer). Even assuming the relevant documents are easily transportable, "ease of transport weighs no more heavily in favor of [the Southern District of New York] than the proposed transferee district," *Coker v. Bank of America,* 984 F.Supp. 757, 766 (S.D .N.Y.1997) (internal quotation marks and citation omitted), especially where, as here, no relevant documents are located in New York and all of the documents are in New Jersey.

### F. Interest of Justice

*4 The court must also consider whether a transfer is in the interest of justice, "a concern which relates primarily to issues of judicial economy." *Dostana Enterprises LLC v. Federal Express Corp.,* 2000 WL 1170134, at *7."Although certainly not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2005 WL 3046298 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

decisive, docket conditions or calendar congestion of both the transferee and transferor districts is a proper factor for the Court to consider and is afforded 'some weight." ' *Hernandez v. Graebel Van Lines,* 761 F.Supp. 983, 991 (E.D.N.Y.1991) (citations omitted). It has been noted that the Southern District of New York is one of the busiest courts in the nation. *SeeRaines v. Switch Manufacturing Corp.,* No. 96 Civ. 2361, 1996 WL 413720, at *3 (S.D.N.Y. July 24, 1996). Accordingly, retention of a case such as this, with only minimal connections to New York, would not serve the interest of justice, and would only "delay adjudication of other cases brought by parties who are compelled to sue [here]." *Kanbar v. U.S. Healthcare, Inc.,* 715 F.Supp. 602, 606 (S.D.N.Y.1989).

### Conclusion

Notwithstanding Mr. Colida's choice of New York as the venue for this action, the relevant factors favor transfer to the District of New Jersey. Accordingly, Panasonic's motion is granted and the Clerk of Court shall effect the transfer.
SO ORDERED.

S.D.N.Y.,2005.
Colida v. Panasonic Corp. of North America
Not Reported in F.Supp.2d, 2005 WL 3046298 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB
4

Westlaw.

Slip Copy                                                            Page 1

Slip Copy, 2006 WL 2849818 (S.D.N.Y.)
(Cite as: Slip Copy)

C
Deshoulieres, S.A. v. Cuthbertson Imports, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
DESHOULIERES, S.A., Plaintiff,
v.
CUTHBERTSON IMPORTS, INC., Defendants.
No. 06 Civ. 5163(HB).

Oct. 3, 2006.

Marc Jonathan Jason, Philip Howard Gottfried,
Amster, Rothstein & Ebenstein LLC, New York,
NY, for Plaintiff.
Andrew Mitchell La Bella, White Plains, NY, for
Defendant.

### OPINION & ORDER
HON. HAROLD BAER, JR., District Judge.
*1 On July 7, 2006, plaintiff Deshoulieres, S.A. ("
Deshoulieres" or "Plaintiff"), filed a complaint
against defendant Cuthbertson Imports, Inc. ("
Cuthbertson" or "Defendant"), alleging trademark
infringement and false designation of origin under
the Lanham Act, 15 U.S.C. §§ 1051, et. seq., as
well as supplemental claims under New York
common law for unfair competition, deceptive acts
and practices, breach of contract, and recovery for
goods sold and delivered. Defendant subsequently
brought a motion to transfer venue to the District of
Connecticut pursuant to 28 U.S.C. § 1404(a), as
well as a motion for a more definite statement
pursuant to Fed.R.Civ.P. 12(e). For the reasons set
forth below, the motion to transfer is granted, and
the motion for a more definite statement is referred
to the Connecticut court.

### I. BACKGROUND

Plaintiff Deshoulieres is a French manufacturer of
high quality cookware that it sells under the
APILCO trademark, registered in the United States.
Plaintiff's Complaint ("Pl.Compl.") at ¶ 6-10.
Defendant Cuthbertson is an American distributor,
incorporated and with principal place of business in
Connecticut. Defendant's Motion to Transfer to the
District of Connecticut ("Def. Motion to Transfer"),
Ex. A at ¶ 5. On December 14, 1993, Deshoulieres
and Cuthbertson entered into an agreement whereby
Cuthbertson became the exclusive distributor of
APILCO cookware in the United States. Pl. Compl.
at ¶ 11, Ex. A.

Plaintiff alleges that it terminated the agreement in
or about January 2005 in accordance with its terms
because of Cuthbertson's failure to discharge its
obligations. Pl. Compl. at ¶ 12. Plaintiff alleges,
among other things, that Defendant Cuthbertson
failed to properly service customers of APILCO
products, failed to use its best efforts to promote
APILCO products in the United States, offered
unauthorized competing products for sale, and owed
monies to Plaintiff now totaling over $135,000. Pl.
Compl. at ¶ 12-16. Plaintiff also alleges that
Defendant continues to offer APILCO products for
sale in violation of APILCO's trademark and
continues to fail to properly service customers. Pl.
Compl. at ¶ 17-22.

Defendant Cuthbertson filed this Motion to Transfer
Venue to the District of Connecticut on August 2,
2006. Defendant cites that it has no offices,
employees, or presence in New York, nor is it
licensed to do business in New York. Def. Motion
to Transfer at 4, Ex. A at ¶ 10. It appears that
Defendant's performance of the contract occurred
primarily, if not wholly, in Connecticut. Defendant
represents that Plaintiff shipped goods from France
to Defendant's warehouse in Connecticut. Def.
Motion to Transfer, Ex. A at ¶ 7. Defendant spells
out how it communicated with Plaintiff from its
Connecticut office, received orders, generated
purchase orders, and contacted its customers all
from its Connecticut office, and paid Plaintiff
through its Connecticut bank. Def. Motion to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 2

Slip Copy, 2006 WL 2849818 (S.D.N.Y.)
(Cite as: Slip Copy)

Transfer, Ex. A at ¶ 8-9, 11.

*2 The underlying contract between the parties bears the signature of Cuthbertson's President, Allyn Powell, and states that it was signed in New York on December 14, 1993. Pl. Compl., Ex. A. However, this fact is in dispute between the parties. Powell states that she believes she signed the contract in Connecticut, and is unsure whether the contract attached to the complaint is the "actual contract" (perhaps she contends that she signed the signature page in Connecticut). Def. Motion to Transfer, Ex. A at ¶ 6.[FN1] Powell goes on to state that her negotiations of the contract took place in Connecticut, London, and New Jersey, and that the parties "shook hands" on the contract at Defendant's Connecticut office. *Id.*

> FN1. Plaintiff cites to the fact that David Holmes of Elite Design, a third-party to the contract, also apparently signed the contract in New York (according to the signature page). Memorandum of Law in Opposition to Defendant's Motion to Transfer to the District of Connecticut (" Pl.Opp.") at 4.

The contract itself contains a forum selection clause providing for jurisdiction in France for disputes regarding its application or interpretation, but also providing the option to Defendant Cuthbertson to bring its action in Connecticut if it be the claimant. Pl. Compl., Ex. A. The contract states that it is governed by French law. *Id.*

## II. STANDARD OF REVIEW

Defendant Cuthbertson brings this motion to transfer under 28 U.S .C. § 1404(a), which provides that: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a) (2006).[FN2]

> FN2. As a threshold matter, this court must

determine whether the Plaintiff could have brought this action in the District of Connecticut. Pursuant to 28 U.S.C. § 1391(b), because Defendant resides in Connecticut and is subject to personal jurisdiction there, venue is proper in Connecticut. *See, e.g., D'anton Jos, S.L. v. Doll Factory,* 937 F.Supp. 320, 322 (S.D.N.Y.1996). The parties do not contest this.

A motion to transfer rests within the "sound discretion" of the district court. *Schwartz v. R.H. Macy's, Inc.,* 791 F.Supp. 94 (S.D.N.Y.1992). The burden is on the movant to establish that there should be a change of forum.*Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978); *see also Editorial Musical Latino Americana, S.A. v. Mar Int'l Records,* 829 F.Supp. 62, 66 (S.D.N.Y.1993) (movant must make "clear and convincing showing"). Although the plaintiff's choice of forum is entitled to substantial weight, this presumption does not apply if the plaintiff chooses a foreign forum and the cause of action bears little relation to the chosen forum. *See Bassili v. Chu,* 242 F.Supp.2d 223 (W.D.N.Y.2002); *Anadigics, Inc. v. Raytheon,* 903 F.Supp. 615, 616 (S.D.N.Y.1995); *Bordiga v. Directors Guild,* 159 F.R.D. 457, 462 (S.D.N.Y.1995).

Factors the court should consider include: (1) the convenience of witnesses; (2) the availability of process to compel the attendance of unwilling witnesses; (3) the convenience of the parties; (4) the locus of operative facts; (5) the location of relevant documents and relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of circumstances. *See, e.g., Anadigics, Inc. v. Raytheon,* 903 F.Supp. at 617. " The convenience of the witnesses and the parties are generally considered as the most important factors in a transfer application."*D'anton Jos, S.L. v. Doll Factory,* 937 F.Supp. 320, 322 (S.D.N.Y.1996); *see also Hubbell Inc. v. Pass & Seymour,* 883 F.Supp. 955, 962 (S.D.N.Y.1995) ( " The core determination under § 1404(a) is the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 3

Slip Copy, 2006 WL 2849818 (S.D.N.Y.)
(Cite as: Slip Copy)

center of gravity of the litigation, a key test of which is the convenience of witnesses.").

## III. DISCUSSION

\*3 I find that the totality of the factors favors transfer to the District of Connecticut. I will address each factor in turn.

### A. *Convenience of Witnesses and Availability of Process*

Defendant Cuthbertson provides a list of eighteen witnesses, fourteen of whom reside in Connecticut, the remainder residing in California, Illinois, and England. Defendant avers that these witnesses will testify that Cuthbertson neither sold nor distributed competing products of APILCO prior to January 2005 and did not substitute any products for APILCO's during or after January 2005. Def. Motion to Transfer, Ex. A at ¶ 12.[FN3]

> FN3. As Plaintiff notes, it is Defendant's burden to "clearly specify the key witnesses to be called" and "make a general statement of what their testimony will cover."*Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d at 218. Defendant has satisfied this burden, albeit briefly.

Plaintiff is correct in pointing out that all of the fourteen Connecticut witnesses reside within 100 miles of New York City and thus within the subpoena power of this Court, and that it would be equally inconvenient for the four remaining witnesses to travel to either Connecticut or New York. Plaintiff is also correct in pointing out that public transportation is generally available from southwestern Connecticut to New York City. *See Kelly v. MD Buyline,* 2 F.Supp.2d 420, 422 n. 9 (S.D.N.Y.1998) (noting that even a four-hour plane ride is "not sufficiently inconvenient" to weigh heavily in favor of transfer). On the other hand, courts have transferred cases from New York to adjoining districts without hesitation, particularly where the plaintiff chooses a foreign forum. *See De*

*Jesus v. National R. Passenger Corp.,* 725 F.Supp. 207, 209 (S.D.N.Y.1989) ("[T]he proximity of New York to New Jersey does not alter the fact that this case has no significant connection with this forum.")

Because Connecticut is more convenient for the majority of witnesses, and no less convenient for the remainder of witnesses, the balance of interests favors Connecticut.

### B. *Convenience of Parties*

For Defendant Cuthbertson, a Connecticut corporation, Connecticut is clearly more convenient. For Plaintiff Deshoulieres, a French company, it appears to matter little whether it litigates in New York or Connecticut, as both are equally inconvenient from France. Although Plaintiff's attorneys may be based in New York, courts have accorded "little weight" to the convenience of plaintiffs' attorneys. *Kolko v. Holiday Inns,* 672 F.Supp. 713, 715 (S.D.N.Y .1987). The balance of interests here strongly favors Connecticut.

Additionally, the forum-selection clause contracted to by Plaintiff potentially providing for venue in Connecticut undercuts its argument that Connecticut would be an inconvenient forum in which to litigate. Although "not dispositive," a forum-selection clause can be a "key consideration" in determining motions to transfer. *APA Excelsior III L.P. v. Premiere Techs., Inc.,* 49 F.Supp.2d 664, 668, 671 (S.D.N.Y.1999), *citing Heller Financial, Inc. v. Midwhey Powder Co. Inc.,* 883 F.2d 1286, 1293 (7th Cir.1989) ("a valid forum-selection clause may waive a party's right to assert his own inconvenience as a reason to transfer a case ..."); *see also Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988) (Congress explicitly intended district courts to consider forum-selection clauses in considering motions to transfer under 28 U.S.C. § 1404(a)).

### C. *Locus of Operative Facts*

\*4 Nearly all the operative facts here occurred in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 2849818 (S.D.N.Y.)
(Cite as: Slip Copy)

Connecticut. According to the facts before the Court, the contract was negotiated by Defendant in Connecticut, consummated orally in Connecticut, and performed by Defendant nearly wholly in Connecticut. Such performance is the crux of the parties' underlying dispute.

The sole significant action in New York, albeit disputed, appears to be the signing of the contract in New York. Even accepting Plaintiff's version of events as true, the "center of gravity" of the litigation appears to be in Connecticut. "Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district."*Bordiga v. Directors Guild,* 159 F.R.D. 457, 462,*citing Viacom Int'l, Inc. v. Melvin Simon Productions, Inc.,* 774 F.Supp. 858, 868 (S.D.N.Y.1991).[FN4] As the operative facts are nearly entirely within Connecticut, the balance of interests here favors Connecticut.

> FN4. Although Plaintiff alleges that the Defendant sold products in New York, and thus that the tort of trademark infringement occurred in New York, Plaintiff alleges no specific facts to support this assertion. *See* Pl. Opp. at 5. Indeed, Defendant's assertions that it conducted business wholly from its Connecticut offices contradict Plaintiff's assertion. Def. Motion to Transfer, Ex. A at ¶ 9-10. Additionally, Plaintiff claims that it was injured in New York because one of its major customers is located in New York. *See* Pl. Opp. at 5-6. Even assuming such injury existed, the injury seems too attenuated to change the determination that the majority of operative facts happened in Connecticut. *See Bassili v. Chu,* 242 F.Supp.2d 223, 231 .

### D. Location of Documents

Defendant states that "all of [its] documentation relevant to this matter" exists in Connecticut. Def. Motion to Transfer, Ex. A at ¶ 14. Plaintiffs counter that the "location of documents is irrelevant in the modern age of copying."*In re Glenayre*

*Techs., Inc. Sec. Litig.,* 982 F.Supp. 294, 300 (S.D.N.Y.1997). While the inconvenience to Defendant is perhaps slight, the balance of interests favors Connecticut.

### E. Relative Means of Parties

Neither party suggested that litigation in one district or another would adversely affect it financially. Here, the balance of interests is neutral.

### F. Governing Law

The governing law of the underlying contract is that of France. Although Plaintiffs have pled New York causes of action, in addition to federal causes of action, Defendants challenge their ability to do so. At this stage of the litigation, it is fair to say that at best, New York may have more familiarity with the governing law, and at worst, both fora may be unfamiliar with the governing law. Although the eventual result of these claims is unclear, the balance of interests at this time slightly favors New York.

### G. Plaintiff's Choice of Forum

As noted above, although the plaintiff's choice of forum is entitled to "substantial weight," this presumption does not apply if the plaintiff chooses a foreign forum and the cause of action bears little relation to the chosen forum. *See Bassili v. Chu,* 242 F.Supp.2d 223 (W.D.N.Y.2002); *Anadigics, Inc. v. Raytheon,* 903 F.Supp. 615, 616 (S.D.N.Y.1995); *Bordiga v. Directors Guild,* 159 F.R.D. 457, 462 (S.D.N.Y.1995). The balance of interests here do not weigh as strongly in favor of New York as plaintiff would suggest.

### H. Interests of Justice

Courts can consider trial efficiency and general "interests of justice" in considering a motion to transfer. *See Balaban v. Pettigrew Auction Co.,* 1997 U.S. Dist. LEXIS 22127, at *10-11 (S.D

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                         Page 5

Slip Copy, 2006 WL 2849818 (S.D.N.Y.)
(Cite as: Slip Copy)

.N.Y.1997). However, the parties have put forth no
evidence of circumstances, such as crowded docket
conditions in one district, that would militate a
speedier prosecution of the action in one District as
opposed to another. *See De Jesus v. National R.
Passenger Corp.*, 725 F.Supp. 207, 209. The
balance of interests here do not favor either forum.

### IV. CONCLUSION

*5 Because plaintiff has chosen a foreign forum
with little connection to the facts of the case and the
totality of the factors, particularly the convenience
of the parties and witnesses, favors transfer to
Connecticut, Defendant's Motion to Transfer Venue
to the District of Connecticut is GRANTED. I
decline to act upon Defendant's Motion for a More
Definite Statement; it will be transferred with the
case to be acted upon by the District Of
Connecticut. The Clerk of the Court is instructed to
close this matter and remove it from my docket.

**IT IS SO ORDERED.**

S.D.N.Y.,2006.
Deshoulieres, S.A. v. Cuthbertson Imports, Inc.
Slip Copy, 2006 WL 2849818 (S.D.N.Y.)

**END OF DOCUMENT**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB
5



Slip Copy                                                                Page 1

Slip Copy, 2007 WL 2068107 (S.D.N.Y.)
(Cite as: Slip Copy)

---

C
Electrical Workers Pension Fund, Local 103,
I.B.E.W. v. Nuvelo, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
   United States District Court,S.D. New York.
   ELECTRICAL WORKERS PENSION FUND,
LOCAL 103, I.B.E.W., On Behalf Of Itself And All
      Others Similarly Situated, Plaintiff,
                      v.
   NUVELO, INC., Ted W. Love, Gary S. Titus, and
         Shelly D. Guyer, Defendants.
   Barry Logan, Individually and On Behalf Of
Himself and All Others Similarly Situated, Plaintiff,
                      v.
   Nuvelo, Inc., Ted W. Love, Gary S. Titus, and
         Shelly D. Guyer, Defendants.
   Arnold Giles, Individually and On Behalf Of
Himself and All Others Similarly Situated, Plaintiff,
                      v.
   Nuvelo, Inc., Ted W. Love, Gary S. Titus, and
         Shelly D. Guyer, Defendants.
   Herbert Braker, Individually and On Behalf Of
Himself and All Others Similarly Situated, Plaintiff,
                      v.
   Nuvelo, Inc., Ted W. Love, Gary S. Titus, and
         Shelly D. Guyer, Defendants.
   Nos. 07 Civ. 975(HB), 07 Civ. 1229(HB), 07 Civ.
            1777(HB), 07 Civ.1953(HB).

                 July 19, 2007.

           *JOINT OPINION AND ORDER*
Hon. HAROLD BAER, JR., District Judge.
*1 Defendants Nuvelo, Inc. ("Nuvelo") and three of
Nuvelo's individual officers and directors, Ted
Love, Gary Titus, and Shelly Guyer (collectively, "
Defendants") move to transfer venue over these
four putative securities class actions to the Northern
District of California.[FN1] Plaintiffs Electrical
Workers Pension Fund, et. al. ("Plaintiffs") oppose.

FN1. Four Nuvelo-related securities class
actions before this Court are at issue in this
motion—*Electrical Workers v. Nuvelo*,
07-cv-975 (S.D.N.Y); *Logan v. Nuvelo*,
07-cv-1229 (S.D.N.Y.); *Giles v. Nuvelo*,
07-cv-1777 (S.D.N.Y.); and *Braker v.
Nuvelo*, 07-cv-1953 (S.D.N.Y.) The
parties have agreed to delay this Court's
consideration of Plaintiffs' motions to
consolidate the four cases and appoint
Lead Plaintiffs, as if the case is transferred,
it may be more appropriate to let the
transferee rule on those issues.
Citations in this Opinion will be to
documents filed in connection with
*Electrical Workers v. Nuvelo*, 07-cv-975,
unless otherwise noted.

For the reasons articulated below, Defendants'
motion to transfer venue is GRANTED.

               I. BACKGROUND

        A. *Underlying Facts of Action*

Nuvelo is a biopharmaceutical company,
incorporated in Delaware and headquartered in San
Carlos, CA, near Silicon Valley. *See* Affidavit of
Shelly D. Guyer in Support of Defendants' Motion
to Transfer Venue, Apr. 18, 2007 ("Guyer Aff."), ¶
5; Complaint, *Logan v. Nuvelo*, 07-cv-1229, ¶ 11.

On January 5, 2006 (the beginning of the Class
Period), Nuvelo announced a partnership with the
company Bayer Health Care AG regarding "
alfimeprhase," Nuvelo's new drug in development
that is designed to dissolve blood clots. Complaint
¶¶ 36-37. Nuvelo announced that Bayer would
pay it $50 million up front, and potentially up to
$335 million in additional payments, in exchange
for the right to commercialize alfimeprhase outside
the United States. *Id.* at ¶ 36.Defendants allegedly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 2

Slip Copy, 2007 WL 2068107 (S.D.N.Y.)
(Cite as: Slip Copy)

stated in a conference call that they anticipated the "alfimephrase" drug would win FDA approval and thus reach the U.S. consumer market by 2008. *Id.* at ¶ 15.Nuvelo's CEO Ted Love allegedly predicted that the drug would generate $500 million in annual sales. *Id.* Nuvelo's stock price rose. *Id.*

On January 30, 2006, Nuvelo conducted a "follow-on" stock offering that raised over $119 million for the company. Complaint ¶ 16. Nuvelo's underwriters for this offering were JP Morgan, Lehman Brothers, and Deutsche Bank. *Id.* at ¶¶ 16, 26.

Over the next several months, Nuvelo embarked on Phase III clinical trials to test alfimephrase. Complaint ¶ 19. Nuvelo also made several public statements regarding alfimephrase. Some statements were in the form of press releases issued from Nuvelo's California headquarters. *See generally* Complaint ¶¶ 36-56; Guyer Aff. ¶ 6; Affidavit of Gary S. Titus in Support of Defendants' Motion to Transfer Venue, Apr. 18, 2007 ("Titus Aff.") ¶ 6. Some statements were allegedly made at presentations at approximately eight analysts' and investors' conferences in New York. *See* Declaration of David A. Rosenfeld In Support of Plaintiffs' Opposition ..., May 4, 2007 ("Rosenfeld Decl."), ¶ 2, Ex. A.

On December 11, 2006 (the end of the Class Period), Nuvelo announced that two Phase III trials (in technical terms, the "NAPA-2" and "SONOMA-2" trials) did not go as well as they hoped (or in Plaintiffs' words, "failed").*See* Complaint ¶¶ 56, 63. The company disclosed that prior clinical trials did not involve the use of a placebo; that any past effectiveness of the drug was not due to the drug itself, but other factors; and that other Phase III clinical trials (in technical terms, the "NAPA-3" and "SONOMA-3" trials) would be put on hold. See Memorandum of Law in Opposition ..., May 4, 2007 ("Pl.Opp."), at 4; Complaint ¶ 56. Nuvelo's stock dropped nearly 80%, from $19.55 to $4.05. Complaint ¶¶ 57, 64.

### B. *Facts Relating to Defendants' Motion to Transfer Venue*

*2 Nuvelo avers that the vast majority of operative facts, witnesses, and documents that relate to this litigation are located in the Northern District of California. Nuvelo does not have operations, offices, or employees in New York. Guyer Aff. ¶ 5; Titus Aff. ¶ 5. Nuvelo states that the three individual defendants, its senior management, its officers, and the vast majority of its employees are located at, or near, its headquarters in California. Guyer Aff. ¶ 5-6; Titus Aff. ¶ 5-6. Nuvelo states that the individual employees who helped prepare the press releases at issue are located at its headquarters in California, and that the press releases were issued from its headquarters. Guyer Aff. ¶ 6; Titus Aff. ¶ 6. Nuvelo states that the officers and employees that designed and analyzed the NAPA-2 and SONOMA-2 clinical studies at issue are all located at its headquarters in California. *Id.* Nuvelo states that most of the relevant documents are either located at its headquarters or at a separate warehouse in Union City, CA. Guyer Aff. ¶ 7.

Plaintiffs aver that Nuvelo or (it is not entirely clear) the individual Defendants made presentations at approximately eight analysts' and investors' conferences in New York during the Class Period, during which they made statements about the drug alfimephrase. *See* Rosenfeld Decl. ¶ 2, Ex. A. Plaintiffs do not at this time specifically identify those particular statements in their Complaint.[FN2]

> FN2. Plaintiffs aver that after the Court appoints a Lead Plaintiff, that Plaintiff will file a consolidated amended complaint which will include a more comprehensive list of allegedly materially false and misleading statements. *See* Pl. Mem. Opp. at 7 n. 6.

Plaintiffs also note that Defendants' underwriters for their follow-on stock offering (before which, Plaintiffs allege, Defendants made false statements about the drug in order to raise additional funds) all have offices in New York. Complaint at ¶¶ 16, 26. Nuvelo rebuts that its primary contacts at two of these three underwriters, including JP Morgan, its lead underwriter, worked out of San Francisco, not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2068107 (S.D.N.Y.)
(Cite as: Slip Copy)

New York. Guyer Reply Aff. ¶ 3.

Lastly, Plaintiffs note that one of Nuvelo's Phase III clinical trials took place in the Bronx, two other trials took place in New Jersey, and one trial took place in Pennsylvania. *See* Rosenfeld Decl., Ex. D. Nuvelo, however, points out that these particular trials in New York, New Jersey, and Pennsylvania were in fact the NAPA-3 and SONOMA-3 trials-*not* the failed NAPA-2 and SONOMA-2 trials which engendered this lawsuit. *See* Guyer Aff., Ex. G; Complaint ¶ 56; Rosenfeld Decl., Ex. D.

Plaintiffs do not allege in their papers before me that any of the class plaintiffs reside in New York.

## II. STANDARD OF REVIEW

28 U.S.C. § 1404(a) provides that: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a) (2006); *see generally, e.g., Montgomery v. TAP Enters.,* 2007 U.S. Dist. LEXIS 12702, at *6-8 (S.D.N.Y. Feb. 26, 2007) (Baer, J.).

A motion to transfer pursuant to § 1404(a) rests within the "sound discretion" of the district court. *Schwartz v. R.H. Macy's, Inc.,* 791 F.Supp. 94 (S.D.N.Y.1992). The burden is on the movant to establish that there should be a change of forum. *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978); *see also Editorial Musical Latino Americana, S.A. v. Mar Int'l Records,* 829 F.Supp. 62, 66 (S.D.N.Y.1993) (movant must make "clear and convincing showing"). Although the plaintiff's choice of forum is entitled to substantial weight, this presumption is reduced if the cause of action bears "little material connection" to the chosen forum. *See, e.g., St. Regis Mohawk Tribe v. State of New York,* 774 F.Supp. 185, 189 (S.D.N.Y.1991); *see also Arrow Electronics Inc. v. Ducommun, Inc.,* 724 F.Supp. 264, 265 (S.D.N.Y.1991) (where the facts of the action bear little connection to the chosen forum, "plaintiff's choice is given reduced significance"). This presumption is reduced further in class actions,

particularly securities class actions. *See In re AtheroGenics Sec. Litig.,* 2006 U.S. Dist. LEXIS 15786, at *9 (S.D.N.Y.2006) (Holwell, J.) (" *AtheroGenics"* ).

## III. DISCUSSION

*3 When evaluating a motion to transfer, a court should consider the following factors: (1) the convenience of witnesses; (2) the availability of process to compel the attendance of unwilling witnesses; (3) the convenience of the parties; (4) the locus of operative facts; (5) the location of relevant documents and relative ease of access to sources of proof; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of circumstances.[FN3]*See, e.g., Anadigics, Inc. v. Raytheon Co.,* 903 F.Supp. 615, 617 (S.D.N.Y.1995)."The convenience of the witnesses and the parties are generally considered as the most important factors in a transfer application."*D'anton Jos, S.L. v. Doll Factory,* 937 F.Supp. 320, 322 (S.D.N.Y.1996); *see also Hubbell Inc. v. Pass & Seymour,* 883 F.Supp. 955, 962 (S.D.N.Y.1995) ("The core determination under § 1404(a) is the center of gravity of the litigation, a key test of which is the convenience of witnesses.").

> FN3. To succeed on a motion to transfer venue, Defendant must as a threshold matter establish that the action could have been brought in the proposed transferee district. *See, e.g., Montgomery v. TAP Enters.,* 2007 U.S. Dist. LEXIS 12702, at *9 n. 6, *citing Van Dusen v. Barrack,* 376 U.S. 612 (1964). Secondly, Defendant must "demonstrate that the balance of the convenience of the parties and witnesses and the interests of justice are in [his] favor."*See Consol. Metal Prods., Inc. v. Am. Petroleum Inst.,* 569 F.Supp.773, 774 (D.D.C.1983). Because it is undisputed here that these actions could have been brought in the proposed transferee district (i.e. the Northern District of California),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4

Slip Copy, 2007 WL 2068107 (S.D.N.Y.)
(Cite as: Slip Copy)

the first inquiry does not require
examination.

I will address the most relevant factors first.

### A. Plaintiff's Choice of Forum

A plaintiff's choice of forum "is generally entitled to
considerable weight and should not be disturbed
unless the balance of the factors is strongly in favor
of the defendant."*AtheroGenics*, 2006 U.S. Dist.
LEXIS 15786, at *9, *citing Berman v. Informix
Corp.*, 30 F.Supp.2d 653, 659 (S.D.N.Y.1998).
However, "while it is axiomatic that a plaintiff's
choice of forum is entitled to great consideration,
the adage has little weight in stockholder class
actions."*Id., citing, e.g., Eichenholtz v. Brennan*,
677 F.Supp. 198, 202 (S.D.N.Y.1988) (in a
securities class action, there will be "numerous
potential plaintiffs, each possibly able to make a
showing that a particular forum is best suited," and
thus plaintiff's choice receives less deference); *but
see In re Geopharma Sec. Litig.*, 2005 U.S. Dist.
LEXIS 8885, at *3-4 (S.D.N.Y.2005) (Scheindlin,
J.) ("*Geopharma*") ("affording less deference to
representative plaintiffs does not mean they are
deprived of all deference.").

Here, in this securities class action, plaintiff's choice
of forum is entitled to less deference. Indeed, there
is no allegation that any of the class plaintiffs reside
in New York, such that those plaintiffs might be
prejudiced by transfer. Even leaving the question of
deference to plaintiff's choice of forum aside, there
remains ample support to rule in favor of transfer
based on the other factors, as further articulated
below.[FN4]

> FN4.*See Laborers Local 100 & 397
> Pension Fund v. Bausch & Lomb*, 2006
> U.S. Dist. LEXIS 36018, at * 13-14
> (S.D.N.Y.2006) (Baer, J.) ("*Bausch &
> Lomb*") ("Defendants argue ... that courts
> have accorded 'little weight' to plaintiff's
> choice of forum in securities class actions ..
> . Whether that's so or not here, the other
> factors are persuasive.").

### B. Convenience of Parties

Defendants Nuvelo, and the three individual
Defendants, all reside in the Northern District of
California. Guyer Aff. ¶¶ 5-6; Titus Aff. ¶ 5-6.
As noted above, it appears no class plaintiffs reside
in this District. This factor favors transfer.

### C. Convenience of Witnesses and Availability of Process

*4 Defendants argue the vast majority of witnesses
aside from the individual Defendants (i.e. Nuvelo
employees and ex-employees) are all located in
California, and that process would not be available
to compel their testimony in New York, were the
actions to proceed to trial here.

Plaintiffs aver that some non-party witnesses are
located in New York. For example, Plaintiffs argue
that Nuvelo's underwriters are located in New York.
Defendants rebut, however, that the primary
contacts for two out of three of Nuvelo's
underwriters, including its lead underwriter, JP
Morgan, are in fact located in San Francisco. *See*
Guyer Reply Aff. ¶ 3. Plaintiffs also aver that
securities analysts that follow Nuvelo are located in
New York. Defendants rebut, however, that three of
the analysts who follow Nuvelo are also based in
San Francisco. *See* Guyer Reply Aff. ¶ 4. To the
extent that Plaintiffs seek to call underwriters and
securities analysts at trial, it is doubtful Plaintiffs
will experience any prejudice by transfer.

Plaintiffs also aver that some non-party witnesses
are located *near* (albeit not *in* ) New York. For
example, Plaintiffs aver that Bayer's United States
corporate headquarters is located in Pittsburgh, and
its pharmaceutical division is located in West
Haven, CT. See Pl. Mem. Opp. at 10. Additionally,
Plaintiffs aver that FDA employees are located in
Washington, DC. *See Geopharma*, 2005 U.S. Dist.
LEXIS 8885, at *7 (noting that *inter alia*, FDA
employees are located in Washington, DC, and
calling this factor "neutral"). Typically, however,
district courts have given little, if any, weight to the
convenience of witnesses who reside in neither the
transferor nor transferee forum. *See, e.g.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 5

Slip Copy, 2007 WL 2068107 (S.D.N.Y.)
(Cite as: Slip Copy)

*AtheroGenics*, 2006 U.S. Dist. LEXIS 15786, at *15, *citing Wechsler v. Macke Int'l Trade, Inc.*, 1999 WL 1261251, at *6 (S.D.N .Y.1999) ("The Court dismisses from consideration the convenience of witnesses who are located outside both the current and transferee forums.").

More importantly, "it is the nature of the testimony and not the number of prospective witnesses on each side that is important."*In re Nematron Corp. Secs. Litig.*, 30 F.Supp.2d at 402. Here, notwithstanding that some tangentially related witnesses may reside in or near New York, the far greater number of the most material witnesses-i.e., the individual Defendants and Nuvelo employees-are located in California. *See AtheroGenics*, 2006 U.S. Dist. LEXIS 15786, at *15 (finding that this factor favored transfer to Georgia because Defendants and employees resided there, despite the fact that securities analysts and defendants' public relations firm resided in New York); *Nematron Corp. Secs. Litig.*, 30 F.Supp.2d at 402 (finding that this factor favored transfer to Defendant's home district because "testimony more critical and extensive is likely to be provided by the parties and witnesses residing" there).

In sum, this factor favors transfer to California.

### D. *Locus of Operative Facts*

*5 Nuvelo argues that the locus of the operative facts of this lawsuit-i.e., Nuvelo's allegedly fraudulent statements contained in its press releases-were issued from its company headquarters in California."Misrepresentations and omissions are deemed to 'occur' in the district where they are transmitted or withheld, not where they are received. "*See, e.g., Laborers Local 100 & 397 Pension Fund v. Bausch & Lomb*, 2006 U.S. Dist. LEXIS 36018, at *16 (where "all of the press releases and corporate filings, as well as the alleged misstatements, originated at Bausch & Lomb headquarters in Rochester," this factor favored transfer); *In re Nematron Corp. Secs. Litig.*, 30 F.Supp.2d 397, 404 (S.D.N.Y.1998); *In re Hanger Orthopedic Group, Inc.*, 418 F.Supp.2d 164, 169 (S.D.N.Y.2006); *AtheroGenics*, 2006 U.S. Dist.

LEXIS 15786, at *13.

The locus of the operative facts of this lawsuit centers on the misrepresentations made by Nuvelo in its press releases-all of which, as a matter of law, "occur" in California. Plaintiffs' attempts to aver that other allegedly "operative" facts occurred in New York are unavailing. For example, the clinical trials that occurred in or near the Southern District of New York were not the failed trials that engendered the fraud alleged in these actions. And even had Plaintiffs alleged specific misrepresentations that occurred at analysts' conferences in New York, courts have generally not found that statements at analysts' conferences alone warranted transfer where the "locus of all relevant decisionmaking" emanated from the company's headquarters, as is the case here. *See AtheroGenics*, 2006 U.S. Dist. LEXIS 15786, at *12, 13 n. 5.

Because the "locus of operative facts" here is in California, this factor favors transfer.[FN5]

> FN5. Although the majority of Courts in this district follow this approach, one Court in this district takes a different view. *See Geopharma*, 2005 U.S. Dist. LEXIS 8885, at *7 (where defendants argued that press releases were drafted at headquarters, and plaintiffs argued that information was disseminated via the NASDAQ exchange in New York, Court held that "operative facts" were spread across many districts).

### E. *Location of Relevant Documents*

Defendants argue that the relevant documents are available either at its headquarters, or at a separate storage facility in Union City, CA. "Securities fraud litigation almost invariably involves production and review of a vast number of documents, almost all of which will be in the defendants' possession."*Blass v. Capital Int'l Sec. Group*, 2001 U.S. Dist. LEXIS 3504, at *17-18 (E.D.N.Y.2001).

Although Plaintiffs aver that some documents relating to a) the underwriters, b) Bayer, or c) the clinical trials will be produced from or near New

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                            Page 6

Slip Copy, 2007 WL 2068107 (S.D.N.Y.)
(Cite as: Slip Copy)


York, as above, these documents (to the extent they
actually reside in New York), like the witnesses, are
far less relevant than the documents in California.
This factor favors transfer.


### F. Remaining Factors

The factors of a) the relative means of the parties,
b) the respective forums' familiarity with the
governing law, and c) trial efficiency and the
interests of justice are all neutral.


### IV. CONCLUSION

Because the majority of factors favor transfer,
Defendants' motion to transfer venue for these four
actions-*Electrical Workers v. Nuvelo*, 07-cv-975
(S.D.N.Y); *Logan v. Nuvelo*, 07-cv-1229
(S.D.N.Y.); *Giles v. Nuvelo*, 07-cv-1777
(S.D.N.Y.); and *Braker v. Nuvelo*, 07-cv-1953
(S.D.N.Y.)-is GRANTED.

*6 The Clerk of the Court is instructed to transfer
these four actions to the Northern District of
California and remove them from my docket.

**SO ORDERED.**

S.D.N.Y.,2007.
Electrical Workers Pension Fund, Local 103,
I.B.E.W. v. Nuvelo, Inc.
Slip Copy, 2007 WL 2068107 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB
# 6

Westlaw.

Slip Copy                                                          Page 1

Slip Copy, 2007 WL 895282 (S.D.N.Y.)
(Cite as: Slip Copy)

C
Freeman v. Hoffmann-La Roche Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
   United States District Court,S.D. New York.
   Hellane FREEMAN and David Coen on Behalf of
themselves and others similarly situated, Plaintiffs,
                        v.
   HOFFMANN-LA ROCHE INC and Roche
       Laboratories Inc., Defendants.
       No. 06CIV13497(RMB)(RLE).

               March 21, 2007.


            DECISION AND ORDER
BERMAN, J.

               I. Background

*1 On or about January 30, 2007, Hellane Freeman (
"Freeman") and David Coen ("Coen") (together, "
Plaintiffs") filed a Second Amended Complaint in
this putative class action against Hoffman-La Roche
and Roche Laboratories (together, "Defendants")
alleging, among other things, that Defendants "
willfully fail[ed] and refus[ed] to pay them at the
legally required [overtime] rates," and "fail[ed] to
make, keep and preserve accurate records" in
violation of the Fair Labor Standards Act ("FLSA")
(29 U.S.C. §§ 201-219), the New York Minimum
Wage Act (N.Y. Lab. Law §§ 650-665; N . Y.
Comp.Codes R. & Regs. tit. 12, § 142), the New
York Timely Payment of Wages provisions (N.Y.
Lab. Law §§ 190-199-a), and the New Jersey State
Wage and Hour Law (N.J. Stat. Ann. §§ 34:11-56a
to:11-56a38). (2d Am.Compl.¶¶ 21-22, 30, 38,
44-45, 49, 53, 56, 60.) [FN1]

        FN1. The original Complaint was filed on
        or about November 28, 2006 and the First
        Amended Complaint was filed on or about
        January 8, 2007.

On or about February 2, 2007, Defendants
submitted a motion to transfer venue to the United
States District Court, District of New Jersey
pursuant to 28 U.S.C. § 1404(a), or "in the
alternative, to dismiss this action in part pursuant to
[Federal Rule of Civil Procedure] 12(b)(6) with
prejudice, or to strike pursuant to [Rule] 12(f), the
Rule 23 state law class action allegations and the
FLSA record-keeping claim."(Mem. of Law in
Supp. of Defs.' Mot. to Transfer Venue or to
Dismiss or Strike in Part the Second Am. Compl. ("
Def.Mem.") at 1-3, 25.) Defendants argue that "the
District of New Jersey is the forum most closely
linked to the events and witnesses that are truly
material to this litigation, and transferring the case ...
would advance the overall interests of justice as
contemplated by Section 1404(a)." (Def. Mem. at
1-2.) "Freeman worked for Roche Labs, a New
Jersey based company ... for a total of nine years
[but] she covered a sales territory in New York for
only seven months."(Def. Mem. at 7 (emphasis
removed).) Alternatively, Defendants argue that "
the assertion of an opt-in collective action under the
FLSA together with an opt-out state law wage and
hour class action ... pursuant to Rule 23 contravenes
express Congressional intent...." (Def. Mem. at 2.)
Plaintiffs responded on or about February 23, 2007,
arguing that "Plaintiffs' choice of forum is entitled
to deference" and this Court "permit[s] FLSA
collective actions to proceed simultaneously with
Rule 23 classes for state law claims."(Pl.'s Mem. of
Law in Opp'n to Def.'s Mot. to Transfer Venue or to
Dismiss or Strike in Part the Second Am. Compl. ("
Pl.Opp'n") at 1, 4-5, 12-13.) Defendants submitted
a reply on or about March 5, 2007. Oral argument
was held on March 21, 2007.

For the reasons set forth below, the motion to
transfer venue is granted and the case is transferred
to the United States District Court for the District of
New Jersey.

               II. Standard

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

Slip Copy, 2007 WL 895282 (S.D.N.Y.)
(Cite as: Slip Copy)

"For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a)."The determination whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court."*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.,* 865 F.2d 513, 520 (2d Cir.1989)."The burden is on the party seeking transfer to make a clear-cut showing that it is warranted...."*UFH Endowment, Ltd. V. Nevada Manhattan Mining, Inc.,* No. 98 Civ. 5032, 2000 WL 1457320, at *3 (S.D.N.Y. Sept. 28, 2000) (citation and internal quotation omitted). A plaintiff's choice of forum will not be disturbed unless the movant shows that "the balance of convenience and justice weighs heavily in favor of transfer."*Royall Lyme Bermuda Ltd. v. Coastal Fragrance, Inc.,* No. 97 Civ. 2711, 1997 WL 620840, at *1 (S.D.N.Y. Oct. 7, 1997) (granting motion to transfer venue) (citations and internal quotation omitted)."The interests of justice require that this Court not reward [forum shopping]."*In re Eclair Bakery Ltd.,* 255 B.R. 121, 142 (Bankr.S.D.N.Y.2000)."The core determination under § 1404(a) is the center of gravity of the litigation...."*Deshoulieres, S.A. v. Cuthbertson Imps., Inc.,* No. 06 Civ. 5163, 2006 WL 2849818, at *2 (S.D.N.Y. Oct. 3, 2006) (quoting *Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D.N.Y.1995)).

### III. Analysis

*2 "The threshold question in a transfer motion [under § 1404(a) ] is whether the action could have been brought in the district to which transfer is proposed."*Arrow Elecs., Inc. v. Ducommun Inc.,* 724 F.Supp. 264, 265 (S.D.N.Y.1989). This action could have been brought in New Jersey because a " substantial part of the events or omissions giving rise to the claim" occurred there and because Defendants are "subject to personal jurisdiction" in that district. 28 U.S.C. § 1391(b)-(c); *Crow Constr. Co. v. Jeffrey M. Brown Assocs.,* No. 01 Civ. 3839, 2001 WL 1006721, at *2 (S.D.N.Y. Aug. 31, 2001).

"[T]he Court next considers whether the convenience of the parties and witnesses and the interest of justice warrant a transfer ."*Brockmeyer v. May,* No. 98 Civ. 5521, 1999 WL 191641, at *3 (S .D.N.Y. Apr. 6, 1999).

### Location of Events Giving Rise to the Suit

"[T]he location of operative events is a 'primary factor' in determining a motion to transfer venue."*ZPC 2000, Inc. v. SCA Group, Inc.,* 86 F.Supp.2d 274, 279 (S.D.N.Y.2000) (quoting *Smart v. Goord,* 21 F.Supp.2d 309, 316 (S.D.N.Y.1998)). In this case, substantial operative facts and events took place in New Jersey. "Defendants employ and have employed ... [hundreds] of pharmaceutical sales representatives [including Freeman] in ... New Jersey."And, with the exception of a seven month period in 2005, Plaintiff Freeman worked for Defendants "exclusively in New Jersey." (2d Am. Compl. ¶ 13; Def. Mem. at 3.) Plaintiffs allege that Defendants "systemically violated the law throughout [several states including] New Jersey." (2d Am.Comp.¶ 15.) "Courts routinely transfer cases when [as here] the principal events occurred ... in another district."*Viacom Int'l, Inc. v. Melvin Simon Prods., Inc.,* 774 F.Supp. 858, 868 (S.D.N.Y.1991) (citation omitted).*See also Hall v. S. Orange,* 89 F.Supp.2d 488, 494 (S.D.N.Y.2000) (transferring venue to the District of New Jersey because "a substantial part of the events ... occurred in ... New Jersey" even though "some events giving rise to plaintiff's claims occurred in the Southern District [of New York]").

This factor favors transfer.

### Convenience of the Parties

When considering the convenience of the parties, " [t]he logical and relevant starting point is a consideration of the residence of the parties."*Wine Mkts. Int'l v. Bass,* 939 F.Supp. 178, 182 (E.D.N.Y.1996) (citations omitted). Plaintiff Freeman is a New Jersey resident. (2d Am.Compl.¶ 9.) Plaintiff Coen is a Kansas resident. (2d Am.Compl.¶ 10.) Defendants "have their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 3

Slip Copy, 2007 WL 895282 (S.D.N.Y.)
(Cite as: Slip Copy)

headquarters and principal place of business in Nutley, New Jersey."(Def. Mem. at 3, 9; *see also* 2d Am. Compl. ¶¶ 7-8.)

This factor favors transfer.

### Convenience of the Witnesses

"The convenience of party and nonparty witnesses is usually the most important consideration in deciding a motion to transfer venue."*ACE One Stop Group, Inc. v. CD Listening Bar, Inc.*, 326 F.Supp.2d 525, 529 (S.D.N.Y.2004) (citation omitted). The party seeking the transfer "must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover."*Howard v. Four Seasons Hotels Ltd.*, No. 96 Civ. 4587, 1997 WL 107633, at *3 (S.D.N.Y. Mar. 10, 1997). Defendants list several potential witnesses, including Ryan Patterson, Larry Prince, and Michele Crocco who " are all resident in New Jersey, as are a number, if not all, of the other witnesses," (Def. Mem. at 9-10) and argue persuasively that these witnesses, as well as other co-workers, would testify with respect to, among other issues, the "manner in which [Freeman] performed her job[,] ... [t]he training Freeman received[,] ... [and] compensation and polices and procedures."(Def. Mem. at 9.) [FN2]

> FN2."[P]roximity to the forum is not a sole or controlling consideration,"*Haase v. Mallenkrodt, Inc.*, 415 F.Supp. 889, 890 (S.D.N.Y.1976) (citation and internal quotation omitted), but, in any case, convenience of the witnesses is not greater in New York than New Jersey. *See also Brasseler USA Dental, L.L.C. v. Discus Dental, Inc.*, No. 04 Civ. 9494, 2005 WL 1765706, at *3 (S.D .N.Y. July 25, 2005).

*3 This factor favors transfer.

### Plaintiffs' Choice of Forum

Generally, "[a] plaintiff's choice of venue is entitled

to significant consideration and will not be disturbed unless other factors weight strongly in favor of transfer."*Royal & Sunalliance v. British Airways*, 167 F.Supp.2d 573, 576 (S.D.N.Y.2001). This factor is less compelling where, as here, plaintiffs choose a forum that is not their home district. *SeeIntira Corp. v. Intira Corp.*, No. 00 Civ. 7198, 2000 WL 1745043, at *8 (S .D.N.Y. Nov. 27, 2000) ("[W]here the forum is not the plaintiff's home district, the plaintiff's choice of forum is given less deference, even when the plaintiff's home district is adjacent to the forum.") (citation omitted). And, a plaintiff's choice of forum "is afforded little weight" in a purported class action, as here, where "numerous potential plaintiffs [are] each possibly able to make a showing that a particular forum is best suited...."*Eichenholtz v. Brennan*, 677 F.Supp. 198, 202 (S.D.N.Y.1988) (citations omitted); *see alsoLewis v. C.R.I., Inc.*, No. 03 Civ. 0651, 2003 WL 1900859, at *4 (S.D.N.Y. Apr. 17, 2003) ("[R]epresentative plaintiffs are entitled to some deference in their choice of forum, but they are entitled to less deference than other plaintiffs."(citing *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir.2002)); *see alsoMontgomery v. Tap Enters ., Inc.*, No. 06 Civ. 5799, 2007 WL 576128, at *4-*5 (S.D.N.Y. Feb. 26, 2007) ("Plaintiffs' argument would be stronger in a situation where plaintiffs had already ' opted-in' to the lawsuit, as opposed to here, where the litigation is nascent.").

This factor favors transfer.

### Relative Means of the Parties

Plaintiffs argue that the Court should give deference to Plaintiffs' choice of forum because a "disparity exists between the means of the parties."(Pl. Opp'n at 8-9.) But, there is "no reason to conclude that litigation of this action in [New Jersey] would present significant increased costs for either party," *Cuszupoli v. Metro-North Commuter R.R.*, No. 02 Civ. 7947, 2003 WL 21496879, at *4 (S.D.N.Y. June 30, 2003). As noted, Plaintiff Freeman herself is a New Jersey resident and it might well be somewhat less expensive to litigate in her home district of New Jersey.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 4

Slip Copy, 2007 WL 895282 (S.D.N.Y.)
(Cite as: Slip Copy)

This factor favors transfer.

### Interests of Justice

"The interest of justice is a separate component of the Court's § 1404(a) transfer analysis, and may be determinative in a particular case."*Tucker Anthony, Inc. v. Bankers Trust Co.,* No. 93 Civ. 0257, 1994 WL 9683, at *8 (S.D.N.Y. Jan. 10, 1994) (citations and internal quotations omitted). The interests of justice are "based on the totality of the circumstances."*Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. LaFarge N. Am., Inc.,* No. 06 Civ. 3123, 2007 WL 214408, at *4 (S.D.N.Y. Jan. 29, 2007) (citations omitted).

Defendants argue that Plaintiffs filed this suit in the Southern District of New York because the law in the Second Circuit is more favorable to them than the law in the Third Circuit "with regard to the mutual exclusivity of the FLSA's opt-in and Rule 23's opt-out provisions in an effort to avoid the dismissal of the state law class action claims." (Def. Mem. at 11.) Plaintiffs respond that "Defendants plainly want this case transferred to New Jersey so that they can avoid facing Plaintiffs' state law claims by taking advantage of the ... law [there]." (Pl. Opp'n at 11.) [FN3]An "important interest[ ] to be considered [is] the discouragement of forum shopping."*Unique Indus., Inc. v. Lisa Frank, Inc.,* No. 93 Civ. 8037, 1994 WL 525041, at *2 (S.D.N.Y. Sept. 23, 1994) (citations omitted).

> FN3. These positions were emphasized at oral argument on March 21, 2007. (*See* Tr. of Proceedings, Mar. 21, 2007.)

*4 This factor favors transfer.

In summary, among other reasons to transfer the case to the District of New Jersey are the following: substantial operative facts and events occurred in New Jersey, and Freeman worked in New Jersey for a majority of the time she was employed by Defendants; Plaintiffs and Defendants are residents of New Jersey (and no party is a resident of New York); many of the (potential) witnesses are in New Jersey; Plaintiffs choice of forum is given less deference because it is not the Plaintiffs' home district.[FN4]The Court concludes that the "center of gravity" of this litigation is in New Jersey. *See Deshoulieres,* 2006 WL 2849818, at *2.[FN5]

> FN4. The Court concludes that the factors not specifically addressed (e.g., location of the documents and familiarity with the governing law) are neutral. *SeeWalker v. Jon Renau Collection, Inc.,* 423 F.Supp.2d 115, 117-18 n. 3 (S.D.N.Y.2005); *MasterCard Int'l, Inc. v. Lexcel Solutions, Inc.,* No. 03 Civ. 7157, 2004 WL 1368299, at *8 (S.D.N.Y. June 16, 2004).

> FN5. Having found that this action should be transferred, this Court need not resolve Defendants' motion to dismiss or strike portions of the Second Amended Complaint. *SeeHandler v. Regents of Univ. of Michigan,* No. 00 Civ. 6314, 2000 WL 1635701, at *3 (S.D.N.Y. Nov. 1, 2000).

### IV. Conclusion and Order

For the reasons stated above, Defendants' motion to transfer this action to the United States District Court for the District of New Jersey is granted. The Clerk is respectfully requested to remove the case from the docket and transfer it to the District of New Jersey.

S.D.N.Y.,2007.
Freeman v. Hoffmann-La Roche Inc.
Slip Copy, 2007 WL 895282 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB
# 7

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2004 WL 1774250 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

C
I Create Intern., Inc. v. Mattel, Inc.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
I CREATE INTERNATIONAL, INC., Plaintiff,
v.
MATTEL, INC. and Fisher Price, Inc., Defendants.
No. 03 Civ. 3993(JFK).

Aug. 9, 2004.

Stoll, Miskin & Badie, Howard C. Miskin, New
York, New York, for Plaintiff I Create
International, Inc.
Goldberg Segalla LLP, Christopher J. Belter, Kurt
D. Moody, Buffalo, New York, for Defendants
Mattel, Inc. and Fisher Price, Inc.

*OPINION and ORDER*
KEENAN, J.

## I. BACKGROUND

*1 Plaintiff brings claims for patent infringement,
breach of contract, and unfair competition. Before
the Court is defendants' motion to transfer this
action, pursuant to 28 U.S.C. § 1404(a), to the
Western District of New York.

### A. The Parties

Plaintiff is a New Jersey corporation that consists of
president/director/sole     shareholder     Steven
Campanella and vice-president Donna Campanella,
Steven Campanella's wife. Declaration of Steve
Campanella ¶¶ 1-2. Plaintiff's only place of
business is at Steven Campanella's home in
Middletown, New Jersey.*Id.* ¶ 2.

Defendant Mattel, Inc. ("Mattel") is a Delaware
corporation with its principal place of business in El

Segunda, California. Affidavit of Jeffrey Miller ("
Miller Aff.") ¶ 7. Defendant Fisher-Price, Inc. ("
Fisher-Price"), a wholly-owned subsidiary of
Mattel, is a Delaware corporation with its principal
place of business in East Aurora, New York. *Id.* ¶
¶ 5-6.

### B. The Suit and the Instant Motion

John Campanella, the brother of Steven
Campanella, is the inventor of an "Interactive
Children's Game" that has been designated U.S.
Patent No. 5,829,985. Declaration of John
Campanella ¶¶ 2-3 John Campanella assigned
this patent to plaintiff. *Id.* ¶ 2. Plaintiff alleges
that, through the product development firm PDQ
Product Development LLC ("PDQ"), plaintiff
obtained non-disclosure agreements from, and
presented drawings and a prototype of a toy based
on the patent to, several toy companies, including
defendants. Complaint ("Cplt.") ¶¶ 8-12.
According to plaintiff, defendants have
manufactured and sold a product, the Magna
Doodle Doodle Talker ("the Talker"), that infringes
plaintiff's patent. *Id.* ¶ 19.Such infringement,
plaintiff contends, violates the non-disclosure
agreement and constitutes unfair competition.*Id.* ¶
¶ 25, 33.

Arguing that all decisions concerning the marketing,
design, product development, and consumer
relations relative to the Talker were made and
continue to be made in East Aurora, New York, that
all relevant documents are maintained at
Fisher-Price headquarters in East Aurora, New
York, and that all employees involved with
marketing, design, product development, and
consumer relations regarding the Talker are located
in East Aurora, New York, defendants have moved
to transfer venue to the Western District of New
York, in which district East Aurora is located.
Defendants' Memorandum of Law at 2-3; *see* Miller
Aff. ¶¶ 9-14; Affidavit of Vladimir Buzga ¶¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2

Not Reported in F.Supp.2d, 2004 WL 1774250 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

9-13. Mattel consents to venue in the Western District of New York. Defendants' Reply Memorandum of Law at 5 n.1.

Plaintiff contends that, because it does not generate any significant income, a change of venue to the Western District of New York would make continuance of this litigation financially impossible. Plaintiff's Memorandum of Law ("Pl.Mem.") at 3. Indeed, plaintiff claims to have selected the Southern District of New York as the least expensive, most easily accessible court for plaintiff and plaintiff's potential witnesses. *Id.* at 2. These witnesses include representatives and employees of PDQ, the offices of which are in New Jersey and in New York City, and a former employee of PDQ who resides in New Jersey. *Id.* at 3-4.

*2 Plaintiff also argues that all documents related to the patent are located at plaintiff's place of business in New Jersey or at the office of plaintiff's attorney in New York City. *Id.* at 5. In addition, based on three listings for job openings in New York City that were posted on Fisher-Price's website, plaintiff contends that the Talker must have been designed, at least in part, in the Southern District of New York. Plaintiff's Supplemental Memorandum of Law at 2-4. Finally, plaintiff contends that even if defendants had designed, developed and marketed the Talker in East Aurora, New York, the non-disclosure agreement was signed and the breach of contract occurred in the Southern District of New York. Pl. Mem. at 8-9.

## II. VENUE

"Venue refers to locality; it concerns the forum where a lawsuit may be brought and judicial authority exercised."*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,* 869 F.Supp. 152, 154 (S.D.N.Y.1994) (citing 15 Wright, Miller & Cooper, *Federal Practice & Procedure: Jurisdiction 2d* § 3801). Unlike subject matter jurisdiction, venue is a "personal privilege[ ]" that a party may waive. *Leroy v. Great W. United Corp.,* 443 U.S. 173, 180, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979); *seeRC Entertainment, Inc. v. Rodriguez,* No. 98 Civ. 8585(BSJ), 1999 WL 777903 at *2

(S.D.N.Y. Sept.29, 1999). In addition, a court may transfer a case from one district court to another, even if venue in the original location is proper: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a). On a motion to transfer venue, a court must decide whether the action could have been brought in the transferee forum, and whether the convenience of the parties and the interests of justice warrant transfer. *SeeMillennium, L.P. v. Hyland Software, Inc.,* No. 03 Civ. 3900(DC), 2003 WL 22928644 at *2 (S.D.N.Y. Dec.10, 2003); *Savoy Owners Assocs., Inc. v. The Ins. Corp.,* No. 02 Civ. 6145(JFK), 2003 WL 941098 at *1 (S.D.N.Y. Mar.6, 2003).

Courts weigh a number of factors in determining whether a transfer serves the convenience of the parties and the interests of justice. These factors include (1) the locus of operative facts, (2) the convenience of witnesses, (3) the convenience of parties, (4) the location of relevant documents and ease of access to sources of proof, (5) the availability of process to compel attendance of unwilling witnesses, (6) the relative means of the parties, (7) the transferee forum's familiarity with governing law, (8) the weight accorded plaintiff's choice of forum, and (9) trial efficiency and the interests of justice, based on the totality of the circumstances. *See800-Flowers, Inc. v. Intercont'l Florist, Inc.,* 860 F.Supp. 128, 133 (S.D.N.Y.1994); *see alsoHyland,* 2003 WL 22928644 at *2;*Savoy Owners,* 2003 WL 941098 at *1. No single factor is determinative, and a court's discretion will not be overturned on appeal absent a clear showing of abuse. *Hyland,* 2003 WL 22928644 at *3 (citing, *inter alia,In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992)); *seeBristol-Myers Squibb Co. v. Andrx Pharmaceuticals, LLC,* No. 03 Civ. 2503(SHS), 2003 WL 22888804 at *1 (S.D.N.Y. Dec.5, 2003); *Savoy Owners,* 2003 WL 941098 at *2. The moving party bears the burden of making a "clear and convincing showing" that the balance of convenience tips in its favor. *Berman v. Informix Corp.,* 30 F.Supp.2d 653, 656 (S.D.N.Y.1998) (citations omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2004 WL 1774250 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

### A. The Action Could Have Been Brought in the Western District of New York

*3 Under 28 U.S.C. § 1400(b), which governs patent infringement cases, an infringement action " may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."A corporation " reside[s] in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."28 U.S.C. § 1391(c); see VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1575 (Fed.Cir.1990) (holding that the definition of "reside" in 28 U.S.C. § 1391(c) applies in patent infringement cases); Wechsler v. Macke Int'l Trade, Inc., No. 99 Civ. 5725(AGS), 1999 WL 1261251 at *3 (S.D.N.Y. Dec.27, 1999) (applying the § 1391(c) definition of "resides" to § 1400(b)).

Where state law claims, such as breach of contract and unfair competition, arise from the same nucleus of operative fact as a federal claim, the doctrine of " pendent venue" comes into play. See Hsin Ten Enter. USA v. Clark Enters., 138 F.Supp.2d 449, 462 (S.D.N.Y.2000). Under this doctrine, a federal court may hear a claim related to a properly venued federal claim even if the related claim would not otherwise fulfill venue requirements. Id.

Because Fisher-Price has its principal place of business in East Aurora, New York, it is subject to personal jurisdiction there and can be said to reside in the Western District of New York. Whether venue is proper as to Mattel is an issue this Court need not decide, as Mattel has consented to venue in the Western District of New York. Therefore, venue on the patent claim is proper in the Western District of New York.

Plaintiff specifically brought its state law claims of breach of contract and unfair competition before this court because those claims were "raised with the substantial and related claim under the Patent Laws."Cplt. ¶ 23, 31. Accordingly, these claims arise out of defendants' alleged infringement of plaintiff's patent. Because venue is proper on the patent claim in the Western District of New York,

the exercise of venue over the state law claims in the Western District of New York is also appropriate.

### B. Transfer Is Warranted

#### 1. Locus of operative facts

Of the nine factors listed above, the locus of operative facts carries significant weight. Hyland, 2003 WL 22928644 at *5 ("primary factor"); Lighting World, Inc. v. Birchwood Lighting, Inc., No. 01 Civ. 4751(BSJ), 2001 WL 1242277 at *3 (S.D.N.Y. Oct.16, 2001) ("most important" because it "informs the court's analysis of several other factors"). In patent infringement cases, the locus of operative facts is where the design, development, and production of an allegedly infringing product took place. Hyland, 2003 WL 22928644 at *5; Wechsler, 1999 WL 1261251 at *4. For a breach of contract claim, the place of negotiation, execution, performance, and breach of the alleged contract are considered. PI, Inc. v. Quality Prods., Inc., 907 F.Supp. 752, 757-58 (S.D.N.Y.1995). Finally, the locus of operative facts for an unfair competition claim "is in the initial forum if the acts of infringement, dilution, or unfair competition occur in that forum," but this factor only "weakly favors" retaining a case when no other important events occurred in the forum. Nabisco, Inc. v. Brach's Confections, Inc., No. 00 Civ. 5875(AGS), 2000 WL 1677935 at *3 (S.D.N.Y. Nov.8, 2000).

*4 In this case, the Western District of New York is the locus of operative facts because the Talker was allegedly designed, developed, and marketed at the Fisher-Price headquarters in East Aurora, because any breach of the alleged contract would have occurred in East Aurora, and because, considering the foregoing, the sale of the Talker in the Southern District of New York is only a weak link between this forum and the unfair competition claim. For all three of plaintiff's claims this factor strongly favors transfer.

#### 2. Convenience of witnesses

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2004 WL 1774250 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

"A party seeking to rely on the convenience of the witnesses factor must identify the material witnesses and supply a general description of what their testimony will cover."*Mattel, Inc. v. Procount Business Servs.*, No. 03 Civ. 7234(RWS), 2004 WL 502190 at *4 (S.D.N.Y. Mar.10, 2004) (citing *Wechsler*, 1999 WL 1261251 at *6). The significance of each witness's testimony is more important than the number of witnesses in each district. *Hyland*, 2003 WL 22928644 at *3. Greater weight is given to the convenience of a non-party witness than a party witness, and little weight is given to the convenience of witnesses outside both the transferor and transferee districts. *Royal Ins. Co. v. Tower Records, Inc.*, No. 02 Civ. 2612(PKL), 2002 WL 31385815 at *5 (S.D.N.Y. Oct.22, 2002) (citing *Wechsler*, 1999 WL 1261251 at *6).

Neither party has provided a list of specific witnesses. Defendants have indicated that all their witnesses are Fisher-Price employees, who are thus party witnesses and who reside and/or work in East Aurora. Plaintiff's witnesses include non-party witnesses John Campanella and current and former PDQ employees, and party witness Steven Campanella. It is unclear where the current PDQ employees reside and at which PDQ office they work. The former PDQ employee and John and Steven Campanella all reside in New Jersey. Given this mixture of party and non-party witnesses both within and without the contested districts, this factor does not favor either party.

### 3. Convenience of the parties

To the extent that a transfer causes a mere shift of inconvenience from one party to the other, this factor is neutral. *SeeMillennium, L.P. v. Dakota Imaging, Inc.*, No. 03 Civ. 1838(RWS), 2003 WL 22940488 at *7 (S.D.N.Y. Dec.15, 2003). Both parties here claim that the other party's favored forum will cause some degree of inconvenience. This factor does not weigh in favor of either party.

### 4. Location of relevant documents and ease of access to sources of proof

"[M]odern photocopying technology deprives this issue of legal and practical significance."*Savoy Owners*, 2003 WL 941098 at *3. However, the location of relevant documents is often the locus of operative facts. *SeeDakota*, 2003 WL 22940488 at *7. This is especially true in patent cases, where the bulk of evidence usually comes from the alleged infringer. *Hyland*, 2003 WL 22928644 at *4. Convenience to counsel, and consequently the location of relevant documents at counsel's office, is not considered. *Bionx Implants, Inc. v. Biomet, Inc.*, No. 99 Civ. 740(WHP), 1999 WL 342306 at *4 (S.D.N.Y. May 27, 1999).

*5 In one view, this factor comes out neutral because neither party would be significantly inconvenienced, in this age of fax machines and Federal Express, to transport its documents to either forum. Alternatively, this factor favors defendants because all documents regarding the alleged infringement are in the Western District of New York and only some of plaintiff's documents are in the Southern District of New York, at the office of plaintiff's counsel.

### 5. Availability of process to compel attendance of unwilling witnesses

The existence of non-party witnesses who can be compelled to appear at trial in one district but not in the other is an important consideration. *SeeBerman*, 30 F.Supp.2d at 658. Plaintiff wishes to call non-party witnesses who reside in New Jersey and who could be compelled to appear in this district but not in the Western District of New York. Defendant's witnesses, on the other hand, are employees of defendant who can be compelled to testify in this district. However, plaintiff has not shown that any of its non-party witnesses would refuse to appear in the Western District of New York. Even if the witnesses were to refuse, their testimony could be offered through depositions. This factor therefore only slightly favors plaintiff.

### 6. Relative means of the parties

A "disparity of means" between the parties, when it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 5

Not Reported in F.Supp.2d, 2004 WL 1774250 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

exists, is a consideration in determining venue. *Hyland,* 2003 WL 22928644 at *6. However, courts place less weight on this factor when both parties are corporations. *Roval Ins.,* 2002 WL 31385815 at *7;*About.com, Inc. v. Aptimus, Inc.,* No. 01 Civ. 2106(AGS), 2001 WL 503251 at *3 (S.D.N.Y. May 11, 2001). Furthermore, even when significant disparity of means does exist, courts exercise considerable discretionary power over the location of depositions and other matters that impact the financial burden a party must bear. *Mill-Run Tours, Inc. v. Khashoggi,* 124 F.R.D. 547, 550 (S.D.N.Y.1989); *seeFed. Deposit Ins. Co. v. La Antillana, S.A.,* No. 88 Civ. 2670(JFK), 1990 WL 155727 at *2 (S.D.N.Y. Oct.5, 1990). For example, the general presumptions that a plaintiff is usually deposed in the district where plaintiff initiated the action, and that a defendant is usually deposed in defendant's district of residence may be overcome by affidavits demonstrating in detail that the exigencies of a particular case warrant a departure from the general presumptions. *See* 2 Michael C. Silberberg, *Civil Practice in the Southern District of New York* § 17.11-17.12 (2d ed.2003) (citing cases).

Plaintiff, a corporation, represents itself as having limited financial means and as being unable to pursue this action should transfer to the Western District of New York be granted. Defendants, on the other hand, are large multi-national corporations. Should plaintiff find it difficult to go forward with the litigation in the Western District of New York because of the expense of litigating there, plaintiff may seek relief from the transferee court by, for example, submitting a request to hold depositions at the office of plaintiff's attorney.

7. Transferee forum's familiarity with governing law

*6 "Patent law is federal law and 'any district court may handle a patent case with equal skill.'" *Bristol-Myers,* 2003 WL 22888804 at *4 (quoting *Bionx,* 1999 WL 342306 at *5). This factor is neutral.

8. Weight accorded plaintiff's choice of forum

"[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."*Bristol-Myers,* 2003 WL 22888804 at *4 (citations omitted). However, that choice's importance is diminished when the Southern District of New York "has only a tenuous connection to the operative facts of the litigation."*Id.* at *5; *seeHyland,* 2003 WL 22928644 at *6; *Lighting World,* 2001 WL 1242277 at *4;*Berman,* 30 F.Supp.2d at 659.

As established above, the locus of operative facts in this case is the Western District of New York, and the connection between the Southern District of New York and this case is tenuous at best. Plaintiff's choice of forum, therefore, is not entitled to great weight.

9. Trial efficiency and the interests of justice

Docket conditions are not a particularly relevant consideration, and, in any event, neither party has alleged that either court would be burdened by this litigation. While the Southern District of New York has little connection with this action, the connection between this case and the Western District of New York is strong. Trial efficiency and the interests of justice therefore weigh in favor of transfer.

IV. Conclusion

For the reasons set forth above, defendants' motion to transfer venue is granted. The Clerk of the Court is directed to transfer this case to the Western District of New York.

SO ORDERED.

S.D.N.Y.,2004.
I Create Intern., Inc. v. Mattel, Inc.
Not Reported in F.Supp.2d, 2004 WL 1774250 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB
8

Westlaw.

Slip Copy                                                    Page 1

Slip Copy, 2007 WL 1541087 (S.D.N.Y.)
(Cite as: Slip Copy)

**H**
International Securities Exchange, LLC v. Chicago
Bd. Options Exchange Inc.
S.D.N.Y.,2007.
    Only the Westlaw citation is currently
    available.INTERNATIONAL SECURITIES
        EXCHANGE, LLC, Plaintiff,
                    v.
    CHICAGO BOARD OPTIONS EXCHANGE
        INCORPORATED, Defendant.
        No. 06 Civ. 13445(RMB)(THK).

            May 24, 2007.


        MEMORANDUM OPINION AND ORDER
THEODORE H. KATZ, United States Magistrate
Judge.
*1 This patent infringement action was referred to
this Court for general pretrial supervision.
Defendant Chicago Board Options Exchange, Inc. ("
CBOE") has moved, pursuant to 28 U.S.C. §
1404(a), to transfer this action, brought by Plaintiff
International Securities Exchange, LLC ("ISE"),
from the Southern District of New York to the
Northern District of Illinois. CBOE argues, *inter
alia,* that the events giving rise to the Complaint
have no connection to the Southern District of New
York, and that most of the relevant documents and
witnesses are located in the Northern District of
Illinois. (*See* Defendant's Memorandum of Law in
Support of Motion to Transfer Venue to Northern
District of Illinois, dated Feb. 5, 2007 ("Def.'s Mem.
"), at 2.) ISE contends that CBOE has failed to meet
its burden justifying a change of venue, and that its
choice of forum should not be disturbed. (*See*
Plaintiff's Memorandum of Law in Opposition to
Defendant's Motion to Transfer Venue to the
Northern District of Illinois, dated Feb. 20, 2007 ("
Pl.'s Mem."), at 5.) For the following reasons,
Defendant's motion is granted.


            *I. Factual Background*

ISE is a Delaware corporation with its principal
place of business at 60 Broad Street, New York,
New York. CBOE is a Delaware corporation with
its principal place of business at 400 South LaSalle
Street, Chicago, Illinois. (*See* Complaint, filed Nov.
22, 2006 ("Compl."), ¶¶ 2-3.)

ISE is the owner of United States Patent No.
6,618,707 ("the Patent"), which concerns "an
automated exchange for trading a financial
instrument and a process for trading a financial
instrument on an automated exchange."(*See* Compl.
¶ 7.) ISE claims that CBOE "infringed,
contributed to the infringement by others of, or
actively induced infringement by others" the Patent
by "making, using, selling, offering to sell, or
causing to be sold" the CBOE Hybrid System, and
its component, the Ultimate Matching Algorithm
(collectively the "Hybrid System"), which concern
an exchange for trading a financial instrument. (*See
id.* ¶¶ 8, 10.)


        *II. Standard for Transfer of Venue*

Motions for a change of venue are governed by 28
U.S.C. § 1404(a), which provides: "For the
convenience of parties and witnesses, in the interest
of justice, a district court may transfer any civil
action to any other district or division where it
might have been brought."If a court determines that
the action could have been brought in the transferee
court, it must then consider the convenience of the
parties and witnesses, and the interests of justice, to
resolve whether the transfer is warranted. *See D.H.
Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 106
(2d Cir.2006); *Laborers Local 100 and 397
Pension Fund v. Bausch & Lomb Inc.,* Nos. 06
Civ.1942(HB),   06   Civ.2025(HB),   06   Civ.
2659(HB),  06 Civ. 2916(HB), 06 Civ. 2918(HB),
06 Civ. 3106(HB), 06 Civ. 3653(HB), 2006 WL
1524590, at *3 (S.D.N.Y. June 5, 2006) (citing *Fuji
Photo Film Co., Ltd. v. Lexar Media, Inc.,* 415
F.Supp.2d 370, 373 (S.D .N.Y.2006)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

Slip Copy, 2007 WL 1541087 (S.D.N.Y.)
(Cite as: Slip Copy)

### A. *The Action Could Have Been Brought in the Northern District of Illinois*

**\*2** CBOE's principal place of business is Chicago, Illinois (*see* Compl. ¶ 3; Def.'s Mem., at 2-3), thus it is subject to personal jurisdiction in the Northern District of Illinois and venue is proper there. *See* 28 U.S.C. § 1400(b); 28 U.S.C. § 1391(c); FN1 *see also Fuji Photo Film*, 415 F.Supp.2d at 373 (citing *Walker v. Jon Renau Collection, Inc.*, 423 F.Supp.2d 115, 117 (S.D.N.Y.2005)); *Aerotel, Ltd. v. Sprint Corp.*, 100 F.Supp.2d 189, 194-95 (S.D.N.Y.2000); *Invivo Research, Inc. v. Magnetic Resonance Equip. Corp.*, 119 F.Supp.2d 433, 437 (S.D.N.Y.2000). Moreover, ISE does not dispute that this action could have been brought in the Northern District of Illinois. Thus, the remaining inquiry is whether the convenience of the witnesses and parties, and the interests of justice, weigh in favor of a change in venue.

> FN1. 28 U.S.C. § 1400(b) governs venue in patent infringement actions and provides that such actions "may be brought in the judicial district where the defendant resides ..." A corporation is "deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c).

### B. *The Balancing of Factors Weigh in Favor of Transfer*

When considering a motion for transfer, a court must balance "private interest factors," including the convenience of the litigants and "all other practical problems that make trial of a case easy, expeditious and inexpensive," and "public interest factors," which include the administrative and jurisdictional interests of the districts involved. *See Iragorri v. United Technologies Corp.*, 274 F .3d 65, 74 (2d Cir.2001) (*en banc* ). In analyzing the balance of conveniences, a court should consider: " (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5)

the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties. "*D.H. Blair & Co.*, 462 F.3d at 106-07 (quoting *Albert Fadem Trust v. Duke Energy Corp.*, 214 F.Supp.2d 341, 343 (S.D.N.Y.2002)). As to the public interest factors, a court should consider the transferee court's familiarity with the governing law, as well as trial efficiency and the interests of justice. *See Hummingbird USA, Inc. v. Texas Guaranteed Student Loan Corp.*, No. 06 Civ. 7672(LTS)(GWG), 2007 WL 163111, at \*2 (S .D.N.Y. Jan. 22, 2007) (citing *Pilates, Inc. v. Pilates Instit., Inc.*, 891 F.Supp. 175, 183 (S.D.N.Y.1995)); *accord Cook v. UBS Financial Servs., Inc.*, No. 05 Civ. 8842(SHS), 2006 WL 760284, at \*6 (S.D.N.Y. Mar. 21, 2006); *Mears v. Montgomery*, No. 02 Civ. 0407(BSJ)(MHD), 2004 WL 964093, at \*8 (S.D.N.Y. May 5, 2004). These factors need not be accorded equal weight, and a court may consider other factors as well. *Hummingbird USA*, 2007 WL 163111, at \*2 (citing *Malone v. Commonwealth Edison Co.*, 2 F.Supp.2d 545, 547 (S.D.N.Y.1998)). The burden is on the movant to make a "clear and convincing showing" that there should be a change in forum. *Montgomery v. Tap Enterp., Inc.*, No. 06 Civ. 5799(HB), 2007 WL 576128, at \*2 (S.D.N.Y. Feb. 26, 2007) (quoting *Editorial Musical Latino Americana, S.A. v. Mar Int'l Records*, 829 F.Supp. 62, 66 (S.D.N.Y.1993)); *see also Wildwood Imports v. M/V ZIM SHANGHAI*, No. 04 Civ. 5538(MBM), 2005 WL 425490, at \*3 (S .D.N.Y. Feb. 20, 2005)." Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir.), *cert. denied* 537 U.S. 1028, 123 S.Ct. 556 (2002) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843 (1947)).

### 1. *Convenience of Witnesses*

**\*3** Convenience of witnesses "is probably the single-most important factor in the analysis of whether transfer should be granted." *Cower v. Albany Law School of Union Univ.*, No. 04 Civ. 0643(DAB), 2005 WL 1606057, at \*2 (S.D.N.Y.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                     Page 3

Slip Copy, 2007 WL 1541087 (S.D.N.Y.)
(Cite as: Slip Copy)

July 8, 2005) (internal quotation marks omitted); *accord Houlihan Lokey Howard & Zukin Capital, Inc. v. Protective Group, Inc.,* No. 05 Civ. 4741(DC), 2005 WL 3367044, at *4 (S.D.N.Y. Dec. 12, 2005). In considering the convenience of the witnesses, a court "must consider the materiality, nature, and quality of each witness, not merely the number of witnesses in each district." *Houlihan Lokey Howard & Zukin Capital, Inc.,* 2006 WL 2927176, at *4 (citing *Royal & Sunalliance v. British Airways,* 167 F.Supp.2d 573, 577 (S.D.N.Y.2001)). In the context of a patent infringement suit, a court should give particular consideration to individuals who can testify about the technology of the allegedly infringing inventions. *Cf. Kwik Goal, Ltd. v. Youth Sports Pub., Inc.,* No. 06 Civ. 395(HB), 2006 WL 1517598, at *4 (S.D.N.Y. May 31, 2006) (citing *AEC One Stop Group, Inc. v. CD Listening Bar, Inc.,* 326 F.Supp.2d 525, 529 (S.D.N.Y.2004) (stating that in a copyright infringement action, "the key witnesses, ..., are those officers and employees who were involved in the design, production, and sale" of the allegedly infringing products)); *Fuji Photo Film Co., Ltd.,* 415 F.Supp.2d at 373 ("The key issues in a patent infringement suit involve the technology of the inventions claimed in the patents-in-suit.").

ISE has identified two witnesses who it intends to call: Gary Katz, the Chief Operating Officer of ISE, who is the sole inventor named on the Patent, and Stephen J. Lieb, Esq., who "assisted with preparation and prosecution of the applications that led to the Patent."(*See* Pl.'s Mem., at 8; Declaration of Gary Katz, dated Feb. 20, 2007 ("Katz Decl."), ¶¶ 5-6.) Katz and Lieb both work in New York City. (*See* Katz Decl. ¶¶ 5-6.)

CBOE has identified three groups of witnesses, all of whom reside in Illinois. The first group is comprised of six individuals, three of whom are non-party witnesses, who were involved in the development, implementation and operation of the Hybrid System, and all of whom are listed as inventors on the patent application for the Hybrid System. (*See* Def.'s Mem., at 10-11; Declaration of Mark Esposito, dated Feb. 2, 2007; Declaration of Anthony J. Carone, dated Feb. 2, 2007; Declaration

of Stuart Kipnes, dated Feb. 2, 2007; Declaration of Edward T. Tilly, dated Feb. 5, 2007; Declaration of Eileen C. Smith, dated Feb. 2, 2007; Declaration of Anthony Montesano, dated Feb. 2, 2007.) The second group includes fourteen non-party witnesses who were "primarily involved with the development and implementation" of one or more of the electronic trading systems used by Defendant prior to the implementation of the Hybrid System.[FN2] (*See* Def.'s Mem., at 7; Declaration of Larry Pfaffenbach in Support of Defendant's Motion to Transfer, dated Feb. 5, 2007, at 2-3.) In the third group are twenty-two individuals, all of whom are non-party witnesses, who served on the CBOE committee responsible for the development and implementation of the Hybrid System. (*See* Def.'s Mem., at 8-9.)

> FN2. These systems, in place between 1985 and 2003, include: (1) the Retail Automatic Execution System ("RAES"); (2) the Electronic Book ("Ebook"); (3) the Order Routing System ("ORS") and (4) CBOEDirect. (*See* Def.'s Mem., at 6-7.)

*4 While, as ISE suggests, CBOE appears to have proffered many witnesses who might give duplicative or arguably immaterial testimony, CBOE clearly has more than a handful of witnesses whose testimony is likely to be material to the central question at issue: whether the Hybrid System infringes on Plaintiff's Patent. *See Kwik Goal, Ltd.,* 2006 WL 1517598, at *4 ("key witnesses [in copyright infringement claim" will be those [ ] employees who designed the allegedly infringing website"). It appears that, unlike ISE's Patent, the Hybrid System patent was the work of several people, all of whom appear to live in Illinois.

Given the materiality of testimony regarding the allegedly infringing patent, and the fact that every witness who could testify with respect to that patent resides or works in the Northern District of Illinois, the Court finds that this factor strongly favors transfer. *See Credit Suisse Securities (USA) LLC v. Hilliard,* 469 F.Supp.2d 103, 112 (S.D.N.Y.2007) (that "a significant number of witnesses" live in the transferee state weighs in favor of transfer").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4

Slip Copy, 2007 WL 1541087 (S.D.N.Y.)
(Cite as: Slip Copy)

### 2. *Availability of Process to Compel Attendance of Witnesses*

Availability of compulsory process "is an important consideration in transfer motions."*Brasseler USA Dental, L.L.C. v. Discus Dental, Inc.,* No. 04 Civ. 9404(NRB), 2005 WL 1765706, at *4 (S.D.N.Y. July 25, 2005) (quoting *Arrow Elecs. v. Ducommun, Inc.,* 724 F.Supp. 264, 266 (S.D.N.Y.1989); *accord Billing v. Commerce One, Inc.,* 186 F.Supp.2d 375, 378 (S.D.N.Y.2002). While neither party has identified any witnesses who would refuse to appear in either forum, the bulk of Defendant's witnesses are non-party witnesses. These non-party witnesses are not subject to subpoena power in New York, but are subject to such authority in Chicago. *See* Fed.R.Civ.P. 45(b)(2) (district court can enforce a trial subpoena served on a witness within the judicial district of the court, or within 100 miles of the court). Defendant has a strong interest in presenting live testimony from its witnesses. *See Am. Steamship Owners Mut. Protection and Indem. Ass'n, Inc. v. LaFarge N. America, Inc.,* 474 F.Supp.2d 474, 485 (S.D.N.Y.2007) (finding that deposition testimony would "clearly be second-best to [the witnesses'] live testimony").

Thus, this factor strongly weighs in favor of transfer.

### 3. *Location of relevant documents*

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location."*Fuji Photo Film Co., Ltd.,* 415 F.Supp.2d at 374 (quoting *Millennium, L.P. v. Hyland Software, Inc.,* No. 03 Civ. 3900(DC), 2003 WL 22928644, at *4 (S.D.N.Y. Dec. 10, 2003)). Neither side, however, has provided any information about the volume of records to be produced and the costs of doing so; thus, the Court concludes that this factor is neutral. *See Hummingbird USA,* 2007 WL 163111, at *3 (defendant's argument about the location of relevant documents fails because it fails "to identify a single document it would require that is bulky or difficult

to transport"); *Kiss My Face Corp. v. Bunting,* No. 02 Civ. 2645(RCC), 2003 WL 22244587, at *2 (S.D.N.Y. Sept. 30, 2003) ("[G]iven Defendant's failure to provide the Court with the nature and volume of the documents she plans to use in support of her case, or the difficulty in transporting such documents, this factor weighs against transfer."); *Royal Ins. Co. of America v. Tower Records, Inc.,* No. 02 Civ. 645(RCC), 2002 WL 31385815, at *6 (S.D.N.Y. Oct. 22, 2002) ("defendant's assertion that documents are located in the proposed transferee forum is entitled to little weight unless the defendant makes a detailed showing as to the burden it would incur absent transfer").

### 4. *Convenience of Parties*

*5 ISE is headquartered in New York, and has no presence in Chicago. (*See* Pl.'s Mem., at 2-3.) CBOE is headquartered in Chicago, and although it operates a three-person office in New York, none of the employees in that office has any knowledge about the issues in this case. (*See* Def.'s Mem., at 17.) To some extent, both parties will be inconvenienced by having to travel to the forum of their opponent's choosing. Thus, this factor is neutral. *See Findwhat.com v. Overture Servs., Inc.,* No. 02 Civ. 447(MBM), 2003 WL 402649, at *6 (where both parties were headquartered in different states, court found each would be inconvenienced " to some degree" by being required to travel to another forum).

### 5. *Locus of Operative Facts*

The locus of the operative facts is "traditionally an important factor to be considered in deciding where a case should be tried."*Royal Ins. Co. of America,* 2002 WL 31385815, at *4 (citing *800-Flowers, Inc. v. Intercontinental Florist, Inc.,* 860 F.Supp. 128, 134 (S.D.N.Y.1994)). In patent infringement cases, the locus of operative facts "usually lies where the allegedly infringing product was designed, developed, and produced."*Neil Bros. Ltd. v. World Wide Lines, Inc.,* 425 F.Supp.2d 325, 331 (E.D.N.Y.2006) (citing *Invivo Research, Inc.,* 119 F.Supp.2d at 439); *accord I Create Intern., Inc. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5

Slip Copy, 2007 WL 1541087 (S.D.N.Y.)
(Cite as: Slip Copy)

*Mattel, Inc.,* No. 03 Civ. 3993(JFK), 2004 WL 1774250, at *3 (S.D.N.Y. Aug. 9, 2004); *Millennium, L.P. v. Dakota Imaging, Inc.,* No. 03 Civ. 1838(RWS), 2003 WL 22940488, at *7 (S.D.N.Y. Dec. 15, 2003); *Bristol-Myers Squibb Co. v. Andrx Pharmaceuticals, LLC,* No. 03 Civ. 2503(SHS), 2003 WL 22888804, at *3 (S.D.N.Y. Dec. 5, 2003).

In the instant case, there is no dispute that the Hybrid System "was designed, developed, and produced" in Chicago. Moreover, "[i]t is also relevant that the designers, developers, ... of the allegedly infringing patent are employed in the transferee forum ."*Bristol-Myers Squibb Co.,* 2003 WL 22888804, at *3. ISE argues, however, that because CBOE has raised the validity of its Patent as an affirmative defense, the locus of operative facts is New York. (*See* Pl.'s Mem., at 8.) This argument ignores the fact that CBOE's challenge to the Patent's validity appears to be based upon demonstrating that three Chicago-based exchanges were utilizing systems and processes claimed in the Patent, prior to the Patent being filed. (*See* Def.'s Mem., at 11-12 (arguing that the trade execution systems of the national Stock Exchange, Chicago Board of Trade and Chicago Stock Exchange, constitute prior art that include features claimed in the Patent).)

Because the allegedly infringing trading execution system was conceived and created in Chicago, and Defendant's patent validity challenge requires demonstration of prior art located in Chicago, the Court concludes that the locus of operative facts is Chicago, and that this factor weighs towards transfer.

### 6. Relative Means of the Parties

*6 The parties have not alleged any disparity in their relative economic means that would favor prosecuting the action in either forum, thus this factor is neutral. *Compare Coast to Coast Fabrics, Inc. v. Exact Change Only Corp.,* No. 04 Civ. 7300(DAB), 2006 WL 846716, at *5 (S.D.N.Y. Mar. 29, 2006) ("[w]here disparity exists between the parties, such as an individual plaintiff suing a

large corporation, the relative means of the parties may be considered") (quoting *Berman v. Informix Corp.,* 30 F.Supp.2d 653, 659 (S.D.N.Y.1988)). Moreover, the relative means of the parties is entitled to little weight where both parties are corporations. *See Hummingbird USA,* 2007 WL 163111, at *3 (citing *Student Advantage, Inc. v. Int'l Student Exch. Cards, Inc.,* No. 00 Civ.1971 (AGS), 2000 WL 1290585, at *8 (S.D.N.Y. Sept. 13, 2000)). Therefore, this factor is neutral.

### 7. Plaintiff's Choice of Forum

"A plaintiff's choice of forum should not be altered ' unless the balance of factors weighs strongly in favor of transfer.' " *Kwik Goal,* 2006 WL 1517598, at *2 (quoting *Caville v. Malibu Toys, Inc.,* No. 03 Civ. 9727(SAS), 2004 WL 1516799, at *2 (S.D.N.Y. July 7, 2004)). However, ISE's choice of forum is accorded less weight when the operative facts of the litigation have little material connection with the chosen forum. *See Rephen v. Pitzele,* No. 05 Civ. 7511(CM), 2006 WL 37170, at *2 (S.D.N.Y. Jan. 3, 2006); *Foot Locker Retail, Inc. v. SBH, Inc.,* No. 03 Civ. 5050(DAB), 2005 WL 91306, at *9 (S.D.N.Y. Jan. 18, 2005).

As discussed, the operative facts of this litigation-namely the alleged infringement of Plaintiff's patent-arise in Chicago. Thus, ISE's choice of forum does not weigh heavily against transfer. *See Dakota Imaging, Inc.,* 2003 WL 22940488, at *8 (that "neither the design and development of the allegedly infringing product, nor a single sale, took place within the Southern District of New York" supported transfer); *Bionx Implants, Inc. v. Biomet, Inc.,* No. 99 Civ. 740(WHP), 1999 WL 342306, at *4 (S.D.N.Y. May 27, 1999) (where, *inter alia,* allegedly infringing technology was developed, and the creators of the allegedly infringing technology lived, in the transferee state, plaintiff's choice of forum did not override other factors favoring transfer).

### 8. Familiarity with Governing Law

Patent law is federal law and "any district court may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 6

Slip Copy, 2007 WL 1541087 (S.D.N.Y.)
(Cite as: Slip Copy)

handle a patent case with equal skill."*Dakota Imaging, Inc.*, 2003 WL 22940488, at *8 (quoting *Bionx Implants*, 1999 WL 342306, at *5). Thus, this factor is neutral.

* * * *

Taking into account the relevant factors, the Court finds that the balance of conveniences weighs towards a transfer of the action.

### 9. *Interests of Justice*

On January 31, 2007, CBOE filed a declaratory judgment action in the Northern District of Illinois. ( *See* Chicago Board Options Exchange's Reply in Support of Motion to Transfer Venue, dated Feb. 27, 2007 ("Def.'s Reply Mem."), at 9.) That action involves the Patent, as well as two other ISE patents that ISE offered to license to Defendant. (*See id.* )CBOE urges that "[t]ransfer would promote judicial economy and transfer would not burden either party because both actions are in their infancy. "(Def.'s Mem., at 20.) The Court agrees. "It would be inefficient and a waste of judicial resources to subject the same parties to suit over two interconnected claims concerning identical technology and underlying disputes in their separate fora."*Mastercard Int'l Inc. v. Lexcel Solutions, Inc.*, No. 03 Civ. 7157(WHP), 2004 WL 1368299, at *8 (S . D.N.Y. June 16, 2004).[FN3]

> FN3. ISE makes reference to the fact that it filed its patent infringement action before CBOE filed its declaratory judgment action (*see* Pl.'s Mem., at 1, 15.), while not expressly invoking the "first-filed rule"-the rule that "an action will normally remain in the jurisdiction in which it was first filed." *Findwhat.com*, 2003 WL 402649, at *4. Defendant argues that the rule is not applicable in the instant case "because the issues in the two cases are different. The Chicago case involves two ISE patents not involved in this action."(*See* Def.'s Reply Mem., at 9 n. 8.)
> Regardless of whether the rule would

apply, "[d]istrict courts need not slavishly adhere to the first filed rule."*Aerotel, Ltd* ., 100 F.Supp.2d at 196. A showing that the above-discussed transfer factors favor transfer can justify an exception to the rule, particularly when there has been "[a] lack of progress in either litigation." *Findwhat.com*, 2003 WL 402649, at *4 (quoting *Invivo Research*, 119 F.Supp.2d at 441). As discussed, the balance of relevant factors-particularly the convenience of witnesses and locus of operative facts-weighs in favor of transfer. In addition, both actions are in the early stages of litigation, further justifying a departure from the rule.

*7 Plaintiff suggests that the instant action should not be transferred because the Northern District of Illinois may dismiss the pending declaratory judgment action for lack of personal jurisdiction over Plaintiff. (*See* Pl.'s Mem., at 15.) In support of this contention, Plaintiff cites *Aerotel, Ltd. v. Sprint Corp.*, 100 F.Supp.2d 189 (S.D.N.Y.2000), a case where the court found that the possibility that a declaratory judgment action filed in the transferee district could be dismissed for lack of jurisdiction militated against transfer. However, unlike this action, the *Aerotel* court also found that all convenience factors were either neutral or weighed in favor of the plaintiff's chosen forum. The *Aerotel* Court ultimately concluded that the potential that the declaratory judgment matter would be dismissed weighed against transfer, but it did not *mandate* that the matter not be transferred. Inasmuch as Plaintiff apparently has been involved in other litigation in the transferee district (*see* Def .'s Reply Mem., at 9) (noting that ISE engaged in unrelated litigation in Illinois state courts), and the other convenience factors strongly favor transfer, the Court does not find the possibility that the declaratory judgment action might be dismissed to be of countervailing weight.

### CONCLUSION

For the reasons set forth above, Defendant's motion to transfer venue to the Northern District of Illinois

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1541087 (S.D.N.Y.)
(Cite as: Slip Copy)

is granted. However, to preserve the jurisdiction of
the District Judge to conduct review of this ruling
pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(a) of
the Federal Rules of Civil Procedure, should
Plaintiff file objections, transfer of the matter is
stayed until the time for filing objections has passed
or the disposition by the District Judge of any
timely-filed objections to this opinion and Order.

So Ordered.

S.D.N.Y.,2007.
International Securities Exchange, LLC v. Chicago
Bd. Options Exchange Inc.
Slip Copy, 2007 WL 1541087 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB
9

Westlaw.

Slip Copy                                    Page 1

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

Reinhard v. Dow Chemical Co.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
J. Pedro REINHARD, Plaintiff,
v.
The DOW CHEMICAL CO., and Andrew N.
Liveris, Defendants.
No. 07 Civ. 3641(RPP).

Aug. 13, 2007.

Kramer, Levin, Naftalis & Frankel LLP, Attn: Gary
P. Naftalis, New York, NY, for Plaintiff, J. Pedro
Reinhard.
Kirkland & Ellis LLP, Attn: David M. Bernick,
New York, NY, for Defendants, Dow Chemical
Co., and Andrew N. Liveris.

### OPINION and ORDER

ROBERT P. PATTERSON, JR., U.S.D.J.

*1 Defendant The Dow Chemical Company ("Dow"
) moves to transfer pursuant to 28 U.S.C. § 1404(a).
Defendant Andrew N. Liveris ("Liveris") moves to
dismiss pursuant to Fed R. Civ. P. 12(b)(3), to
transfer pursuant to 28 U.S.C. § 1406(a), or in the
alternative, to join Defendant Dow's motion to
transfer under 28 U.S.C. § 1404(a).

For the reasons that follow, Dow's and Liveris'
motions to transfer under § 1404(a) are granted.
Liveris' motion to dismiss under Fed R. Civ. P.
12(b)(3) or transfer under § 1406(a) is denied. The
action is transferred to the Eastern District of
Michigan.

### BACKGROUND

#### A. Factual Background

##### 1. The Parties

Plaintiff, J. Pedro Reinhard ("Reinhard"), was an
employee of Dow for thirty-seven years. Reinhard
became Chief Financial Officer ("CFO") and a
member of the Board of Directors ("the Board") in
1995. Although he retired as CFO and Executive
Vice President in 2005, he remained an employee
director on the Board until his termination in April,
2007. (Compl., dated May 8, 2007, ¶ 14.)
Reinhard is a citizen of Brazil, a lawful permanent
resident of the United States, and is domiciled in
Florida. (Id. ¶ 9.)

Defendant, The Dow Chemical Company, is a
Delaware corporation that has its principal place of
business in Michigan and engages in continuous
activities in New York. (Id. ¶ 10.)Defendant,
Liveris, is the Chairman, CEO, and President of
Dow; he is a citizen of Australia, a lawful
permanent resident of the United States, and is
domiciled in Michigan. (Id. ¶ 11.)

##### 2. Rumors about a Dow Acquisition and Reinhard's Termination

According to Defendants, rumors about a Dow
acquisition began with a report in the *Financial
Times* on January 18, 2007, which stated that a
group of private equity firms were "working on a
break-up bid for Dow."(Dow Countercl., dated May
29, 2007, ¶ 10 .) On February 25, 2007, the
*Sunday Express*, a United Kingdom newspaper,
reported that a group of "global investors and
American private equity giants were close to
making a bid for Dow."(Compl.¶ 22.) Reports
relating to such a bid were also published in the
*Evening Standard* on March 12, 2007. (Dow
Countercl. ¶ 15.) On April 8, 2007, the *Sunday
Express* reported that a group of Middle East
investors and a group of private equity firms were
potentially "days away" from a bid. (Id. ¶ 20.)

Dow's response to these early reports rumors was to
make "inquiries with the investment banking and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

financial community, to determine whether: (i) there was a basis for these rumors; and (ii) the source of these rumors."(*Id.* ¶ 11.)[FN1] Additionally, Dow had board meetings to discuss the reports, which were attended by Reinhard, at its headquarters in Midland, Michigan on February 14 and March 16, 2007. (*Id.* at ¶¶ 12, 17.)After the second meeting, the company issued a press release stating that Dow had not had any discussions about a possible leveraged buyout. (*See id.* ¶ 23.)

> FN1. Dow "retained [the law firm] Wachtell, Lipton ... to advise the company concerning potential reactions to a takeover bid."(Transcript of Oral Argument, dated August 2, 2007 ("8/2 Tr ." ) at 13.)

*2 On April 9, 2007, James Dimon ("Dimon") the Chief Executive Officer of J.P. Morgan Chase (" Morgan"),[FN2] is alleged to have told Liveris at a dinner meeting in Michigan that a London affiliate was working on an acquisition of Dow on behalf of Middle East investors. (*Id.* ¶ 24.)Dow contends that on April 10, 2007, Dimon called Liveris and stated that Reinhard and Romeo Kreinberg (" Kreinberg"), another Dow executive, were engaged in discussions about a Dow acquisition. (*Id.* ¶ 25.)[FN3] On the same day, Dow's outside counsel, James Saverese, spoke with Dimon and Liveris on a conference call to confirm the statements Dimon had made to Liveris. (*See* 8/2 Tr. at 14.)

> FN2. Dow refers to its source as the " Bank's CEO," never naming James Dimon. (*See generally* Dow Ans.; Dow Countercl.) Reinhard states, however, that it is " alleged by Mr. Kreinberg in his complaint, and as is undisputed by Dow, the CEO was James Dimon, of Morgan Chase."(Pl.'s Opp'n., dated July 6, 2007 at 4; *see* Affidavit of Duncan Stuart, dated May 29, 2007 ("Stuart Aff.") Ex. C (Kreinberg Compl.) ¶ 2.)

FN3. Reinhard denies participation in any meetings with respect to takeovers or acquisitions of Dow. (Compl.¶ 35.) He alleges that on July 27, 2006, Dow lowered its earnings estimate for the year, its shares fell by more than ten percent, and "thereafter, rumors began to circulate that Dow might be a target for a buyout or other effort ...." (*Id.* ¶ 21.)

On April 11, 2007, the first day of a previously scheduled board meeting, [FN4] Liveris addressed the allegations about Reinhard's and Kreinberg's alleged third party discussions regarding a bid for Dow. The Board discussed the extent of the Dow employees' involvement, the credibility of the witness, and what steps to take. (Dow Countercl. ¶ 27.) The Board unanimously decided that the information was credible and that Reinhard and Kreinberg should be terminated. (*Id.* ¶¶ 27-28.)

> FN4. Reinhard was absent from this meeting, having previously informed Liveris that he would not be able to attend for unrelated reasons. (*See* Dow Countercl. ¶ 29.)

At 7:00 AM, on April 12, 2007, prior to the Board meeting scheduled for that day, Liveris met with Reinhard in his office in Midland, Michigan. (Compl.¶ 25.) Also present at this meeting were Charles Kalil (General Counsel to Dow), Paul Stern, Arnold Allemang (a Board member), and Martin Lipton of Wachtell, Lipton. (*See* Dow Countercl. ¶ 28.) At the meeting, Liveris told Reinhard that he had "received information" about Reinhard's participation in discussions about an acquisition of Dow. Liveris informed Reinhard that, based on this information, the company had concluded that Reinhard had engaged in grave misconduct and breaches of his fiduciary duty. (Compl.¶ 25.) Reinhard alleges, and Dow denies, that Liveris offered Reinhard his financial benefits if he resigned immediately. (*Id.* ¶ 25; Dow Ans. ¶ 25.) Reinhard denied breaching his fiduciary duties and refused to resign; Dow terminated Reinhard that day. (Compl.¶ 26.)

### 3. Reinhard's Termination Becomes Public

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 3

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

That same day, Dow issued a press release, in Michigan, which stated that Reinhard and Kreinberg had been terminated because they " engaged in business activity that was highly inappropriate and a clear violation of Dow's Code of Business Conduct."[FN5](*Id.* ¶ 29.)Dow also published on its website "An Open Letter to Our Valued Customers" and mailed a "Supplement to Notice of the Annual Meeting and Proxy Statement, "[FN6] addressing both the alleged actions of Reinhard and his termination. (*Id.* ¶¶ 32, 36.)Reinhard released a statement on April 16, 2007 denying any involvement in a Dow acquisition.(*Id.* ¶ 35.)

> FN5. The press release was also published on Dow's website. (Compl.¶ 31.)
>
> FN6. The "Supplement to Notice of the Annual Meeting and Proxy Statement" had the following return address: The Dow Chemical Company, c/o The Bank of New York, PO Box 11002, New York, N.Y. 10286-1002. (Compl.¶ 36.)

Reports of Reinhard's and Kreinberg's termination were published in various news sources, including: *Saginaw News, The Wall Street Journal, The New York Times,* and *The Financial Times.*(*Id.* ¶¶ 31, 33.)An article in *The Wall Street Journal* quoted Dow spokesperson, Christopher Huntley, stating that Reinhard's alleged third party discussions were conducted during "multiple meetings in multiple months in multiple locations [and] with a number of different parties."(*Id.* ¶ 33.)

#### 4. Events Preceding the Instant Action

*3 Dow and Reinhard engaged in ineffective settlement talks for three weeks after Reinhard's termination. (Declaration of Gary P. Naftalis, dated July 5, 2007 ("Naftalis Decl.") ¶¶ 2-3.) After receiving a settlement proposal from Dow on May 7, 2007, Dow and Reinhard agreed to a conference call on May 8, 2007 at 11 a.m. to further discuss the proposal. (*Id.* ¶ 3.) On May 8, 2007, Dow cancelled the conference call and filed suit. (*Id.* ¶

4.)

On May 8, 2007, at 8:30 a.m., Dow filed an action for breach of contract, breach of fiduciary duty, and declaratory judgment against Reinhard and Kreinberg in the Eastern District of Michigan. Later that day, Reinhard filed this complaint against Dow and Liveris.[FN7](*Id.* ¶ 3.) On the same day, Kreinberg filed his own action in New York State Supreme Court.[FN8]

> FN7. Reinhard alleges that Dow was aware of his preparation for litigation in early May. He also claims that he did not discover that Dow had filed suit against him in Michigan until he had filed the instant action. (Naftalis Decl. ¶¶ 3-4.)
>
> FN8. Kreinberg's action was subsequently removed to federal court in this district and then transferred to Michigan by Judge Marrero. *See Kreinberg v. Dow Chemical Co.,* 2007 WL 2141391 (S.D.N.Y. July 23, 2007).

#### B. Procedural Background

The May 8, 2007, complaint filed by Reinhard in this district against Defendants Dow and Liveris alleged claims for (1) libel and (2) breach of contract. On May 29, 2007, Dow filed their Answer and Counterclaim, as well as this Motion to Transfer Pursuant to 28 U.S.C. § 1404(a). On June 19, 2007, Liveris filed a Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(3), to Transfer Pursuant to 28 U.S.C. § 1406(a), or in the Alternative to Join Dow's Motion to Transfer under 1404(a). On July 6, 2007, Reinhard filed a Memorandum in Opposition to Dow's Motion to Transfer and Liveris' Motion to Dismiss or Transfer. Defendants submitted a reply memorandum on July 16, 2007 in further support of their motions. Oral arguments were held on August 2, 2007.

#### DISCUSSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                     Page 4

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

### A. Legal Standard

Section 1404(a) states that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a) (1996). District courts have broad discretion to determine convenience and justice on a case-by-case basis. *D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 106 (2d Cir.2006) (citations omitted). Courts should consider factors of private and public interest. *See Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-509 (1947). The following factors are considered in determining convenience and justice: "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the ability to compel the attendance of unwilling witnesses, [and] (7) the relative means of the parties."*D.H. Blair & Co.,* 462 F.3d at 106-107. The majority of district courts in this circuit also include two additional factors: "[ (8) ] a forum's familiarity with governing law ... [and (9) ] trial efficiency and the interests of justice, based on the totality of the circumstances."*Strougo v. Brantley Capital Corp.,* 2007 WL 1683348, at *5 (S.D.N.Y. June 3, 2007) (citations omitted). The party making the motion to transfer has the burden to show that the transfer is warranted. *D.H. Blair & Co.,* 462 F.3d at 106.

*4 After a consideration of all nine factors, the Court finds that Defendants have met their burden of showing by a preponderance of the evidence that this case should be transferred to the Eastern District of Michigan.

### 1. Plaintiff's Choice of Forum

Normally, a court should "give due deference to the plaintiff's choice of forum which should not be disturbed unless the balance of convenience and justice weigh heavily in favor of defendant's forum .. .."*Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d. 549, 561 (S.D.N.Y.2000) (internal

quotations omitted). However, a plaintiff's choice of forum is given less deference when the forum is " neither the [plaintiff's] home nor the place where the operative facts of the action occurred." *Hall v. South Orange,* 89 F.Supp.2d 488, 494 (S.D.N.Y.2000) (internal quotations omitted).

Although Reinhard chose to bring suit in the Southern District of New York, he is domiciled in Florida, and most of the operative facts took place in Michigan.[FN9] Reinhard's assertion that he " travels to New York at least once a month to attend board meetings ... and to transact other business," (Pl.'s Opp'n at 17), is not persuasive. *See Herbert Ltd. Pship. v. Elec. Arts, Inc.,* 325 F.Supp.2d 282, 291 (S.D.N.Y.2004) (holding that plaintiff's forum will receive relatively little weight because even though plaintiff alleges that it "conducts all of its business operations" in its chosen forum, it is not plaintiff's home district and the majority of operative facts took place elsewhere).

FN9.*See infra* § A(5), discussing locus of operative facts.

### 2. The Convenience of Witnesses

The convenience of witnesses weighs in favor of a transfer to Michigan. The convenience of party and non-party witnesses is an important factor: "indeed, certain courts in this district have called it ' probably the single-most important factor in the analysis of whether transfer should be granted.' " *Strougo,* 2007 WL 1683348, at *5 (internal citations omitted). The defendant has the burden of " clearly specify[ing] the key witnesses to be called and must make a general statement of what their testimony will cover." *Peterman v. U.S.,* 2006 WL 2806417, at *2 (N.D.N.Y. Sept. 28, 2006) (citing *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 218 (2d Cir.1978)).

Dow's Assistant General Counsel, Duncan Stuart, listed the following possible witnesses all located in Michigan both defendants, Dow and Liveris; Dow spokesperson, Chris Huntley, the other employee named in the complaint; Dow's public affairs personnel who were involved in releasing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                  Page 5

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

statements about Reinhard's termination; Dow's human resources personnel who were involved in Reinhard's compensation plans and the finance and mergers and acquisitions personnel; and Reinhard's assistant who made his international travel plans. (Stuart Aff. ¶¶ 6-12.)

Despite Dow's long list of Michigan witnesses, Reinhard believes that this factor should weigh in favor of maintaining the action in this district because Dimon, "arguably the most important non-party witness [for the libel claim]," and other possible Morgan witnesses reside either in New York or London. (Pl. Opp'n at 13.)[FN10]

> FN10. While Plaintiff's opposition papers refer to "other Morgan witnesses," at oral argument Dow's counsel made the uncontradicted statement that Plaintiff's Rule 26(f) statement listed only Mr. Reinhard, Mr. Kreinberg, Mr. Dimon, and three Dow Employees in Michigan, as the persons known to them to have knowledge of the claims in the Complaint. (See 8/2 Tr. at 20.) Furthermore, counsel for Plaintiff, stated at oral argument that the allegedly false statements were "based solely and exclusively on a conversation ... with Mr. Dimon ...." (Id. at 39.)

*5 At oral argument, however, Dow's counsel, David Bernick, pointed out that although Mr. Dimon had provided information to Dow about the proposed leveraged buyout planned by groups of investors in the United Kingdom and Oman at meetings in the United Kingdom, Dimon was not in attendance at these meetings, nor were the other "Morgan sources," nor was outside counsel, Saverese, who participated in the discussions with Dimon and Liveris. (See 8/2 Tr. at 11-17.) Thus, the potential witnesses residing in New York will not be able to testify as to the truth or falsity of the allegedly defamatory statements made by Dow. The witnesses who might have personal knowledge about the statements are located in the U.K. and Oman.

The most the New York witnesses could testify

about would be whether the allegedly libelous statements made by Dow and Liveris about Plaintiff were fair and reasonable in light of the information they had provided to Defendants. Thus, their testimony at trial would only be relevant in so far as it might bear on any bad intent or reckless negligence on the part of Defendants, and, even then, only if the statements of Defendants about Plaintiff contradicted the information supplied by Mr. Dimon and the other alleged Morgan witnesses. On the other hand, Plaintiff is also alleging malice on the part of Defendant Liveris based on prior interactions with Plaintiff. (See Compl. ¶ 49.) The witnesses to such prior statements of Defendant Liveris are most likely all employees of Dow residing in Michigan, or members of Dow's board, a number of whom live in Michigan, while only one lives in New York. (See 8/2 Tr. at 65.)

Furthermore, the witnesses to Plaintiff's breach of contract claim, other than Plaintiff, would appear to be based solely in Michigan, since the contract was formed and all the acts alleged in the Complaint bearing on its breach occurred in Michigan. (See Compl. ¶¶ 53-57.) On balance, the convenience of the witnesses will best be served by a transfer to Michigan.

### 3. Location of documents and relative ease of access to sources of proof

The location of relevant documents and relative ease of access to sources of proof weigh in favor of a transfer to Michigan. Dow's relevant documents are minutes from the Board's meetings involving Reinhard's termination, press release drafts, Reinhard's documents and emails, and the documents and emails of other Dow employees. (Stuart.Aff.¶ 13.) These documents are all located in Michigan. (Id.) Because of technological advancements and the ability to electronically send documents to the site of the litigation, the location of hard copies is given little weight. See Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. LaFarge N. Am. Inc., 474 F.Supp.2d 474 (S.D.N.Y.2007). However, because email discovery is likely and hard drive discovery may be required, this factor favors a transfer to Michigan.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                      Page 6

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

#### 4. The Convenience of Parties

The convenience of the parties weighs in favor of Dow's motion to transfer: "[w]here neither party resides in the chosen forum, 'it is only logical that a transfer to the residence of one of them would be more convenient.'" *Dealtime.com v. McNulty*, 123 F.Supp.2d 750, 756 (S.D.N.Y.2000) (quoting *ZPC 2000, Inc. v. SCA Group, Inc.*, 86 F.Supp.2d 274, 279 (S.D.N.Y.2000)). Both defendants, Dow and Liveris, reside in Michigan and Reinhard himself is domiciled in Florida. (Compl.¶¶ 9-11.) Though Reinhard claims that it will be more convenient for him to travel to New York than to Michigan (Pl.'s Opp'n. 17), he must travel regardless of where the case is tried.[FN11] Moreover, though a trip from Florida or New York to Bay City, Michigan, may indeed be inconvenient for parties residing on the East Coast, a trip to New York will be equally inconvenient for those parties residing in Michigan.

> FN11. Plaintiff's counsel, whose offices are located in New York, and who would not have to travel if the action were kept in this district, noted that it took them "14 hours to get home from [a] conference [in Bay City]." (8/2 Tr. at 47.) While the Court empathizes with this inconvenience, it also notes that convenience of counsel is not a factor to be weighed in a motion to transfer.

#### 5. Locus of operative facts

*6 The locus of operative facts weighs in favor of Dow's motion to transfer. The claims of libel and breach of contract are based largely on Reinhard's employment and compensation agreements, Dow's board meetings, Reinhard's termination, and the allegedly defamatory press releases and letters to shareholders issued by Dow. These events all took place in Michigan. (*See* Compl. ¶¶ 24-26, 28-32, 40-42.) The locus of operative facts in a breach of contract case looks at "where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *Prudential Sec. v. Norcom Dev., Inc.*, 1998 WL 397889, at *4 (S.D.N.Y. July 16, 1998). Reinhard's

breach of contract claim is based on multiple contracts and compensation plans, at least one of which was signed by executives in Midland, Michigan. (Compl. ¶ 54; Naftalis Decl. Ex. J.) The Board of Directors and the Dow personnel who interpret and administer the compensation plans, meets in Midland, Michigan. (Dow Countercl. ¶ 35.)

As for the libel claim, Reinhard alleges that he has suffered the greatest harm in New York, since most of the defamatory statements were circulated in New York and because New York is the center of the financial press. (Compl. ¶ 37; Pl.'s Opp'n at 15.) The harm to Reinhard based on the publication of Dow's press release in New York does weigh in favor of a trial in this district, however, it is not a determinative factor when all of the operative facts are considered together. *See Curtis Publ'g Co. v. Birdsong*, 360 F.2d 344, 347 (5th Cir.1966) (holding that in a multi-state publication of libel, it is not enough that the Post was sold in Alabama, as this would create a forum in all other states as well)); *see also Barge v. Daily Journal Corp.*, 1996 WL 434561, at * 4-5 (S.D.N.Y. Aug. 2, 1996) (holding that although allegedly defamatory claims were published in Seattle and the plaintiff was harmed in Seattle, the litigation should be situated in California because that was the location where more operative facts took place). Here, even if the circulation of the allegedly defamatory statement did the most harm to Reinhard in New York, the majority of operative facts still took place in Michigan.

#### 6. Availability of process to compel the attendance of unwilling witnesses

The availability of process to compel the attendance of unwilling witnesses is a neutral factor. Important elements for this factor are the inability to compel process over a witness, the availability of alternate forms of testimony, and a showing that the witness would be unwilling to testify. *See Citigroup Inc.*, 97 F.Supp.2d at 561-562 (holding that although it may be preferable to have live testimony in the issue at hand, this factor had little weight because defendants failed to show or suggest an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 7

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

unwillingness of the non-party witness to testify).

As Plaintiff notes, Dimon may be beyond Michigan's subpoena power. (Pl.'s Opp'n at 16.) However, there has been no suggestion that Mr. Dimon or any other witness would be unwilling to travel to testify.[FN12] Furthermore, "in light of the option of videotaping testimony of witnesses unwilling to travel,"*Dealtime.com*, 123 F.Supp.2d at 757 (citations omitted), the witnesses' possible unwillingness to appear in Michigan would not be a determinative factor in this case.

> FN12. At oral argument, neither party indicated knowledge about Mr. Dimon's willingness to travel to Michigan (*See* 8/2 Tr. at 44, 54 .)

### 7. Relative means of the parties

*7 The relative means of the parties weighs against a transfer. If a "disparity exists between the parties, such as an individual suing a large corporation, the relative means of the parties may be considered." *Berman v. Informix Corp.*, 30 F.Supp.2d 653, 659 (S.D.N.Y.1998). However, where "no showing has been made that [a change of forum] would impose an undue hardship on the plaintiff ... this factor weighs neutrally in the overall analysis."*Id.* Reinhard states that litigating in Michigan would " further strain [his] financial resources," (Affidavit of J. Pedro Reinhard, dated July 6, 2007, ¶ 8), but, given the depth of his financial resources, he has not shown that traveling to Michigan for this litigation will be an undue hardship.[FN13]

> FN13. According to a 2006 SEC filing by Dow, Reinhard's annual compensation in 2005, less long term incentives, was over $2 million. (Declaration of Frank Holozubiec, Ex. B (Dow Form 14A) at 4.)

### 8. Forum's familiarity with the governing law

The forum's familiarity with the governing law is a neutral factor in the analysis. It is likely that Delaware law will govern the breach of contract

action and breach of fiduciary duty counterclaim because Dow is incorporated in Delaware.

For the libel claim, it is not certain which state's laws will govern.[FN14] Regardless, as noted by Plaintiff's counsel at oral argument, libel laws are similar enough that a judge will be familiar with the governing law no matter which state's statute ends up applying to the claim in this case.[FN15] Therefore, because the breach of contract and breach of fiduciary duty claim is governed by Delaware law, which is foreign to both jurisdictions, and because a judge in either forum should be familiar with the principles of libel law, this factor is neutral.

> FN14. The following are factors to consider in multi-state libel cases: "(1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (7) the state where the libel was first seen; and (9) the law of the forum."*Weinstein v. Friedman*, 1996 WL 137313, *8-9 (S.D.N.Y. Mar. 26, 1996). It is not immediately clear whether Michigan or New York has more connections to the libel claim.

> FN15. (*See* 8/2 Tr. at 42 ("I don't have any reason to believe that the general principles of libel law are any different in Michigan than they are in New York.").)

### 9. Trial efficiency and the interests of justice

Now that both Dow's action and Kreinberg's action are located in the Eastern District of Michigan, efficiency and the interests of justice weigh in favor of transferring this lawsuit to that district. It is logistically practical to have all trial and discovery scheduling issued from one court given that so many of the witnesses and document production

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8

Slip Copy, 2007 WL 2324351 (S.D.N.Y.)
(Cite as: Slip Copy)

will coincide in all three cases.                                    END OF DOCUMENT

**B. Liveris' motion to dismiss pursuant to Rule 12(b)(3) or transfer pursuant to § 1406(a) is denied; his motion to transfer pursuant to § 1404(a) is granted.**

Liveris' motion to dismiss for lack of venue under Rule 12(b) (3), and his motion to transfer under § 1406(a) are denied.[FN16]Liveris is a citizen of Australia and a lawful permanent resident of the United States.[FN17] (Compl. ¶ ; Dow Ans. ¶ 11.) Under § 1391(d), "an alien may be sued in any district."Accordingly, venue is proper in this district or in the Eastern District of Michigan.

> FN16. A motion to dismiss for improper venue is made under Fed.R.Civ.P. 12(b)(3). Section 1406(a) states that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."28 U.S.C. § 1406(a) (1996).

> FN17. Section 1391(d) applies to all aliens, resident or non-resident. *See Haaretz Daily Newspapers, Ltd. v. Maariv Modiin Pub. Co., Ltd.,* 1999 WL 796163, at *1 (S.D.N.Y. Oct. 6, 1999).

Liveris' Motion to Transfer under § 1404(a) is granted on the same grounds as Dow's motion.

## CONCLUSION

For the aforementioned reasons, it is hereby ordered that the Clerk of Court is directed to transfer this action to the Eastern District of Michigan.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Reinhard v. Dow Chemical Co.
Slip Copy, 2007 WL 2324351 (S.D.N.Y.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**TAB**
**10**

Westlaw.

Not Reported in F.Supp.                                    Page 1

Not Reported in F.Supp., 1994 WL 525041 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)


c
Unique Industries, Inc. v. Lisa Frank, Inc.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
UNIQUE INDUSTRIES, INC., Plaintiff,
v.
LISA FRANK, INC., Defendant.
No. 93 CIV. 8037 (LAP).

Sept. 23, 1994.


*OPINION & ORDER*
PRESKA, District Judge:
*1 In this action, plaintiff Unique Industries, Inc. ("
Unique") seeks a declaratory judgment that certain
of its products do not infringe any copyrights or
trademark rights relating to certain products of one
of its competitors, defendant Lisa Frank, Inc. ("LFI"
). Presently before me is LFI's motion to dismiss
or transfer the action. Because I find that the filing
of Unique's complaint was an improper exercise in
forum shopping, I grant LFI's motion to transfer the
action to the District of Arizona.


*Background*

The facts underlying the present motion are simple
and largely undisputed. Unique and LFI are
competitors in the market for children's school
products and novelty items. In mid-1993, LFI
became aware that Unique was marketing certain
products that, in LFI's opinion, duplicated the
distinctive look of existing LFI products and
thereby infringed upon LFI's copyright and
trademark rights. By letter dated September 22,
1993, LFI informed Unique of its position and
requested that Unique contact LFI's counsel by
October 15, 1993 if it wanted "to resolve this matter
amicably." Rowlette 2/17/94 Aff., Exh. B at 3.
The letter further stated that if Unique failed to
contact LFI, LFI would "take appropriate legal

action." *Id.*

Unique's counsel responded to LFI's notice by letter
dated October 8, 1993. Counsel requested that LFI
provide samples of the products it claimed Unique
was duplicating so that counsel could "evaluate the
charges." Rowlette 2/17/94 Aff., Exh. C at 1.
Upon reviewing the products, the letter stated,
counsel would offer a more detailed response. LFI
forwarded the samples, and Unique's counsel
responded, as promised, on or about November 16,
1993. The parties spoke substantively on
November 17, and after the conversation, counsel
for LFI concluded that settlement was still a
possibility. Counsel for Unique, however, decided
that settlement would not be possible. Thereafter,
on November 23, 1993, Unique filed the present
action seeking a declaratory judgment that Unique's
products infringe neither the copyrights nor
trademark rights owned by LFI. LFI was served
with the complaint on January 11, 1994 and
launched a two-pronged response. First, on
February 17, it commenced suit against Unique in
the District Court of Arizona, charging Unique with
copyright and trademark infringement and unfair
competition. Then, the next day, LFI filed its
motion to dismiss or transfer this action.


*Discussion*

Stripped of its procedural trappings, the issue now
before the Court is the proper order of priority
between Unique's declaratory judgment action and
LFI's coercive action. Both suits address the same
dispute; the question is which one should be given
precedence. This problem is by no means novel or
unique. Courts have confronted it often and
analyzed it under a variety of rubrics. Some have
treated the question as a matter of discretion under
the Declaratory Judgment Act, 28 U.S.C. § 2201(a).
*E.g., Great American Ins. v. Houston General Ins.,*
735 F.Supp. 581 (S.D.N.Y.1990). Others have
considered the issue as governed by the "first-filed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                        Page 2

Not Reported in F.Supp., 1994 WL 525041 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

rule" (and its exceptions), *e.g., DH Cattle Holding Co. v. Boyer,* No. 94 Civ. 0083 (RPP), 1994 WL 114821 (S.D.N.Y. Mar. 31, 1994); *The Continental Insurance Companies v. Wickes Companies, Inc.,* No. 90 Civ. 8215 (KMW), 1991 WL 183771, 1991 U.S.Dist. LEXIS 12426 (S.D.N.Y. Sep. 5, 1991); and still others have analyzed it using standards established for Rule 12(b) motions to dismiss or motions to transfer under 28 U.S.C. § 1404(a). *E.g. Federal Ins. Co. v. May Dept. Stores Co.,* 808 F.Supp. 347 (S.D.N.Y.1992); *Gibbs & Hill, Inc. v. Harbert Intern., Inc.,* 745 F.Supp. 993 (S.D.N.Y.1990). The most commonly used framework appears to be the balance-of-conveniences analysis called for by § 1404(a), and that is what I will employ today.

*2 Under 28 U.S.C. § 1404(a), district courts are empowered to transfer civil actions to other judicial districts "[f]or the convenience of the parties and witnesses, in the interest of justice." Transfer decisions are committed to the court's sound discretion. *In re Cuyahoga Equipment Corp.,* 980 F.2d 110, 117 (2d Cir.1992). Among the factors considered are (1) convenience to the parties, (2) convenience of material witnesses, (3) availability of process to compel attendance, (4) ease of access to sources of proof, (5) cost of obtaining the presence of witnesses, (5) calendar congestion, (6) where the events in issue took place, and (7) the interests of justice. *See International Com. Export v. North Pacific Lumber,* 737 F.Supp. 242, 245 (S.D.N.Y.1990). The burden rests with the party seeking transfer to show that transfer is warranted, and the plaintiff's choice of forum is ordinarily accorded significant weight. *See Newsweek, Inc. v. U.S. Postal Service,* 652 F.2d 239 (2d Cir.1981). Where the plaintiff's forum has no substantial connection to the dispute, however, the movant's burden is lessened accordingly. *See Firestone v. Galbreath,* 722 F.Supp. 1020, 1028-29 (S.D.N.Y.1989); *Mobile Video Servs., Ltd. v. Nat'l Ass'n of Broadcast Employees and Technicians, AFL-CIO,* 574 F.Supp. 668 (S.D.N.Y.1983).

In the matter at hand, factors (1) through (4) are evenly balanced. Unique is headquartered in Philadelphia, Pennsylvania, and LFI is headquartered in Tucson, Arizona. The parties'

evidence and witnesses are located at their respective home bases, and neither this court nor the Arizona court will have the ability to compel attendance by all witnesses. Ultimately, whoever's choice of forum is honored, the other will face significant inconvenience and expense. LFI argues that New York is more inconvenient overall because neither party is headquartered here. Unique has chosen this forum, however, and is presumably prepared to deal with the relatively brief commute between Philadelphia and New York. As for LFI, coming from Tucson, New York cannot be markedly more difficult than Pennsylvania.

Factors (5) and (6), considered together, weigh in favor of transfer. But for the fact that both parties sell their products here (and throughout the rest of the nation, as well), this dispute has no connection to New York. This forum has no particular interest, ability, or knowledge relevant to resolving the matter, which militates against keeping it here. *See Mobile Video Servs., Ltd.,* 574 F.Supp. at 670-71 (location of operative facts is an important factor in deciding where a case should be tried). The parties have offered no information on the docket of the District of Arizona. However, whatever the situation there, the Arizona court at least has an interest in matters relating to LFI, which resides in Tucson.

The most significant factor, by far, in the context of this case is factor (7), the interests of justice. This factor encompasses interests such as preservation of judicial resources, prevention of duplicative litigation, and proper administration of justice. *See Capitol Records, Inc. v. Optical Recording Corp.,* 810 F.Supp. 1350, 1355 (S.D.N.Y.1992). Other important interests to be considered are the discouragement of forum shopping, the promotion of the amicable settlement of disputes, and the avoidance of abuse of the declaratory judgment remedy, all of which are implicated in the current situation. *See The Continental Insurance Companies,* 1991 WL 183771, at *45, 1991 U.S.Dist. LEXIS 12426, at *13; *Capitol Record, Inc.,* 810 F.Supp. at 1354; *Great American Ins.,* 735 F.Supp. at 585.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 3

Not Reported in F.Supp., 1994 WL 525041 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

*3 As Judge Friendly observed, the purpose of declaratory judgment actions is to "create[ ] a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy, or in which the party entitled to such a remedy fails to sue for it."

*United States v. Doherty,* 786 F.2d 491, 498 (2d Cir.1986) (quoting Charles Wright, *The Law of Federal Courts* 671 (1983)). The Second Circuit has explained that district courts should entertain such actions when the judgment sought "will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Broadview Chemical Corp. v. Loctite Corp.,* 417 F.2d 998, 1001 (2d Cir.1969), *cert. denied,* 397 U.S. 1064 (1970) (internal quotations omitted).

On the other hand, courts should not allow the declaratory judgment action to be employed as a tool for gamesmanship and manipulation. "[I]t is a ' misuse of the Declaratory Judgment Act' to employ it to 'gain a procedural advantage and preempt the forum choice of the plaintiff in [a] coercive action.... ' " *Youell v. Exxon,* No. 93 Civ. 6094 (LAP), 1994 WL 376068, at *6 (S.D.N.Y. Jul. 19, 1994) (Preska, J.) (quoting *Great American Ins.,* 735 F.2d at 586).

As previously noted, the fact pattern present here-in which a court finds itself asked to dismiss, transfer, or stay a declaratory judgment action in favor of a later-filed coercive suit-is common. With an eye to the considerations discussed above, courts in such cases will afford priority to the declaratory judgment action if it appears that such action was brought for a proper purpose, such as to avoid prejudice resulting from the other party's unreasonable delay in commencing a coercive suit. *E.g., 800-Flowers, Inc. v. Intercontinental Florist, Inc.,* No. 94 Civ. 4224 (PKL), slip op. (S.D.N.Y. Aug. 4, 1994). If, however, the court finds the declaratory judgment action to have been brought in anticipation of the coercive suit, for the purpose of gaining "home field advantage," the coercive suit is

given precedence, and the declaratory action is treated accordingly. *E.g., Federal Ins. Co.,* 808 F.Supp. 347; *Gibbs & Hill, Inc.,* 745 F.Supp. 993; *The Continental Insurance Companies,* 1991 WL 183771, 1991 U.S.Dist. LEXIS 12426. *See also Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 219 (2d Cir.1978), *cert. denied,* 440 U.S. 908 (1979)

.

The instant declaratory action falls within the latter paradigm. Unique filed its complaint a mere three business days after what it considered the breakdown of settlement negotiations.[FN1] In its response to LFI's motion, however, it offers no reason why such haste was necessary. There has been no showing that Unique was suffering prejudice from LFI's failure to file suit. *Cf. 800-Flowers, Inc., supra,* slip op. at 8 (declaratory judgment action properly instituted where defendant had been making disparaging remarks to plaintiff's customers about the underlying dispute). Nor does Unique offer any basis to conclude that LFI would not have filed a coercive action promptly upon learning of Unique's disinterest in further negotiations.[FN2] I can only infer that Unique's filing was motivated by a desire to determine the forum for litigation, a conclusion buttressed by Unique's counsel, who, in explaining the rationale for Unique's filing, states, "Unique was presented with unfounded claims of infringement and chose to defend those claims in a forum convenient to Unique and its counsel." Memorandum in Opposition to Defendant Lisa Frank, Inc.'s Motion to Dismiss or Transfer Action at 1. Such a strategy, while perhaps understandable, is nonetheless forum shopping and will not be sanctioned here.

*4 Unique argues that the nearly five month period between LFI's initial notice letter and the filing of its Arizona complaint evidences unreasonable delay on the part of LFI and justifies Unique's filing of the declaratory action. A closer examination of the facts demonstrates that this contention is without merit. LFI sent its initial notice letter on September 22, 1993; it filed the Arizona action on February 17, 1994. During the first two months of that time span, as Unique admits, the parties were engaged in attempts to resolve the matter amicably.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1994 WL 525041 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Accordingly, the Court will not count that period against LFI in the evaluation of its timeliness in seeking relief. The law looks very favorably upon parties who honestly endeavor to resolve their disputes without resort to litigation. To penalize a litigant who has followed that course by allowing his adversary to label time spent pursuing settlement as unreasonable delay would undermine the policy of promoting good faith settlement efforts. *Capitol Records,* 810 F.Supp. at 1354; *Columbia Pictures Industries, Inc. v. Schneider,* 435 F.Supp. 742, 747 (S.D.N.Y.1978), *aff'd,* 573 F.2d 1288 (2d Cir.1979).

With respect to the three months between the filing of this action and the filing of the Arizona action, Unique's argument is misdirected. The propriety and necessity of a declaratory judgment action is judged by reference to the circumstances in existence at the time such an action is filed. By the filing of Unique's complaint, issue between the parties was formally joined and the process of resolving whatever legal uncertainty Unique might have faced was begun. LFI, at that point, was no longer obligated to consider what effect, if any, its failure to file suit would have on Unique. Accordingly, its delay in doing so is not dispositive of the priority question. *The Continental Insurance Companies,* 1991 U.S.Dist. LEXIS 12426, at *15-16. "It suggests only that [Unique] truly caught [LFI] off guard by filing this action." *Id.*[FN3]

*Conclusion*

Because I find that allowing Unique's action to proceed in this forum would undermine important judicial interests in the promotion of settlement and the prevention of forum shopping and abuse of declaratory judgment actions, I conclude that transfer of this action pursuant to 28 U.S.C. § 1404(a) to the District of Arizona for possible consolidation with LFI's action there would serve the interests of justice. Defendant's motion to transfer is GRANTED. The Clerk of the Court is directed to transfer this case to the District of Arizona.

FN1. Counsel agree that they spoke on November 17, 1993. According to LFI's attorney, Harris J. Kane, Unique's counsel wished to determine the sales volume of certain allegedly infringing items, stating that if the figures were not great:
"... there might not be a problem in discontinuing their production and resolving the controversy. [Unique's counsel] stated that he would check on these matters and call back.
7. There was no return call, and indeed no further communication by Plaintiff about settlement. Plaintiff's next communication was the Summons and Complaint in this action, evidently filed with this Court on Monday, November 22, 1993-only three business days following [LFI's] conversation with [Unique's counsel]...." Kane 2/17/94 Aff., ¶¶ 6-7

FN2. To the contrary, in its September 22, 1993 letter, LFI had stated that it would take legal action if the matter could not be resolved otherwise.

FN3. I note, also, that although nearly three months elapsed between the filing of Unique's complaint and LFI's response, LFI waited more than a month after being properly served.

S.D.N.Y.,1994.
Unique Industries, Inc. v. Lisa Frank, Inc.
Not Reported in F.Supp., 1994 WL 525041 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.