UNITED STATES DISTRICT COURT  
SOUTHERN DISTRICT OF NEW YORK  
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ECF Case

LOUIS DRETCHEN,

                Plaintiff,

v.

ALLAN PHARMACEUTICAL LLC,

                Defendant.  
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

07 Civ. 10306 (CLB) (LMS)

**AFFIDAVIT OF LOUIS DRETCHEN IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE**

STATE OF NEW YORK    )  
COUNTY OF WESTCHESTER  ) ss.:

LOUIS DRETCHEN, being duly sworn, deposes and says:

1.    I am the Plaintiff in the above captioned action. I submit this Affidavit based upon my personal knowledge and review of documents in my possession.

2.    I was employed by one company and only one company, Allan Pharmaceutical LLC, a Delaware Corporation with its principal place of business in Pennsylvania.

3.    I did not sell the cosmetics or dietary supplements that are the principal products of Allan's parent company, Allan Holdings LLC, or for Allan Holdings LLC's subsidiary, ProDerma LLC. The generic drugs that I sold were exclusively for Allan Pharmaceutical LLC.

4.    I was Executive Vice President of Sales and Marketing only of Allan Pharma and was required "to devote [my] best efforts to the business affairs of the Company [Allan Pharma] and *its* subsidiaries, divisions and operational units." (Agr., ¶ 2(b)) (emphasis added). None of the other "Allan" companies are subsidiaries, divisions or operational units of Allan Pharma. I had no duties with, or responsibilities to, Allan Holding, LLC or its subsidiaries, ProDerma LLC or Pharma Pac, LLC.

**Recruitment by Allan Pharma and Pre-hire Activities**

5.      I was first recruited to join Allan Pharma by its CEO, Neil Sirkin and his brother, Sam Sirkin, an owner of Allen Pharma. Upon information and belief, at all relevant times Sam Sirkin was and is a resident of the State of Connecticut.

6.      I had known Sam Sirkin for over ten years as a player in the pharmaceutical sales industry. In or about February 2005, I traveled from my home in New York to Greenwich, Connecticut for an interview with the Sirkin brothers. I had a second interview in Greenwich, Connecticut with the Sirkin brothers in or about March 2005.

7.      In April 2005, I had a third and final interview with Allan Pharma executives in Newark, New Jersey. Present in New Jersey were Neil Sirkin, Allan Pharma President Raju V.K. Vegesna, and Allan Pharma Chief Financial Officer Joseph Donovan. At this meeting, I was extended an offer of employment, to which I agreed.

8.      Subsequent to the New Jersey meeting, my lawyers, who were located in New Jersey, engaged in negotiation with Allan Pharma's lawyers to finalize the details of the agreement that we discussed in Newark, New Jersey. Having successfully negotiated an agreement with my New Jersey lawyers, Defendant sent to my New York home an employment contract for my execution. In May 2005, while in my home office in Rockland County, New York, I signed the agreement and became an employee of Allan Pharma.

9.      At no time prior to my hiring by Allan Pharma, did I travel to Mississippi to meet with any person related to Defendant's business.

**Allan Pharma's Employees Outside Mississippi and Their Interaction with Me**

10.     My first meeting with Allan Pharma's executives as an employee occurred in June

2005 at the company's headquarters in Huntingdon Valley, Pennsylvania. At the meeting, I discussed current products and the future timeline for additional products, sales and marketing. Present for this discussion were Neil and Sam Sirkin, Joseph Donovan, Raju Vegesna and Giora Carni.

11. Mr. Carni was one of the five founding partners of Allan Pharma and at that time was responsible for identifying product selection and obtaining/creating pricing and product data for Allan Pharma's pharmaceuticals. Contrary to the sworn statement of CFO Donovan in his declaration (¶ 6), that "Allan Pharma did not have an officer, executive and employee in New York other than Dretchen," Giora Carni lived in New York City and worked from his home. As an executive of Allan Pharma, Mr. Carni performed his duties and responsibilities, and professionally interacted with me within the State of New York during my employment with the company.

12. In its moving papers, Defendant listed numerous alleged "witnesses" employed at its Mississippi facility. I had little or no relevant professional interaction with at least half of those identified. I had minimal relevant professional contact with VP Thomas Otto and Administrative Assistant Bertha Rush, no professional contact with VP's Juan Picado and John Baugh, and do not know, nor do I recall ever having met, April Williams.

13. Notably absent from the list of potential witnesses are the approximately nineteen employees of Allan Pharma located at the company's Pennsylvania headquarters, in addition to President Raju V.K. Vegesna. I had significant professional contact and interactions with all of Allan Pharma's Pennsylvania employees.

14. Allan Pharma employs 18 scientific researchers in Pennsylvania along with an Office Manger and Pres. Vegesna. It is my understanding that Allan Pharma is expanding its presence in

3

Pennsylvania, as evidenced by the news article recently published in the <u>Philadelphia Business Journal</u>. See article, dated June 6, 2007, annexed hereto as Exh. "1."

15. In addition to frequent telephone calls, I drove to Allan Pharma's Pennsylvania headquarters monthly to meet with my co-workers in that state. By contrast, my visits to the DeKalb, Mississippi facility were much less frequent.

**My Work Activities**

16. My job was to sell and maintain sales accounts for Allan Pharma's generic drugs. Defendant contends that I spent 15 of every 20 business days traveling outside New York. Defendant is incorrect.

17. I conducted the majority of my business by phone, primarily from my home-office in Rockland County, New York. On average, I spent approximately 25% of my time traveling outside of New York to generate and maintain my sales accounts.

18. My business trips almost exclusively originated in, and concluded from, the State of New York. All earnings received by me as an employee of Allan Pharma were paid via direct deposit to my New York bank.

19. As Executive Vice President of Sales and Marketing, I was not required to be a licensed pharmacist, nor possess a degree in pharmacology. I was never questioned regarding my licensure during my interviews with Allan Pharma executives in Connecticut and New Jersey.

20. Upon information and belief, the salesperson assigned by Allan Pharma to replace me, Brad Cunningham, is neither a licensed pharmacist nor does he possess a degree in pharmacology.

4

**Termination of my Employment and Breach of the Employment Agreement by Allan Pharma**

21. I was recruited by Allan Pharma because of my 20 years experience in pharmaceutical sales and extensive network of sales contacts. While employed by Defendant, I had sales in excess of $18 million, built a customer base of approximately forty clients and established programs to monitor ordering and customer service.

22. Defendant alleges that it terminated me because it learned that I was convicted of a felony in New York (17 years prior) and was not a licensed pharmacist. Defendant neither terminated my employment, nor confronted me with the information until March 23, 2007.

23. In January 2007, Defendant directed me to attend two major sales conventions as Allan Pharma's representative. During the 113 days between Allan Pharma's admitted knowledge of the information and its decision to terminate my employment on March 23, 2007 "effective immediately," Allan Pharma encouraged my efforts to meet clients, propose and close bids and contracts on dozens of major accounts, including multimillion dollar deals with McKesson, Walmart, Meijer and Duane Reade.

24. While not relevant to the instant motion, Defendant asserts that a basis for the termination is my purported debarment from contracting with the federal government. During my entire employment by Defendant, I never solicited bids, nor attempted to solicit bids, from the federal government, nor was I ever required or encouraged to do so. Allan Pharma exclusively serviced the private industry wholesale, retail and institutional market. It was never so much as suggested by Allan Pharma that the federal government was a prospective client for its products.

25. During the four months (at least) that Allan Pharma had knowledge regarding my licensure and prior criminal history, I made numerous demands for payment of the compensation owed to me by Defendant.

5

26. In or about the third week of December 2006, Joseph Donovan, told me that Defendant was not able to pay my 2006 commissions until the second week in January 2007. When I asked Donovan about receipt of the ownership interest that I earned in 2006, Donovan was unable or unwilling to provide a date when I would receive the ownership interest I earned.

27. On or about January 16, 2007, I asked Donovan about Defendant's continued failure to pay me my earned commissions for 2006. Donovan apologized for the delay, alleging that Defendant was in the midst of an audit, and promised to send payment to me by the end of that week. In that conversation Donovan alleged that my 2006 commissions were $170,000.

28. Defendant failed to send me my earned commissions in January 2007. When I continued to attempt to contact Donovan to inquire about my unpaid commissions, Donovan refused to take my calls or abruptly terminated the conversations with the promise that he would get back to me. Despite not receiving my earned commissions and ownership interest, I continued to perform services for Allan Pharma and had gross sales in the first three months of 2007 of approximately $3 million.

29. On March 1, 2007, I sent an e-mail from my home office in New York to Donovan demanding payment of my earned commissions. On March 16, 2007, I was instructed to attend an in-person meeting with Defendant's management to discuss my unpaid commissions. On March 23, 2007, I met with Donovan, Neil Sirkin, Raju V.K. Vegesna and Human Resources Director Mandi McDade. My unpaid commissions were not discussed at this meeting. Rather, Defendant lured me to Mississippi under false pretenses to inform terminate my employment and inform me that I was to cease performing services for Defendant.

30. Defendant failed to pay me the following upon my termination: commissions that were due and owing, an ownership interest that was due and owing, expense reimbursement, my accrued, unused vacation pay, and contractually required post-termination salary and benefits.

31. In my home in New York, I possesses numerous documents that are evidence of the work I performed, expenses I incurred and was not reimbursed, communications between me and Defendant, salary and benefits I was paid and damages I have suffered as a result of Defendant's statutory violations and contractual breaches.

32. The cost of litigating in Mississippi would be a burden, perhaps insurmountable, to me.

33. Furthermore, when terminated by Defendant, I obtained employment as a consultant with other pharmaceutical companies in New York, Connecticut and New Jersey, performing services primarily from my New York home-office.

Dated: White Plains, New York
       December 12, 2007

_____
Louis Dretchen

Sworn before me this
12th day of December, 2007

_____
Notary Public
Notary Public, State of New York
Qualified in Westchester County
Commission Expires May 31, 2007
F:\APPLICAT\WP\Dretchen Allan Pharmaceutical Litigation\Affidavit Dretchen Transfer Venue.wpd/rlh



Lean Six Sigma Green Belt Certification: The Key to Su

*Learn from Industry*
*Drexel Instructors are Certified Master Bl*

# BUSINESS JOURNAL

Members: Log in
Not Registered? Register for free extra services.



Subscribe Now

| HOME | ONLINE EDITION | PRINT EDITION | SUBSCRIBE | MARKETPLACE | BUSINESS RESOURCES | EVEN |

Search  Keywords  GO  Search Archive

› News by Company  › News

**LATEST NEWS**

Philadelphia > News > Industries > Real Estate - Construction

Wednesday, June 6, 2007

# Five Phila.-area firms get state expansion loans

Philadelphia Business Journal

Print Article   Email Article   Reprints   RSS Feeds   Add to Del.icio.us   Digg This

Eight firms have been granted low-interest loans through the **Pennsylvania Industrial Development Authority**. The $5 million in loans will result in the creation and retention of 388 jobs in five counties, including Bucks, Montgomery and Philadelphia counties, Gov. Ed Rendell announced Wednesday.

In Bucks County:

- Allan Pharmaceutical LLC, a pharmaceutical products company, will receive a $352,500 loan for renovation and expansion costs associated with its new facility in Warminster. The firm is moving from a 4,000-square-foot facility to an 11,800-square-foot facility, which will result in the retention of 13 employees and the creation of 15 new jobs. The total project cost is about $1.1 million.

- AMM RE LLC will receive a $580,000 loan for redevelopment of its Service Select Inc. company's new site in Bristol Township. The interior and exterior signs manufacturer will relocate to a 22,000-square-foot facility, which will have office and fabrication space. All 44 existing employees will be retained and transferred to the new site. The total project cost is expected to be $1.45 million.

- 257 Keystone LLC will receive an $875,000 loan for the acquisition of a building in Bristol Township for its DNT Corp. a specialty chemicals distributor. The company's relocation to the 32,000-square-foot facility will allow it to operate its office and warehouse more efficiently. Upon completion of the $2.25 million project, all 20 existing employees will be transferred to the new site and five new jobs will be created.

In Montgomery County:



Classes run for s
February 22. Fo
Using the most
you will become
increase produc

For questions c
at 215-895-215

**Search for Jo**

Search
View Philadelphi

**Video**



NEW! View toda
Philadelphia bus
headlines with c
video feature
Today's Video

- Buckman Enterprises Inc. will receive a $1 million loan for construction of a 22,850-square-foot building in Limerick for it's Buckman's Inc., a wholesale pool-chemical producer. The $2.58 million project will result in the retention of all 41 current employees.

In Philadelphia County:

- Mini Flats LLC will receive a $750,000 loan for redevelopment of a vacant building in Philadelphia for its SAAW Inc. wall panel manufacturer. Upon completion of the $1.5 million renovation, SAAW will transfer all nine existing employees to the new site. Fifteen new jobs will also be created as a result of the relocation.

- 5102 Woodland Avenue Associates LP will receive a $327,200 loan for acquisition of a building in Philadelphia for its D.C. Humphry's Co. canvas maker. The site lies adjacent to its current facility and will allow D.C. Humphry's to continue to expand its operation and manufacturing capability. The total project cost is $818,000 and will create nine new jobs and retain 65 jobs.

PIDA provides low-interest loans for land and building acquisition or construction and renovation projects. Since 2003, it has funded more than 320 projects, totaling more than $312 million in loans, resulting in the creation of more than 7,600 jobs and the retention of more than 26,000 jobs.

In addition Crawford and Dauphin counties, PIDA loans were also awarded for projects in Crawford and Dauphin counties.

Contact the Editor    Need Assistance?    More Latest News

**More News Headlines**    Popular News Stories

**Related Industry News**
- CRH buys Cemex operations in Florida, Arizona [Tampa Bay]
- Labor battle likely for Railyards site [Sacramento]
- Prince William looks to hire a BRAC coordinator [Washington, D.C.]
- UB officials present visions to community [Buffalo]
- Dignitaries turn out for arena groundbreaking [Wichita]

**Latest News**
- PerformRx to handle rebates for NationsRx
- Toll posts first quarterly loss as public company
- Penn Virginia completes note, stock offerings
- MedQuist cutting some workers
- NutriSystem shares rise on announcement of new meals line

**Business Pulse Survey**
Holiday shopping: mall or a mouse?

**Business Directory**
Find local business services by clicking on a category
- HVAC
- Data Backup
- Graphic Design
- Air Travel
- Corporate Recycling

**Business Re:**

**Starting Your Business**
Sponsored by MasterCard®
Growing niche: turn to "staging" homes.

**Sales & Marke**
Sponsored by Hoovers®
Not dead yet: T didn't let losing sale kill it.

**Building Your Business**
Sponsored by Contact®
Strong growth: strategies drive company forwar

**Technology**
Keeping an eye
Surveillance vid drives firm.

**HR & Careers**
Sponsored by SuccessFacto
Networking: Mo hires came from networks.

**Featured Job**
- Work for an
- Schedule Ar
- Military Frier Group
- Tax Manage
- Military Frier Group
    Search J

E



- Incorporation Services

**More Services:**
401K Plans

**FEATURED R**

**Post a Job & Re**
Post a job online
Salary Report - F

- Salary & Hour
- Bonus & Bene
- Skills, Experie

Click here to r

**Philadelphia**

**Featured Prop**
Rate: $15.00-$
Building Size: 1
Use Type: Leas

- More Philadel

**EXTRA**

## America's Fun Cities

We pick metros where good times roll

- America's 10 best cities for R&R
- Poll: Which city is your Fun City?
- Rankings for 50 markets

**Sponsored Li**

Electric U

### Search Press Releases

View all Philadelphia Press Releases
View ALL Press Releases

Search by Company, Organization, or Keyword
GO

Content provided by PR Newswire. Learn more about this service.




Use of, registration on, this site constitutes acceptance of our User Agreement. Please read our Privacy Policy

**ONLINE:** Home | Business News | Print Edition | Advertise | Marketplace | Business Resources | About Us | Search | RSS Feeds | Site FAQ | Contact Info | C
**PRINT EDITION:** Subscribe to Print Edition | Advertise | Book of Lists | Download Electronic Version | Article Reprints Rights
**BIZJOURNALS:** bizjournals | BizSpace.com | Jobs | bizwomen.com
**AFFILIATE PUBLICATIONS:** portfolio

© 2007 American City Business Journals, Inc. and its licensors. All rights reserved. The material on this site may not be reproduced, distributed, transmitted,
the prior written permission of bizjournals.